## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| TBB International Bank Corp., | |
| Plaintiff, | Civil Case No. |
| v. | |
| José Antonio Oliveros Febres Cordero; Alejandro J. Valencia Hurtado; Holding Activo Ltd.; Alexandra Oliveros Febres Cordero; María Eugenia Febres Cordero Zamora; José Antonio Oliveros Mora; Gorlio Enterprises Ltd.; El Retiro Group Ltd.; AIB Properties Limited Ltd.; Don Goyo Corporation Aviation; Inversiones Saitam, S.A.; Consultora Baru 2018, C.A.; Gustavo José Gerardo Corredor Salcedo; Alejandro Enrique Montenegro Díaz; Inversiones Elektrogorsk, C.A.; Intelinvest Casa de Valores, S.A., | |
| Defendants. | |

## COMPLAINT UNDER RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND OTHER LAWS

**TO THE HONORABLE COURT:**

**COMES NOW**, TBB International Bank Corp. (previously known as Activo International Bank, Inc.) (hereinafter, "TBB"), in this Complaint for damages and declaratory relief against defendants. In support of this Complaint, TBB alleges as follows:

## INTRODUCTION

1.     The defendants knowingly, willingly, and recklessly have engaged in a scheme to deceive Activo International Bank, Inc. (hereinafter, "Activo PR" or the "Bank") at present known as TBB of millions of dollars in the form of depleting assets of the Bank through several

loans which were approved in violation of federal and state bank regulations. The defendants have committed repeated predicate acts of wire fraud, mail fraud, and money laundering in furtherance of their fraudulent scheme. They have also engaged in theft by deception as well as other activities in furtherance of their conspiratorial and unlawful conduct. This lawsuit seeks to recover the amounts the defendants have wrongfully taken.

2.      The defendants and their co-conspirators have and have had overlapping ownership, management, and financial interests, which enables them to act in concert with each other and with multiple non-party co-conspirators to perpetrate the underlying scheme. Their scheme is nuanced and complex and requires the detail set forth in this Complaint to appreciate its scale, subtleties, and ongoing nature. TBB anticipates additional aspects and evidence demonstrating the scope and details of the defendants' and their co-conspirators' activity will be adduced through discovery and trial. This overview section and this Complaint aim to set forth basic facts that explain the general nature of the defendants' misconduct as it has impacted the Bank. Their actions and wrongdoing left the Bank in a negative capital position with no funds to repay all depositors or employees.

3.      As detailed below, the scheme had three different modalities totaling in excess of $29 Million.

4.      The first modality begins with an arrangement under credit facilities extended to related persons and/or entities that purports to permit the defendants and their co-conspirators (i) to transfer the funds to accounts in their control to cover other illegal transactions, and/or (ii) to ultimately benefit Defendants, and/or relatives and close associates in violation of federal and state banking regulations. As it turns out, these transactions were illegal for the reasons set out

below, and the defendants' scheme defrauded the Bank of more than $5.6 Million due to their adverse nature and performance required charged offs of the outstanding balance.

5.     In the second modality, the scheme adapts and morphs into a commercial arrangement that inextricably depends upon the supposed lawfulness of the imposition of prepaid services charges and that further enables the schemers to take a cut out of the prepaid services charges they impose on the Bank. TBB is still estimating the damages suffered by the Bank in this modality, but it paid entities in excess of $4.4 Million during this period.

6.     In its third modality, the scheme comprised the most extensive and blatant misuse of position and authority in diverting the Bank assets to collateralize loans for the Defendants' benefit through third-party financial institutions and standby letters of credit against the assets of the Bank. These funds were used to feed the fraud cycle of the different schemes, repayment of loans, and lifestyle with funds that belonged to the Bank and its depositors. Under this modality, Defendants defrauded the Bank in excess of $15.8 Million.

7.     In furtherance of these schemes, the defendants and their cohorts do everything they can to maintain a stream of funds available by allowing existing credit facilities of related persons and/or entities to increase the credit facilities, which would be transferred to the Defendants. The funds generated by the overdrafts were then transferred through the different accounts to settle other overdrafts, pay for existing loans, or to capitalize on the related banks. Defendants or their co-conspirators assert the right to generate transactions that further prolong their ability to move around monies illegally to the ultimate benefit of Defendants.

8.     As explained in the paragraphs and pages below, each aspect of the scheme modalities involves multiple false representations, concealment, and predicate acts of

racketeering. The transactions and the commercial arrangements are wholly illegitimate and unlawful.

9.      TBB is a corporation organized under the laws of the Commonwealth of Puerto Rico, licensed as an international banking entity by the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCFI") and based in San Juan, Puerto Rico. It offers demand, saving, money market, time deposits accounts, as well as personal and commercial loans to both individuals and businesses that are not residents of Puerto Rico.

10.     TBB was previously known as Activo PR, founded in 2008 as an international banking entity in Puerto Rico. Due to the mismanagement and the fraudulent schemes object of this Complaint, on February 10, 2020, the OCFI issued an Emergency Consent Order ordering the Activo PR to adopt and implement a Restructuring Plan to reestablish normal operations, thus meeting its obligations to its depositors and other creditors (the "Emergency Order").

11.     Activo PR was placed on an Emergency Order due to the financial crisis left by its shareholders, Board of Directors, and management. The financial crisis was reflected in the adjustments of the Financial Statements of 2019, which the institution had been carrying but never acknowledged or acted upon until no other funds were accessible, creating the liquidity crisis.

12.     The vast losses were attributed to the parties utilizing Activo PR's assets for personal use and funding third-party investments and loans to promote fraud schemes further. The third parties are family relatives, business associates, and close associates.

13.     These losses were attributed to investments in other foreign banks that had losses, loan losses that were issued to related individuals or entities that did not pay back the loan and acted as straw persons for loan fraud, credit card losses, using Activo PR's funds, investments,

and overpriced prepaid "outsourced" service contracts to capitalize and subsidize personal use and funnel funds for the continuation of the scheme.

14.     On March 5, 2020, Activo PR adopted the Restructuring Plan required by the Emergency Order.

15.     On March 6, 2020, the OCFI issued a Consent Order Lifting the Emergency Order and accepting the Restructuring Plan and other orders to implement the Restructuring Plan.  Among the requirements of the OCFI in the Restructuring Plan was removing defendant José Antonio Oliveros Febres-Cordero (hereinafter, "Oliveros") and defendant Alejandro J. Valencia Hurtado ("Valencia") from the management of the Bank and ownership of the Bank.

16.     During the restructuring process, TBB has had to work with clients and their financial needs, reorganize business operations, raise capital for 2019 declared losses, overhaul the Credit Management, Compliance, and Accounting program, and other areas to correct deficiencies noted in an OCFI consent order for 2018, all while maintaining the longevity of the Bank.

17.     The deficiencies noted in the Credit, Compliance, and Accounting programs were structured by management and the Board of Directors to aid the fraud schemes through a lack of internal controls, independence, and lack of policies and procedures with checks and balances. In addition, the activities were strictly controlled by the Defendants and their co-conspirators. As a result of the various corrective actions, the following items came to light which attributed to the root cause that led to the financial crisis of the Bank

18.     Defendant José Antonio Oliveros Febres-Cordero (hereinafter, "Oliveros") is the former Director and Chairman of the Board of Directors of the Bank until April 29, 2020. He was a majority shareholder of Holding Activo Ltd. ("Holding Activo"), the shareholder and

owner of the Bank until August 2020. Defendant Oliveros also possessed an interest in Banco Multiple Activo Dominicana, S.A. (hereinafter, "Activo Dominicana"), located in the Dominican Republic, and Banco Activo Banco Universal (hereinafter, "Banco Universal"), located in Venezuela, both related entities. He utilized the Bank, its related entities, and the bank accounts of related persons and/or entities as instruments to carry out the fraudulent schemes previously described.

19.     Defendant Valencia is the former Director and Executive President of the Bank until April 29, 2020. In conjunction with Defendant Oliveros, he utilized the Bank, its related, and the bank accounts of related persons and/or entities as instruments to carry out the fraudulent schemes previously described. Defendant Valencia misused his position of power in the Bank to authorize illegal transactions. He failed his fiduciary responsibilities and also benefited from the wrongful activity.

20.     Defendant Holding Activo Ltd. ("Holding Activo") is the sole shareholder of the Bank and is controlled by Defendant Oliveros. It was one of the entities utilized to carry out the previous fraudulent schemes. Defendant Holding Activo allowed itself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities.

21.     Defendant Alexandra Oliveros Febres-Cordero (hereinafter, "Alexandra") is the sister of Defendant Oliveros. She was a customer of the Bank and owner, shareholder, and/or executive of various entities utilized to carry out the previously described fraudulent schemes. Defendant Alexandra allowed herself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities.

22.     Defendant María Eugenia Febres-Cordero Zamora (hereinafter, "María Eugenia") is the mother of Defendant Oliveros. She was a customer of the Bank and owner, shareholder,

and/or executive of various entities utilized to carry out the previously described fraudulent schemes. Defendant María Eugenia allowed herself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities.

23.     Defendant José Antonio Oliveros Mora (hereinafter, "Oliveros Mora") is the father of Defendant Oliveros. He was a customer of the Bank and owner, shareholder, and/or executive of various entities utilized to carry out the previously described fraudulent schemes. Defendant Oliveros Mora allowed himself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities.

24.     Defendant Gorlio Enterprises Ltd. ("Gorlio Enterprises") is a company wholly owned by Defendants Alexandra and María Eugenia. It was a customer of the Bank and one of the entities utilized to carry out the previous fraudulent schemes. Defendant Gorlio Enterprises allowed itself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities. As per account opening documentation, the entity's line of business was the purchase and sale of real estate.

25.     Defendant El Retiro Group Ltd. ("El Retiro") is a company wholly owned by Defendants Alexandra and María Eugenia. It was a customer of the Bank and one of the entities utilized to carry out the previous fraudulent schemes. Defendant El Retiro Group LTD allowed itself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities.

26.     Defendant AIB Properties Limited Ltd. ("AIB Properties Limited") is a company wholly owned by Defendant El Retiro Group Ltd, which in turn, it is wholly owned by Defendants Alexandra and María Eugenia. It was a customer of the Bank and one of the entities utilized to carry out the fraudulent schemes previously described. Defendant AIB Properties

Limited allowed itself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities.

27.     Defendant Don Goyo Aviation Corporation ("Don Goyo Aviation") is, on information and belief, a company wholly owned by Defendant Oliveros Mora. It was a customer of the Bank and one of the entities utilized to carry out the previous fraudulent schemes. Defendant Don Goyo Aviation allowed itself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities.

28.     Defendant Inversiones Saitam, S.A. ("Inversiones Saitam") was a company retained by the Bank to provide a variety of services on a prepaid basis for the new client capture and onboarding. Defendant Gustavo José Corredor Salcedo (hereinafter, "Corredor") was the acting manager and assigned through a power of authority extended by Defendant Valencia, the brother-in-law of Defendant Valencia. It shared the same business address, employees, supplier, and manager with Consultora Baru 2018 CA.

29.     Defendant Consultora Baru 2018 CA ("Consultora Baru") was a company retained by the Bank to provide a variety of services on a prepaid basis. It was managed by Defendant Corredor, the brother-in-law of Defendant Valencia, and shared the same business address, employees, supplier, and manager with Defendant Inversiones Saitam.

30.     Defendant Corredor assisted in furthering the Prepaid Services scheme by managing the sham companies that Defendants Oliveros and Valencia utilized to move money from the Bank to other related accounts to pay for loans, credit facilities, overdrafts, and make capital contributions to the affiliate banks. In addition, Defendant Corredor was involved in some operational duties within the Bank, which posed a conflict of interest. Those duties involved account opening documentation, requesting client information on transactional activity, placing

transactional requests for clients, and customer service. Defendant Corredor would also act as the Operations Manager of the Bank on occasion.

31.    Defendant Alejandro Enrique Montenegro Díaz (hereinafter, "Montenegro") is a shareholder of Holding Activo. He was a customer of the Bank and owner, shareholder, and/or executive of various entities utilized to carry out the previously described fraudulent schemes. Defendant Montenegro was a conduit of fraud and wrongdoing, as permitted by Defendant Oliveros. It is important to note that Defendant Montenegro was the beneficiary of several losses to the Bank, totaling in excess of $3.2 Million. These charge-offs include Corporación Caribbean Fly, Sandky Marine, C.A., Inversiones Lietuvos, C.A., Grupo Paprika, C.A., and Inversiones 261186, C.A, totaling $2,040,019.40.[1]

32.    Defendant Inversiones Elektrogorsk, C.A. ("Elektrogorsk") is a company related to Defendant Montenegro. It was a customer of the Bank and one of the entities utilized to carry out the previous fraudulent schemes. Defendant Elektrogorsk allowed itself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Montenegro to benefit from the illegal activities, representing a loss of $1.2 Million for the Bank.

33.    Defendant Intelinvest Casa de Valores, S.A. ("Intelinvest") is a broker-dealer in which the Bank held its investment portfolio. It was also a customer of the Bank and one of the entities utilized to carry out the previous fraudulent schemes. Defendant Intelinvest allowed itself to be used as a conduit of fraud and wrongdoing, as a front for Defendant Oliveros to control the illegal activities.

34.    The fraudulent schemes here flow from multiple elements, some of which include:  (i) Defendants Oliveros and Valencia taking advantage of their positions of power in

---

[1] TBB filed five (5) lawsuits against Defendant Montenegro in the Puerto Rico Court of First Instance for breach of contract, unjust enrichment, and fraudulent donation for the combined losses of $2,040,019.40.

the Bank to authorize and manipulate monitoring systems in order to execute the loans, credit facilities, and overdrafts to further the schemes; (ii) sham and intertwined relationships between Defendants Holding Activo, Gorlio Enterprises, El Retiro Group, AIB Properties Limited, Don Goyo Aviation, Inversiones Saitam, Consultora Baru, Intelinvest; (iii) the defendants' efforts to remove their scheme from the regulated banking industry through the use of supposedly legitimate prepayment arrangements in commercial contracts (the "Prepaid Services").

35.    In this case, the defendants' actions are part of a large fraudulent scheme against the safety and soundness of the banking industry, including now against the Bank.   The representations made throughout the loans, credit facilities, and overdrafts applications were false, as neither those customers, related persons and/or entities of Defendant Oliveros were legitimate end-user customers, and the defendants concealed material information.

36.    Moreover, the defendants utilized the Bank's assets as collateral and/or guarantee for loans extended to related third parties by third-party financial institutions. Ultimately, the beneficiaries of those transactions were others to the detriment of the Bank's financial health.

37.    Further, the services provided under the Prepaid Services do not match the charges imposed or the representations made to the Bank to execute the agreements for Inversiones Saitam and Consultora Baru. That was a patent overcharging for limited services rendered outside the United States. Moreover, the funds paid as part of this scheme were often rerouted to pay Banco Universal directors' dividends, bonuses for Banco Universal employees, payment of related third-party loans, and funds for Defendants Oliveros and Valencia, and related persons and entities.

38.    Defendants Oliveros and Valencia also entered into agreements for Activo PR's assets to be used for collateral and guarantees in foreign banks to benefit related third parties.

These fraudulent agreements put the Bank's liquidity at risk and circumvented Puerto Rico law prohibiting a shareholder and director from benefiting from loans. As such, proper credit management, process, approval, or documentation could not be acquired.

39.     All defendants have been conjoined and associated in many direct and indirect ways.  Sometimes in whole and sometimes in part, they have common employees, ownership, investors, executives, and physical locations.  They are all in business to profit from their efforts to defraud and manipulate the Bank (and others like it).  The defendants were not genuine end-user customers.

40.     As noted, to their profiteering ends, Defendant Oliveros and Valencia created schemes in which they utilized their position in the Bank to approve loans and credit facilities, approved collateral for related third parties loans with Bank assets, and utilized Bank funds and investments that were extended to the accounts of related persons and/or entities. By creating a façade of somewhat standard everyday transactions, they concealed an in-place scheme to divert the Bank's depositors' funds to ultimately beneficiate the defendants. They, instead, are insular arrangements between and among closely related parties created to provide them a hook to divert funds for illegal purposes.  Those arrangements are gimmicks, albeit difficult ones to detect.

41.     Defendants are likewise not independent and credible end-customers of the loans, credit facilities, prepaid outsourced services, and related third-party loan guarantees with Bank assets extended by the Bank. They are deeply connected and related to Defendants Oliveros and Valencia in numerous aspects of their operations to benefit themselves, their relatives, and close associates.

42.     Similarly, the main function of the Prepaid Services scheme thus appears to be a laundering effort in order to divert the Bank's funds, through which the defendants try to use

Inversiones Saitam and/or Consultora Baru as vehicles to circumvent the regulated context (where it could be even more heavily scrutinized and, indeed, found unlawful) and into the private commercial context.  It is a deceptive means to try to evade and escape regulation.

43.     The facts in the foregoing paragraphs are not easy to discover.  The defendants have taken careful and deliberate steps to conceal their misconduct by layering activity.  They laundered their scheme through seemingly legitimate commercial contracts with supposedly genuine entities and made repeated explicit and false representations.

44.     The defendants do not tell the truth.  Their representations to the Bank on the key facts here have been deliberately false.  The loans, credit facilities, overdrafts, and related third-party guarantees extended by the Bank have been approved under false premises to circumvent federal and state regulations. Those funds were sent over the interstate wires. Also, each payment requests the Bank received and paid under the Prepaid Services has been riddled with illegal overcharges and sent over the interstate wires. The usage of Prepaid Services was not aligned with its stated business.

45.     The defendants created a framework of fraudulent schemes to use the Bank's depositor's funds for personal gain, lifestyle, and criminal activity, similar to using a "piggy bank" with total disregard for ethics, integrity, banking laws, and regulations under Puerto Rico and the United States.

46.     In summary, the defendants' scheme can be viewed as consisting of four separate but related modalities.

   a.   The first modality begins with the defendants' requesting and granting loans and credit facilities from the Bank—not independent arrangements because the entities are connected in the many ways described here.  The customers who were

extended these loans, credit facilities, and/or overdrafts were mere conduits ultimately controlled by Defendants Oliveros and Valencia. Unbeknownst, these loans and credit facilities extensions to its different customers were shams as they were no legitimate and true end-user customers.  The framework was put in place to circumvent state regulations that prohibited the officers and directors from being granted loans without the previous authorization of the OCFI. The loans and credit facilities in the defendants' scheme are illegal.

b.  In the second modality, the Bank was approached by Inversiones Saitam and Consultora Baru, purportedly separate companies that are actually operated and managed by Defendant Corredor though a power of authority extended by Defendant Valencia, the brother-in-law of Defendant Valencia. They shared the same business address, employees, supplier, and at some point, the manager. Defendants Oliveros and Valencia, and the other defendants made representations (described in this Complaint) about the legitimacy of the prepaid services that can be imposed on the Bank but offered to enter into a commercial arrangement on the false basis that the commercial arrangement would provide some (lawful) element. The defendants used the Bank to enter those contracts on the supposed notion that the charges of prepaid services were legitimate.  The actual motivation for the approach to use commercial contracts is that the defendants knew throughout their scheme that the illegality eventually would come to light.  They believed using a commercial contract would enable them to escape oversight. The contracts, thus, were an evasive tactic to extend their scheme as long as

possible before the regulatory regime caught up to them. Thus, resulting in funneling the Bank's funds to illegitimate activity.

c. In the third modality, the defendants utilized Bank assets to guarantee loans obtained by related third parties at foreign banks for their own benefit. The borrowed funds were then used to pay related loans, lifestyle, and investments, and capitalize Activo PR with its own funds. Those loans at foreign banks were never repaid, prompting the issuing banks to seize the collateral, thus affecting the Bank's assets.

47. All of this conduct is racketeering activity of the first order.  The defendants are perpetrating this scheme in furtherance of an association-in-fact enterprise consisting of:

a. Defendants Oliveros and Valencia, while acting as directors, shareholders, and officers of the Bank, directed and provided all necessary instructions and approvals to further the schemes;

b. Defendant Holding Activo, the majority shareholder of the Bank and controlled by Defendant Oliveros, was utilized as a conduit to perpetrate the schemes further;

c. Defendants Alexandra and María Eugenia, respectively, the sister and mother of Defendant Oliveros, willingly provided their identities to open accounts and register entities under their name to transfer the funds utilized in the schemes;

d. Defendant Oliveros Mora, the father of Defendant Oliveros, willingly provided his identity to open accounts and register entities under his name to transfer the funds utilized in the schemes;

e.    Defendant Gorlio Enterprises, wholly owned by Defendants Alexandra and María Eugenia but ultimately controlled by Defendant Oliveros, designed to present a false air of credibility and as a means to circumvent federal and state regulations concerning the extension of loans, credit facilities, and overdrafts. It was also used as a means to purchase and sale real estate;

f.    Defendant El Retiro Group, wholly owned by Defendants Alexandra and María Eugenia but ultimately controlled by Defendant Oliveros, designed to present a false air of credibility and as a means to circumvent federal and state regulations concerning the extension of loans, credit facilities, and overdrafts. It was also used as a means to purchase real estate;

g.    Defendant AIB Properties Limited, wholly owned by El Retiro Group Ltd, which in turn is wholly owned by Defendants Alexandra and María Eugenia, but ultimately controlled by Defendant Oliveros, designed to present a false air of credibility and as a means to circumvent federal and state regulations concerning the extension of loans, credit facilities, and overdrafts. It was also used as a means to purchase real estate;

h.    Non-party co-conspirators González and Vizcarrondo, as Operations Manager and Comptroller of the Bank, respectively, aided defendants in carrying out the transactions to bypass internal and external monitoring systems;

i.     Defendants Inversiones Saitam and Consultora Baru, companies registered in Venezuela that the Bank retained to provide their services, whose "prepayments" facilitate the defendants' activity;

j.     Defendant Corredor, the brother-in-law of Defendant Valencia, as acting manager of Defendants Inversiones Saitam and Consultora Baru, participates in the scheme, which has signed and billed the Bank under the Prepaid Services arrangements, and which has separately invoiced the Bank for false and unlawful charges;

k.     Defendant Montenegro, a shareholder of Holding Activo, was a willing participant and benefited from the various fraud schemes permitted by Defendant Oliveros;

l.     Defendant Elektrogorsk, related to Defendant Montenegro, , designed to present a false air of credibility and as a means to circumvent federal and state regulations concerning the extension of loans, credit facilities, and overdrafts;

m.     Defendant Intelinvest, the Bank's broker-dealer, created a structure and an operation intending to divert Bank's funds and assets to further the schemes as directed by Defendant Oliveros;

n.     On information and belief, other persons and entities provided the defendants or non-party co-conspirators with the means to request and approve loans, credit facilities, and/or provide collateral or guarantees with the Bank's assets for related third parties on their behalf to further the fraudulent and illegal schemes.

48.     This racketeering activity was closed-ended in continuity.  It encompasses the defendants' practices covering multiple years, with a specific direction toward the Bank since at least 2015.

49.     It is possible that additional parties and claims may be added to this case as discovery proceeds, including one or more of the co-conspirators and others.  There may be other individuals and/or legal entities to which monies were directed, and revenues shared. Different entities may be involved in the pathways supposedly needed to reach those entities.

50.     The scheme also reflects the defendants' model applied to the industry at large. There may have undoubtedly been other victims besides the Bank, and detailed descriptions of the impact of the racketeering scheme on other victims in the industry will be added to this one as the case proceeds.  In its current format, this iteration of the Complaint focuses primarily on the transactions between the Bank and the Defendants.  Discovery may show that the scheme directed against the Bank goes much further than just the traffic of monies described in this Complaint.  This Complaint addresses the scheme as it is understood at this point. Still, TBB anticipates that discovery may show that other individuals and/or entities are involved, that the scheme has additional components, and that the damages are more widespread.

51.     This Court's intervention is needed.  TBB seeks declaratory and monetary relief to remedy the harm the defendants have inflicted.

## THE PARTIES

52.     Plaintiff TBB is a corporation organized under the General Corporations Act of Puerto Rico. It is licensed as an international banking entity under Act No. 52 of August 11, 1989, as amended, better known as the Puerto Rico International Banking Center Regulatory Act ("Act 52"). TBB's license number under the OCFI is EIB-059, issued on March 30, 2009. TBB's

office and principal place of business are located at 221 Ponce de León, Suite 1101, San Juan, Puerto Rico 00917. TBB is the successor of the Bank.

53.     Defendant José Antonio Oliveros Febres-Cordero was the Director and Chairman of the Board of Directors of the Bank from March 2009 through April 2020. He is a citizen of the Bolivarian Republic of Venezuela. On information and belief, his domicile is 901 Brickell Key Blvd., #603, Miami, Florida, 33131. Defendant Oliveros was a majority shareholder of Holding Activo, the whole owner of the Bank. He also possessed an interest in Banco Multiple Activo Dominicana, located in the Dominican Republic, and Banco Activo Banco Universal, located in Venezuela, related entities to the Bank.

54.     Defendant Alejandro J. Valencia Hurtado was the Director and Executive President of the Bank from January 2012 through April 2020.  Defendant Valencia is a United States citizen. On information and belief, his domicile is located at 4471 Foxtail Lane, Weston, Florida 33331. Defendant Valencia was a shareholder of Holding Activo, the sole owner of the Bank.

55.     Defendant Holding Activo Ltd. is an entity organized, existing, and doing business under and by virtue of the laws of Barbados. Holding Activo's office and principal place of business are located at Amicorp Barbados LTD., Coniston Bush Hill the Garrison, St. Michael FC. On information and belief, it is wholly owned by Defendants Oliveros, Valencia, Montenegro, as well as by Anaheim Equities Corp., Daniel Yepez González, José Miguel Contreras Santos, and Miguel Eduardo Archilla Morales. Defendant Oliveros had an 82.25% interest in Holding Activo, followed by Defendant Valencia with a 10.01% interest and Defendant Montenegro with a 4% interest. Holding Activo was the majority shareholder of the Bank.

56.     Defendant Alexandra Oliveros Febres-Cordero is the sister of Defendant Oliveros. Defendant Alexandra is a citizen of the Bolivarian Republic of Venezuela. On information and belief, her domicile is located at 20000 East Country Club Drive, Apt. 601, Aventura, Florida, 33180. Defendant Alexandra was a customer of the Bank.

57.     Defendant María Eugenia Febres-Cordero Zamora is the mother of Defendant Oliveros. Defendant María Eugenia is a citizen of the Bolivarian Republic of Venezuela. On information and belief, her domicile is located at 20000 East Country Club Drive, Apt. 601, Aventura, Florida, 33180. Defendant María Eugenia was a customer of the Bank.

58.     Defendant José Antonio Oliveros Mora is the father of Defendant Oliveros. Defendant Oliveros Mora is a citizen of the Bolivarian Republic of Venezuela. On information and belief, his domicile is located at 19707 Turnberry Way Apt #23B, Aventura, Florida 33180. Defendant Oliveros Mora was a customer of the Bank.

59.     Defendant Gorlio Enterprises Ltd. is an entity organized, existing, and doing business under and by virtue of the laws of the British Virgin Islands. Gorlio Entrerprises' office and principal place of business are located at 20000 East Country Club Drive, Apt. 601, Aventura, Florida, 33180. On information and belief, it is wholly owned by Defendants María Eugenia and Alexandra, although Defendant Oliveros controls it. Gorlio Enterprises was a customer of the Bank and was extended a standby letter of credit.

60.     Defendant El Retiro Group Ltd. is an entity organized, existing, and doing business under and by virtue of the laws of the British Virgin Islands. El Retiro Group's office and principal place of business is located at Calle Otama QTA Darlingi, Urbanización Valle Arriba, Caracas, Venezuela. On information and belief, it is wholly owned by Defendants María

Eugenia and Alexandra, although Defendant Oliveros controls it. El Retiro Group was a customer of the Bank.

61.     Defendant AIB Properties Limited Ltd. is an entity organized, existing, and doing business under and by virtue of the laws of Barbados. AIB Properties Limited's office and principal place of business are located at AMICORP Barbados LTD. 2nd Floor Carelton Court High Street Bridgetown, St, Michael FC, Barbados.   On information and belief, it is wholly owned by El Retiro Group LTD, which in turn is wholly owned by Defendants María Eugenia and Alexandra, although Defendant Oliveros controls it. AIB Properties Limited was a customer of the Bank and received from Inversiones Saitam funds that were payments for Prepaid Services.

62.     Defendant Don Goyo Aviation Corporation is an entity organized, existing, and doing business under and by virtue of the laws of the State of Delaware. Don Goyo Aviation's office and principal place of business are located at 251 Little Falls Drive, Wilmington, New Castle, Delaware, 19808. On information and belief, it is wholly owned by Defendant Oliveros Mora, although Defendant Oliveros controls it. Don Goyo Aviation was a customer of the Bank and was extended overdrafts. It also sold an aircraft that the Bank bought.

63.     Defendant Inversiones Saitam, S.A. is an entity organized, existing, and doing business under and by virtue of the laws of the Bolivarian Republic of Venezuela. Inversiones Saitam's office and principal place of business are located at Ave. Francisco de Miranda, Torre Europa, Piso 6, Oficina 6-B, El Rosal, Caracas, Venezuela.   Defendant Inversiones Saitam offered services to the Bank that were part of the Prepaid Services.

64.     Defendant Consultora Baru 2018, C.A. is an entity organized, existing, and doing business under and by virtue of the laws of the Bolivarian Republic of Venezuela. Defendant

Consultora Baru's office and principal place of business are located at Ave. Francisco de Miranda, Torre Europa, Piso 6, Oficina 6-B, El Rosal, Caracas, Venezuela. Defendant Consultora Baru offered services to the Bank that were part of the Prepaid Services.

65.      Defendant Gustavo José Gerardo Corredor Salcedo was the acting manager of Inversiones Saitam and Consultora Baru. He was also the brother-in-law of Defendant Valencia. Defendant Corredor is a citizen of the Bolivarian Republic of Venezuela. On information and belief, his domicile is located at 4240 Oaks Terrace Apartment 202, Pompano Beach, Florida 33069.

66.      Defendant Alejandro Enrique Montenegro Díaz was a shareholder of Holding Activo, the whole owner of the Bank. Defendant Montenegro is a citizen of the Bolivarian Republic of Venezuela. On information and belief, his domicile is located at Ave. Los Mangos, Edif. Vista Encanto, Piso 2 Apto 24-B, Urb. Los Chorros, Caracas, Venezuela.

67.      Defendant Inversiones Elektrogorsk, C.A., is an entity organized, existing, and doing business under and by virtue of the laws of the Bolivarian Republic of Venezuela. Defendant Elektrogorsk's office and principal place of business are located at Esq. Pichincha, Edif. Cine El Dorado, Piso PB, Urb. Quinta Crespo, Caracas, Venezuela. Defendant Elektrogorsk was a customer of the Bank and was extended a standby letter of credit.

68.      Defendant Intelinvest Casa de Valores, S.A., is an entity organized, existing, and doing business under and by virtue of the laws of the Republic of Panama. Defendant Intelinvest's office and principal place of business are located at Torre de las Américas, Torre C Piso 29, Oficina 2905 Ciudad de Panamá, Panamá. Defendant Intelinvest offered brokerage services to the Bank.

## NON-PARTY CO-CONSPIRATORS

69.     Non-party conspirator Lawrenz González Rattia was the Operations and Technology Manager of the Bank from 2013 until his resignation in June 2020.  González was a transaction facilitator in many instances, using batch processing to circumvent proper monitoring of illegal transactions in the Bank. In addition, González worked closely with the relationships of Inversiones Saitam, Consultora Baru, and Defendant Corredor.

70.     Non-party conspirator Francisco Vizcarrondo Nazario was the Comptroller of the Bank until his dismissal in May 2020.  Vizcarrondo was a transaction facilitator in many instances, using batch processing to circumvent proper monitoring of illegal transactions in the Bank.

71.     The non-party co-conspirators are linked substantially to the defendants, and the defendants and the non-party co-conspirators view themselves as part of the same enterprise. The transactions were dated at least from November 30, 2015, forward, and the funds were transferred by interstate wire. Communications about these transactions were discussed via interstate email, phone calls, and text messages.  Defendants Oliveros and Valencia provided the framework and instructions to the non-party conspirators to further the schemes. The non-party conspirators were active assistants in carrying out the illegal transactions and providing a façade. It reaffirms that these entities are all run by and through the same persons and are all participants in the scheme described here.

## JURISDICTION AND VENUE

72.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

73.     This Court likewise may issue declaratory relief under 28 U.S.C. § 2201.

74. This Court also has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332, inasmuch as Plaintiff and Defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.00.

75. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because the defendants are subject to personal jurisdiction in this judicial district, and the defendants conducted substantial business in this district. TBB is based in this district, and all monies part of this fraudulent scheme were withdrawn from the Bank, now TBB, in Puerto Rico.

## FACTUAL ALLEGATIONS

### A.   Puerto Rico International Banking Framework

76. After considering that the economic conditions were favorable for Puerto Rico to become an international banking center, the Puerto Rico Legislative Assembly enacted Act 52. *See* Statement of Motives, Act No. 52 of August 11, 1989.

77. Act 52 provides for the establishment of international banking entities under the supervision and regulation of the OCFI.

78. Pursuant to Act 52, an international banking entity authorized may not grant any kind of financing or credit to any of its directors, officers, employees, or stockholders, except when previously authorized in writing by the OCFI. *See* 7 L.P.R.A § 232j(b)(6).

79. Act 52 envisions that any official or employee of an international banking entity, who, on behalf of such international banking entity, receives any deposit or contract for a loan with the knowledge that the international banking entity is insolvent, commits a felony subject to imprisonment, a fine, or both. *See* 7 L.P.R.A § 232p(b).

23

80.     Further, any director, official, or employee of the international banking entity, who illegally appropriates, embezzles, removes, or voluntarily misuses any money, funds, credits, or securities of an international banking entity, or who, without due authorization, issues or draws any certificate of deposit, draws any order or bill of exchange, carries out any type of acceptance or assignment of a note, bond, money order, bill of exchange, and any person who, with the same intention, aids or abets any director, official or employee in pursuing the conduct prescribed before, commits a felony subject to imprisonment, a fine, or both. *See* 7 L.P.R.A § 232p(c).

**B.     Establishment of the Bank in Puerto Rico**

81.     On September 30, 2008, Activo PR, or the Bank, was authorized in Puerto Rico to accept and demand fixed-term deposits, as well as interbank deposits from non-Puerto Rico residents. It is also authorized to borrow from other international banking entities, foreign persons, Puerto Rico Government Development Bank, and the Puerto Rico Economic Development Bank.

82.     The Bank was wholly owned by Holding Activo, an entity organized, existing, and doing business under and by virtue of the laws of Barbados. Holding Activo was owned by Defendant Oliveros, Defendant Valencia, Defendant Montenegro, Anaheim Equities Corp., Daniel Yepez González, José Miguel Contreras Santos, and Miguel Eduardo Archilla Morales.

83.     During the tenure of Defendant Oliveros as Chairman of the Board of Directors, and Defendant Valencia, as Director and Executive President, the Bank became insolvent with negative capital by reason of significant losses due to transactions that benefited Defendants Oliveros and Valencia and their related parties. Defendants Oliveros and Valencia totally controlled the Bank.

84.     On or around February 10, 2020, the OCFI issued the Emergency Order, which ordered a restructuring of the Bank due to the critical financial condition and liquidity position to protect the interest of the depositors.

85.     On or around March 6, 2020, the OCFI accepted the proposal submitted for the restructuring of the Bank, and on May 4, 2020, the Bank changed its name to "TBB International Bank Corp." The restructuring also resulted in a change in control of the previously named parties.

86.     Although the new management of the Bank, had some understanding of the financial difficulties facing the Bank, it was not until they engaged in managing the affairs of the Bank that they became suspicious of the activities and transactions carried out by the defendants and non-party conspirators and the extent of the losses they caused the Bank to suffer. It was not until now that TBB was able to decipher the schemes or artifices designed by defendants to defraud the Bank. TBB anticipates that the misconduct may extend to other transactions that have not come to light yet.

C.     **Defendants' Schemes**

87.     In what is known as loan fraud and assignment of guarantees for related third-party loans schemes, Defendants Oliveros and Valencia took advantage of their controlling position at the Bank to approve and grant loans, and credit facilities, mandate the operational structure, and Bank assets placed to related persons and entities from which they would ultimately obtain monetary benefits.

88.     The money secured from the loans and credit facilities obtained by different Bank customers was not used for the purposes disclosed in the loan applications by each customer but instead funded a loan and credit facility fraud scheme.

89.     Further, Defendants Oliveros and Valencia used contractual arrangements with corporate entities that supposedly provided services to the Bank to divert money through Prepaid Services. In reality, the money paid by the Bank for the Prepaid Services was transferred to other accounts owned by related persons and/or entities to pay for other loans, credit facilities, overdrafts, or capitalize the Bank's related entities.

90.     During the course of the schemes, Defendants Oliveros and Valencia also controlled and/or operated other entities incorporated in Puerto Rico, Venezuela, Barbados, British Virgin Islands, Delaware, and Florida, in order to conduct businesses that funneled the funds.

91.     Defendant Valencia was the executive involved in the day-to-day functions of the Bank, and these operations involved various schemes. On information and belief, he was the one who made all business decisions and directed the daily activities of the Bank.

92.     Regulators and others have given increasing levels of scrutiny to these types of arrangements, known as fraud schemes.

93.     As explained throughout this Complaint, the schemes perpetrated by these defendants are wholly illegitimate.

**D.     The Credit Facility and Loan Scheme**

94.     Many of the elements of the defendants' scheme have been in place for multiple years.  The defendants' conduct in furtherance of this particular aspect of their illegal enterprise dates are between 2015 and 2016 and continuing until 2020.  Events in roughly the past couple of years have seen the defendants adapt and modify their larger scheme.

95.     As demonstrated in this Complaint, the defendants falsely represented that loans and credit facilities were requested, approved, and extended pursuant to the purposes disclosed in

the applications.   As explained throughout this Complaint, the defendants and non-party conspirators also controlled and concealed the information necessary for the Bank to monitor the fraudulent loans and credit facilities internally and avoid them being extended.

96.     The loans and credit facilities in its majority were unsecured without any collateral or guarantees, and the terms were usually interest only with a balloon payoff payment.

97.     The Bank transferred each of the funds approved under the loans and credit facilities through electronic payment.   The defendants deposited the loan funds that the Bank extended into bank accounts located in Puerto Rico.

**Customer A**

98.     On February 9, 2017, the Bank extended a loan of $1.2 Million to Customer A.

99.     Then, on March 22, 2017, Customer A transferred $1 Million to Gorlio Enterprises. As stated previously, Gorlio Enterprises is wholly owned by Defendants María Eugenia and Alexandra, although Defendant Oliveros controls it. Defendants María Eugenia and Alexandra are, respectively, the mother and sister of Defendant Oliveros. Gorlio Enterprises used the funds transferred to pay a loan debt with the Bank.

100.     The loan extended to Customer A currently has an outstanding debt of approximately $1.2 Million. Customer A has claimed that Defendant Oliveros promised to repay at least $900,000.00, as he executed a sworn statement acknowledging responsibility for the debt until that amount.

101.     The default by Customer A on the loan payment has represented a loss to the Bank of approximately $1.2 Million plus interest owed.

102.     Once again, Defendant Oliveros utilized an unrelated account to obtain financing from the Bank to circumvent the prohibition contained in Act 52, which prohibits an

international banking entity from granting financing to its shareholders, directors, officers, or employees without authorization of the OCFI.

103.    As shown, the aforementioned loans were ultimately linked to Defendant Oliveros and/or entities related to or controlled by him or close associates. Those loans or letters of credit were approved by Defendants Oliveros and/or Valencia in their official capacity as directors and officers of the Bank. The proceeds obtained by the different customers were then transferred to Defendant Oliveros' personal account at the Bank or to an account belonging to an entity related to or controlled by him. Defendant Oliveros used the funds for his benefit or the benefit of his related entities. In most instances, the debts remained outstanding, resulting in losses to the Bank.

104.    At least from March 2017, the defendants have made at least one transaction over the interstate wires to transfer the funds obtained from the loan and credit facilities scheme. These transactions improperly and illegally sought to circumvent Act 52 and the Bank's required controls, clearly defrauding the Bank as they resulted in losses.  They amount to wire fraud committed by members of the conspiracy and components of the Enterprise, all in furtherance of the fraudulent scheme.  These transactions were dated from at least March 2017 forward and were transmitted over wires and internal transfers.

105.    Each of those transactions, in whole or in part, was improper and unlawful for the reasons described in this Complaint and resulted in losses to the Bank.

106.    The above examples of transactions are not meant to be exhaustive and only reflect the portions of the overall scheme involving the defendants and the Enterprise. As explained, TBB anticipates that the misconduct may extend to other transactions and reserves all rights to amend this Complaint as more information comes to light.

**E.     The Prepaid Services Scheme**

107.     As discussed in this Complaint, Defendants Oliveros and Valencia executed services contracts with Inversiones Saitam and Consultora Baru to provide services to the Bank by means of a prepaid services arrangement. However, the prepaid services were not rendered as agreed. Instead, the funds of the prepayments made by the Bank to Inversiones Saitam and Consultora Baru were transferred to accounts related to and/or under the control of Defendant Oliveros. As explained throughout this Complaint, the defendants and non-party conspirators authorized those prepaid services and controlled and concealed the information necessary for the Bank to internally monitor the fraudulent commercial arrangements.

108.     Defendant Corredor was the acting manager of Defendants Inversiones Saitam and Consultora Baru through a power of authority extended by Defendant Valencia, granted on November 18, 2015. Whether Defendant Valencia had a beneficial interest in Defendants Inversiones Saitam and Consultora Baru is unknown.

109.     On information and belief, the defendants' conduct in furtherance of this aspect of their illegal enterprise dates back at least to 2017.

110.     The Bank transferred each of the prepayments through internal transfer payment. The defendants transferred those funds into bank accounts located in Puerto Rico.

111.     On or around March 1, 2014, and March 1, 2019, the Bank executed contracts with Defendants Inversiones Saitam and Consultora Baru, respectively. Both companies were registered in Venezuela. The Bank retained the companies to provide marketing services for the acquisition of customers, as well as limited compliance assistance and call center services.

112.     The Bank sent periodic prepayments to Defendants Inversiones Saitam and Consultora Baru to cover the services to be rendered. For example, the Bank would be paid for

the prepaid service within eighteen (18) months. The remaining prepaid balance of both was $2.63 Million if amortized for the stipulated time frame, representing a payment of $146,000 monthly for services. In addition, Defendant Inversiones Saitam would receive quarterly payments.

113.    Further, the funds obtained through the prepayments were utilized to pay the loan of debts of companies related to and/or controlled by Defendants Oliveros and Valencia, as well as related associates.

**Gorlio Enterprises Ltd.**

114.    On December 28, 2017, Defendant Inversiones Saitam received a payment of $345,000.00 for the prepaid services it provided to the Bank.

115.    On that same date, December 28, 2017, Defendant Inversiones Saitam transferred $345,000.00 from its account in the Bank to the account of Defendant Gorlio Enterprises.

116.    On information and belief, it is wholly owned by Defendants María Eugenia and Alexandra, although Defendant Oliveros controls it. Defendants María Eugenia and Alexandra are, respectively, the mother and sister of Defendant Oliveros.

117.    Defendants utilized the prepaid services funds obtained by Inversiones Saitam to fund the account of Defendant Gorlio Enterprises at the Bank. As stated, Defendant Gorlio Enterprises was controlled by Defendant Oliveros. The whole prepaid services scheme was designed to ultimately benefit Defendants and their related entities, not to cover bona fide services rendered to the Bank.

**AIB Properties Limited**

118.    On September 12, 2018, Defendant Inversiones Saitam received a payment of $100,000.00 for the prepaid services it provided to the Bank. Defendant Inversiones Saitam's account at the Bank did not hold any other funds.

119.    On September 21, 2018, Defendant Inversiones Saitam transferred $28,000.00 from its account in the Bank to the account of Defendant AIB Properties. Although Defendant Inversiones Saitam represented that the purpose of the transfer was for payment of an invoice, no supporting documentation was provided. The account of Defendant AIB Properties did not hold any additional funds.

120.    Defendant AIB Properties is a company registered in Barbados in August 2013 focused on purchasing, selling, and renting real estate.  The majority shareholder of Defendant AIB Properties Limited is Defendant El Retiro Group, an entity incorporated in the British Virgin Islands in February 2013. The shareholders of Defendant El Retiro Group are Defendants María Eugenia and Alexandra, respectively, the mother and sister of Defendant Oliveros.

121.    Other shareholders for Defendant AIB Properties are Defendant Valencia, Defendant Montenegro, José Luis Colmenter Guzmán, Giancarlo Pietri Velutini, Daniel Yepez González, José Miguel Contreras Santos, and Miguel Eduardo Archilla Morales.

122.    Defendant Valencia, Defendant Montenegro, Daniel Yepez González, José Miguel Contreras Santos, and Miguel Eduardo Archilla Morales are also shareholders of Holding Activo, the entity that wholly owned the Bank.

123.    The Bank had previously extended a commercial promissory for a loan to Defendant AIB Properties Limited for the amount of $1 Million. The promissory note was to be paid in a period of eight years to be paid in thirty-two quarterly payments of $21,116.10.

Defendant AIB Properties represented that it would use the proceeds for a capital investment contribution in Spain.

124.   Defendant AIB Properties Limited assigned as collateral of the commercial promissory note a property in Caracas, Venezuela. The property owner is Inversiones Curruchanga CA, an entity represented by Elizabeth Gordon Behar, the spouse of Defendant Oliveros Mora, the father of Defendant Oliveros. However, the collateral was never perfected, such as adequately registering, as the Bank did not perform the adequate procedure.

125.   On September 28, 2018, Defendant AIB Properties made a payment of $21,116.10 to cover the commercial promissory note debt. The funds to cover the debt originated from the money paid by the Bank to Inversiones Saitam for prepaid services.

126.   Defendants utilized the prepaid services funds obtained by Defendant Inversiones Saitam to cover the debt of the commercial promissory note held by Defendant AIB Properties. As stated, Defendant AIB Properties was controlled by an entity in which Defendant Oliveros' relatives had a complete interest. The whole prepaid services scheme was designed to ultimately benefit Defendants and their related entities, not to cover bona fide services rendered to the Bank.

127.   Defendants Inversiones Saitam and Consultora Baru were essentially sham companies managed by Defendant Corredor, the brother-in-law of Defendant Valencia. They shared the same business address, employees, supplier, and manager.

128.   Overall, the Prepaid Services scheme resulted in a $4.4 Million loss for the Bank. The Prepaid Services scheme involving Defendant Inversiones Saitam caused losses of no less than $3.55 million. Meanwhile, the Prepaid Services scheme involving Defendant Consultora Baru caused approximately $850,000.

129.    As demonstrated, the prepayments were ultimately linked to Defendant Oliveros and/or entities related to or controlled by him. The Prepaid Services scheme designed by Defendants Oliveros and Valencia consisted of making the Bank extend prepayments to two companies managed by a relative of Defendant Valencia. Those prepayments were approved by Defendants Oliveros and/or Valencia in their official capacity as directors and officers of the Bank. The proceeds obtained from the prepayments were then transferred to Defendant Oliveros' personal account at the Bank or to an account belonging to an entity related to or controlled by him. Defendant Oliveros used the funds for his benefit or the benefit of his related entities.

130.    At least from 2017, the defendants have made at least two transactions over the interstate wires to transfer the funds obtained from the prepaid services scheme.  These transactions improperly and illegally sought to circumvent Act 52 and the Bank's required controls, clearly defrauding the Bank as they resulted in losses.  They amount to wire fraud committed by members of the conspiracy and components of the Enterprise, all in furtherance of the fraudulent scheme.  These transactions were dated from 2017, forward and were transmitted over wires.

131.    Each of those transactions, in whole or in part, was improper and unlawful for the reasons described in this Complaint and resulted in losses to the Bank.

132.    The above examples of transactions are not meant to be exhaustive and only reflect the portions of the overall scheme involving the defendants and the Enterprise. As explained, TBB anticipates that the misconduct may extend to other transactions and reserves all rights to amend this Complaint as more information comes to light.

**F.      The Bank Assets as Collateral Scheme**

133.    As stated throughout the Complaint, Defendants Oliveros and Valencia misused their position and authority to collateralize loans at third-party financial institutions with the Bank's assets. The scheme's purpose was ultimately to benefit Defendant Oliveros, using the funds to repay loans, maintain his lifestyle and continue feeding the fraud cycle of the other schemes. As discussed in detail below, the defendants and non-party conspirators sought loans from third-party financial institutions, authorized the guarantees, and failed to repay the loans, knowing its consequences to the Bank. All while concealing and controlling the information for the Bank to be able to monitor the fraudulent transactions.

134.    The defendants' conduct in furtherance of this aspect of their illegal enterprise dates back at least to 2016 and potentially even before then.

135.    The Bank transferred the borrowed funds from third-party financial institutions guaranteed with the Bank's assets through electronic payment.  The defendants deposited the borrowed funds from third-party financial institutions guaranteed with the Bank's assets into bank accounts located in Puerto Rico.

**Gorlio Enterprises Ltd.**

136.    On September 30, 2016, the Bank extended a standby letter of credit to Defendant Gorlio Enterprises. The purpose of the standby letter of credit was to guarantee payment for a promissory note of $4 million held with a third-party financial institution. The transaction was not approved by the Bank's Board of Directors.

137.    On information and belief, Defendant Gorlio Enterprises is wholly owned by Defendants María Eugenia and Alexandra, although Defendant Oliveros controls it. Defendants María Eugenia and Alexandra are, respectively, the mother and sister of Defendant Oliveros.

138.    By December 30, 2019, the standby letter of credit amounted to $5.2 million. However, due to Defendant Gorlio Enterprises defaulting on the underlying loan payments, the Bank fulfilled its obligation as guarantor holding the losses.

139.    The loan funds were mainly used to pay loans and overdrafts of Defendant Gorlio Enterprises with the Bank. Payments were also made to Defendant Oliveros, his relatives, and other companies controlled by them. The funds were used for the benefit of Defendant Oliveros, his relatives, and other companies controlled by them to the detriment of the Bank.

140.    The default of Defendant Gorlio Enterprises to the underlying loan payments, causing the Bank to fulfill its obligations as guarantor pursuant to the standby letter of credit, caused losses of $5.2 Million to the Bank.

### Intelinvest Casa de Valores SA

141.    On information and belief, Defendant Intelinvest is a broker-dealer registered in Panamá in 2009.

142.    Defendant Intelinvest began its business relationship with the Bank in 2016 by maintaining various accounts in the Bank. In turn, the Bank maintained an investment portfolio with Intelinvest.

143.    The Bank's investment portfolio at Intelinvest sought to earn income for the Bank through its custody, purchase, and administrative services.

144.    However, Intelinvest created a particular trust structure and operation to divert the Bank's funds. It even generated false account statements to provide a façade of normality.

145.    On or around August 2017, the Bank's investment portfolio at Defendant Intelinvest was utilized as collateral for a loan issued to Defendant Holding Activo. Defendant

Holding Activo is the majority owner of the Bank, and its majority shareholder is Defendant Oliveros, followed by Defendant Valencia.

146.   Defendant Holding Activo borrowed approximately $8 Million while using the Bank's investment portfolio at Defendant Intelinvest as collateral through a trust structure. The borrowed funds were deposited in Defendant Holding Activo's account at the Bank.

147.   On or around August 2017, Defendant Holding Activo made several transfers from its account in the Bank to other accounts in the Bank belonging to Defendant Oliveros, Defendant Gorlio Enterprises, and Defendant Inversiones Saitam. The funds transferred to the accounts described before were the same funds borrowed while using the Bank's investment portfolio as a guarantee.

148.   Specifically, Holding Activo transferred more than $3.1 million to Defendant Oliveros, more than $2 million to Defendant Gorlio Enterprises, and $500,000.00 to Defendant Inversiones Saitam. The funds were transferred to the defendants' accounts in the Bank.

149.   From his account, Defendant Oliveros then transferred $188,017.00 to Defendant Valencia and $1.4 million to Defendant Gorlio Enterprises' accounts in the Bank.

150.   Defendant Gorlio Enterprises transferred $1.58 million to Customer B's account in the Bank. Customer B utilized the funds transferred to pay off a loan in the Bank.

151.   Defendant Oliveros mainly used the borrowed funds to pay related loans, finance his lifestyle, and pursue investments. He even capitalized on the Bank with its own funds.

152.   The default of Defendant Holding Activo to the underlying loan payments, causing the Bank to fulfill its obligations as guarantor pursuant to the contract executed with Intelinvest, caused losses in excess of $4.9 Million to the Bank.

**Inversiones Elektrogorsk, C.A.**

153.    On June 16, 2019, the Bank extended a standby letter of credit to Elektrogorsk. The customer represented that the purpose of the standby letter of credit was to guarantee payment for a loan of more than $1.5 Million held with a third-party financial institution.

154.    On information and belief, Elektrogorsk is an entity related to Defendant Montenegro. Defendants Montenegro is a shareholder of Holding Activo, the sole owner of the Bank, and a director and shareholder of Banco Activo Banco Universal.

155.    The standby letter of credit had an expiration of June 16, 2022. However, due to Elektrogorsk defaulting on the underlying loan payments, the Bank fulfilled its obligation as guarantor holding the losses. Thus, the Bank suffered a loss in excess of $1.2 Million.

156.    The funds were used for the benefit of Defendant Montenegro.

157.    The default of Elektrogorsk to the underlying loan payments, causing the Bank to fulfill its obligations as guarantor pursuant to the standby letter of credit, caused losses in excess of $1.2 Million to the Bank.

**Holding Activo Ltd.**

158.    On or around June 2018, the Bank allowed Holding Activo to use a certificate of deposit as collateral for a loan of more than $4.5 million held with a third-party financial institution.

159.    As discussed previously, Holding Activo was the majority shareholder of the Bank. Its majority shareholder is Defendant Oliveros, who totally controlled the entity. Defendant Valencia held the largest interest in Holding Activo behind Defendant Oliveros.

160.     On or around June 2018, Defendant Holding Activo transferred $2.9 million from the funds obtained through the loan mentioned above to Defendant Gorlio Enterprises' account in the Bank.

161.     On information and belief, Defendant Gorlio Enterprises is wholly owned by Defendants María Eugenia and Alexandra, although Defendant Oliveros controls it. Defendants María Eugenia and Alexandra are, respectively, the mother and sister of Defendant Oliveros.

162.     The funds were used for the benefit of Defendant Oliveros, his relatives, and other companies controlled by them to the detriment of the Bank.

163.     The default of Defendant Holding Activo to the underlying loan payments, causing the Bank to fulfill its obligations as guarantor pursuant to the certificate of deposit, caused losses in excess of $4.5 Million to the Bank.

164.     Overall, the Bank Assets as Collateral scheme resulted in approximately a $15.8 Million loss for the Bank.

165.     As evidenced, the borrowed funds obtained while using the Bank's assets as collateral were ultimately linked to Defendant Oliveros and/or entities related to or controlled by him. The Bank's assets as a collateral scheme designed by Defendants Oliveros and Valencia consisted of using the Bank assets as collateral to obtain loans from third-party financial institutions that would ultimately benefit them. Those loan guarantees were approved by Defendants Oliveros and/or Valencia in their official capacity as directors and officers of the Bank. The proceeds obtained from the different loans were then transferred to Defendant Oliveros' personal account at the Bank or to an account belonging to an entity related to or controlled by him. Defendant Oliveros used the funds for his benefit or the benefit of his related entities. It is important to note that the loss of Inversiones Elektrogorsk was for the sole benefit

of Defendant Montenegro, which in his capacity, also took advantage of the Bank through the approval of Defendant Oliveros.

166.    The loans were never registered in the Bank's books per the orders of Defendant Valencia, in his capacity as President of the Bank, and fulfilled by non-party conspirator González, as Operations Manager of the Bank. As part of the scheme, the loans were never repaid, causing the third-party financial institutions to enforce the guarantees and resulting in losses to the Bank.

167.    At least from 2016, the defendants have made at least three transactions over the interstate wires to transfer the funds obtained using bank assets as a collateral scheme.  These transactions improperly and illegally sought to circumvent Act 52 and the Bank's required controls, clearly defrauding the Bank as they resulted in losses.  They amount to wire fraud committed by members of the conspiracy and components of the Enterprise, all in furtherance of the fraudulent scheme.  These transactions were dated at least from 2016, forward, and were transmitted over wires.

168.    Each of those transactions, in whole or in part, was improper and unlawful for the reasons described in this Complaint and resulted in losses to the Bank.

169.    The above examples of transactions are not meant to be exhaustive and only reflect the portions of the overall scheme involving the defendants and the Enterprise. As explained, TBB anticipates that the misconduct may extend to other transactions and reserves all rights to amend this Complaint as more information comes to light.

**G.      The Defendants' Concealment**

170.     The defendants and the non-party co-conspirators have engaged in an elaborate effort to conceal their scheme.  Their efforts include:

a.      Falsely representing to the Bank that the loans and credit facilities were requested for the purposes disclosed in the submitted applications;

b.      Approving loans and credit facilities without the proper paperwork, supporting documents, and approvals, and omitting to follow procedures, circumventing Act 52;

c.      Causing the Bank to disburse the funds associated with the loans and credit facilities when the ultimate customer were persons or entities related to and/or controlled by Defendant Oliveros while knowing those loans and credit facilities were illegal;

d.      Requiring the Bank to transfer the funds associated with the loans and credit facilities to related entities that were the *alter ego* of Defendant Oliveros;

e.      Requiring the Bank to allow overdrafts in accounts to transfer money when no funds to support those transactions were available;

f.      Converting the overdrafts in loans without the proper paperwork, supporting documents, and approvals, and omitting to follow procedures;

g.      Erasing the debt originating from the overdrafts without the proper paperwork, supporting documents, and approvals, and omitting to follow procedures;

h.      Implying that defendants' entities have an existence separate and distinct from Defendant Oliveros;

i.      Performing banking transactions in "batch" or internal transfers to avoid internal controls and monitoring;

j.      Billing services to the Bank on a prepaid basis at a high cost when those services could not be verified or were actually provided; and

k.      Representing that charges made by Inversiones Saitam and Consultora Baru to the Bank for supposed services were lawful despite the inextricably intertwined nature of the entities with Defendants Oliveros and Valencia, who were the ultimate beneficiaries of the payments made to those companies;

l.      Utilizing the Bank's assets as collateral or guarantee for loans obtained from third-party financial institutions that were never intended to be repaid, the borrowed funds ultimately benefit Defendants Oliveros, Valencia, Montenegro, other defendants, and related parties.

**H.      Use of the Interstate Wires**

171.    It is illegal under 18 U.S.C. § 1343 to use interstate wires for the purpose of executing a scheme or artifice to defraud.  A violation of this provision is a predicate act of racketeering under 18 U.S.C. § 1961(5).

172.    As detailed above, the defendants, as well as their non-party co-conspirators, repeatedly and knowingly used the interstate wires to effectuate their schemes.  The funds obtained by means of loans, credit facilities, overdrafts, and prepayments disbursed by the Bank, and loans from third-party financial institutions using the Bank's assets as collateral, were sent

from Puerto Rico to different accounts in Puerto Rico, United States, Dominican Republic, and Venezuela by electronic means. The communications involving these transactions by the defendants were likewise sent by interstate transmission. The transmission of every amount of funds done as part of the schemes is an independent act of wire fraud, examples of which are detailed above.

173. The funds obtained by means of loans, credit facilities, overdrafts, and prepayments disbursed by the Bank, and loans from third-party financial institutions using the Bank's assets as collateral, were knowingly transmitted via bank transfer over the interstate wires and were in furtherance of the schemes.

174. In addition, the entirety of the defendants' and their associates' business and the schemes described here involve the use of interstate wires. The business itself involves interstate exchange and delivery of funds obtained employing loans, credit facilities, overdrafts, prepayments disbursed by the Bank, and loans from third-party financial institutions using the Bank's assets as collateral. Wire fraud is inherent in all aspects of the defendants' schemes.

175. The acts of the defendants were done willfully and with the knowledge that they were using interstate wires to execute a scheme or artifice to defraud. These acts were done intentionally and knowingly with the specific intent to advance the defendants' schemes.

## I.     Use of Interstate Delivery Service

176. It is illegal under 18 U.S.C. § 1341 to deposit or cause to be deposited any matter or thing to be sent or delivered by any private or commercial interstate carrier for the purpose of executing a scheme or artifice to defraud. A violation of this provision is a predicate act of racketeering under 18 U.S.C. § 1961(5).

177.     In furtherance of the scheme, the defendants have deposited money into Activo PR and Activo Dominicana bank accounts that were disbursed by the Bank.  The defendants and non-party conspirators have wired money between themselves and other customers from their bank accounts.

178.     The bank transfers to pay for commercial services are dated from approximately November 2015 through February 2020 on a periodic basis for the Bank to Defendants Inversiones Saitam and Consultora Baru, and payments dated at least from November 2015 through February 2020 on a periodic basis for Defendants Inversiones Saitam and Consultora Baru to the Bank.

179.     The wire transfers occurred between banks, and bank records exist showing multiple transactions among the defendants themselves and other non-party conspirators from at least November 2015 through February 2020.

180.     The acts of the defendants were done willfully and with the knowledge that they were depositing money or causing money to be deposited to execute a scheme or artifice to defraud. These acts were done intentionally and knowingly with the specific intent to advance the defendants' schemes.

**J.       Transport or Receipt of Stolen Money**

181.     Pursuant to 18 U.S.C. § 2314, it is a crime to transfer in interstate or foreign commerce any money valued at $5,000.00 or more, knowing it to have been stolen, converted, or taken by fraud. A violation of this provision is a predicate act of racketeering under 18 U.S.C. § 1961(5).

182.     Further, under 18 U.S.C. § 2315, it is illegal to receive or possess which has crossed interstate or foreign commerce any money valued at $5,000.00 or more, knowing it to

have been stolen, converted, or taken by fraud. A violation of this provision is a predicate act of racketeering under 18 U.S.C. § 1961(5)

183.    The defendants committed acts constituting indictable offenses under this statute by having devised or intended to devise a scheme or artifice to defraud the Bank, or to obtain money from the Bank by means of false or fraudulent pretenses, representations, or promises. Defendants transferred or caused to be transferred in interstate or foreign commerce money having a value of $5,000.00 or more, which was stolen, converted, or taken by fraud.

184.    Defendants also committed acts constituting indictable offenses by receiving money in excess of $5,000.00, which crossed a State or United States boundary after being stolen, unlawfully converted, or taken by fraud.

185.    The acts of the defendants were done willfully and with the knowledge that the money was stolen, converted, or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance the defendants' schemes.

**K.    Money Laundering**

186.    It is a crime under 18 U.S.C. § 1956 to conduct financial transactions involving the proceeds of unlawful activity.  A violation of this provision is a predicate act of racketeering under 18 U.S.C. § 1961(5).

187.    The defendants have violated this statute each time they have obtained money by means of loans, credit facilities, overdrafts, and prepayments disbursed by the Bank, and loans from third-party financial institutions using the Bank's assets as collateral, under false representations and pretenses, in violation of state regulations, as described in this Complaint and, on information and belief, have deposited those proceeds in financial institutions.

188.    The defendants have likewise violated this statute each time they conducted transactions reflected in the invoices provided to the Bank, supposedly reflecting wire transfers and payments between the defendants themselves.

189.    The acts of the defendants were done willfully and with the knowledge that the money originated from unlawful activity. These acts were done intentionally and knowingly with the specific intent to advance the defendants' schemes.

L.    **The Enterprise**

190.    The defendants and the non-party co-conspirators are associated-in-fact and form an enterprise whose activities affect interstate and foreign commerce.

191.    The enterprise is referred to in this Complaint as the "Enterprise."  It existed to enable the defendants to obtain from TBB (i) loans, credit facilities, and overdrafts that were extended to the accounts of related persons and/or entities, creating a façade of somewhat standard everyday transactions, concealing an in-place scheme to divert the Bank's depositors' funds to ultimately beneficiate the defendants; (ii) payments for the Prepaid Services scheme in order to divert the Bank's funds, through which the defendants used Inversiones Saitam and/or Consultora Baru as vehicles to circumvent the regulated context and into the private commercial context; and (iii) loans from third-party financial institutions guaranteed with the Bank's assets, that were never intended to be repaid, and which ultimately benefited the defendants. The Enterprise profits from the disbursement of funds by the Bank through loans, credit facilities, overdrafts, and prepayments for services that are not actually provided.

192.    Defendant Oliveros is associated with the Enterprise as an owner, partner, shareholder, member, executive, or beneficiary of each of the other defendants' entities and as the primary orchestrator of the scheme. In the majority of the instances, Defendant Oliveros was

the ultimate beneficiary of the schemes, whether through persons or entities related to and/or controlled by him.  He utilized his position as director of the Bank to authorize and conceal transactions and activities in furtherance of the schemes. Defendant Oliveros likewise shares sums of money received from the Bank.

193.    Defendant Valencia is associated with the Enterprise as a primary orchestrator of the scheme. He utilized his position as an officer and director of the Bank to authorize and conceal transactions and activities in furtherance of the schemes. Defendant Valencia likewise shares sums of money received from the Bank.

194.    Defendant Holding Activo is associated with the Enterprise as it served as a vehicle to perpetuate the fraud and has the aforementioned connections to other parties associated with the Enterprise. Defendant Gorlio Enterprises thus is intimately involved with and participates in all aspects of the fraudulent scheme. It likewise shares sums of money received from the Bank.

195.    Defendant Alexandra is associated with the Enterprise as it served as a vehicle to perpetuate the fraud, shared her personal account at the Bank to carry out the transactions, and was the owner, partner, shareholder, member, or executive of other defendants' entities from which accounts funds associated with loans, credit facilities, overdrafts, and prepayments were transferred in furtherance of the schemes. She likewise shares sums of money received from the Bank.

196.    Defendant María Eugenia is associated with the Enterprise as it served as a vehicle to perpetuate the fraud, shared her personal account at the Bank to carry out the transactions, and was the owner, partner, shareholder, member, or executive of other defendants' entities from which accounts funds associated with loans, credit facilities, overdrafts, and

prepayments were transferred in furtherance of the schemes. She likewise shares sums of money received from the Bank.

197.   Defendant Oliveros Mora is associated with the Enterprise as it served as a vehicle to perpetuate the fraud, shared his personal account at the Bank to carry out the transactions, and was the owner, partner, shareholder, member, or executive of other defendants' entities from which accounts funds associated with loans, credit facilities, overdrafts, and prepayments were transferred in furtherance of the schemes. He likewise shares sums of money received from the Bank.

198.   Defendant Gorlio Enterprises is associated with the Enterprise as it served as a vehicle to perpetuate the fraud and has the aforementioned connections to other parties associated with the Enterprise. Defendant Gorlio Enterprises thus is intimately involved with and participates in all aspects of the fraudulent scheme. It likewise shares sums of money received from the Bank.

199.   Defendant El Retiro Group is associated with the Enterprise as it served as a vehicle to perpetuate the fraud and has the aforementioned connections to other parties associated with the Enterprise. Defendant El Retiro Group thus is intimately involved with and participates in all aspects of the fraudulent scheme. It likewise shares sums of money received from the Bank.

200.   Defendant AIB Properties Limited is associated with the Enterprise as it served as a vehicle to perpetuate the fraud and has the aforementioned connections to other parties associated with the Enterprise. Defendant AIB Properties Limited thus is intimately involved with and participates in all aspects of the fraudulent scheme. It likewise shares sums of money received from the Bank.

201.    Defendant Don Goyo Aviation is associated with the Enterprise as it served as a vehicle to perpetuate the fraud and has the aforementioned connections to other parties associated with the Enterprise. Defendant Don Goyo Aviation thus is intimately involved with and participates in all aspects of the fraudulent scheme. It likewise shares sums of money received from the Bank.

202.    Defendants Inversiones Saitam and Consultora Baru are associated with the Enterprise. They served as the contractual vehicle through which the defendants sought to defraud the Bank to ultimately benefit persons and entities related to and/or controlled by Defendant Oliveros. Defendants Inversiones Saitam and Consultora Baru requested the Bank prepayments for services that were overpriced. The remittance of funds was not aligned with the purpose. Thus, their business model was wholly dependent on profits from the ability to continue to charge the Bank for prepayments for overpriced services. Defendants Inversiones Saitam and Consultora Baru likewise share sums of money received from the Bank.

203.    Defendant Corredor is associated with the Enterprise as it has the various aforementioned connections to other parties associated with the Enterprise and is the acting manager of the entities purportedly providing overpriced services while receiving prepayments that ultimately beneficiated Defendant Oliveros, other defendants, and related parties.

204.    Defendant Montenegro is associated with the Enterprise as it served as a vehicle to perpetuate the fraud and was the owner, partner, shareholder, member, or executive of other defendants' entities from which accounts funds associated with loans, credit facilities, overdrafts, and prepayments were transferred in furtherance of the schemes. He likewise shares sums of money received from the Bank.

205.     Defendant Elektrogorsk is associated with the Enterprise as it served as a vehicle to perpetuate the fraud and has the aforementioned connections to other parties associated with the Enterprise. Defendant Intelinvest, thus, is intimately involved with and participates in all aspects of the fraudulent scheme. It likewise shares sums of money received from the Bank.

206.     Defendant Intelinvest is associated with the Enterprise as it served as a vehicle to perpetuate the fraud and has the aforementioned connections to other parties associated with the Enterprise. Defendant Intelinvest, thus, is intimately involved with and participates in all aspects of the fraudulent scheme. It likewise shares sums of money received from the Bank.

207.     Non-party co-conspirator González is associated with the Enterprise as it assisted in carrying out and concealing the transactions and activities in furtherance of the schemes.

208.     Non-party co-conspirator Vizcarrondo is associated with the Enterprise as it assisted in carrying out and concealing the transactions and activities in furtherance of the schemes.

209.     Each of the defendants is further associated with each other and the Enterprise through the various ways they are directly and indirectly associated or affiliated with each other, as described throughout this Complaint.  As explained, it is further anticipated that other entities and/or individuals may be directly or indirectly associated or affiliated with the defendants and involved in the scheme.

**M.     Breach of Fiduciary Duties**

210.     Defendants Oliveros and Valencia approved and/or administered the loans, credit facilities, and credit card agreements pursuant to aggressive and reckless conduct ahead of the safety and soundness of the depositor funds entrusted to them.

211.    Defendants Oliveros and Valencia approved the loans, credit facilities, and credit card agreements despite numerous violations of the Bank's loan policies and procedures, federal and state safety and soundness regulations, and prudent banking practices. These violations included: (1) violations of the Bank's Loan to Value ("LTV") ratio limits; (2) lack of required borrower equity; (3) inadequate real estate appraisals or non-existent; (4) insufficient analyses of collateral or inadequate collateral; (5) insufficient borrower repayment information and repayment sources; (6) the questionable character of the borrower or guarantor; and (7) other loan policy violations. Additionally, Defendants Oliveros and Valencia repeatedly increased, extended, and/or renewed expired and deteriorating loans, credit facilities, and credit card agreements to enable continued funding of interest reserves, delaying losses and defaults and increasing the losses on the loans, credit facilities, and credit card agreements.

212.    Defendants Oliveros and Valencia administered and funded the loans, credit facilities, and credit card agreements in violation of major loan terms, the Bank's policies and procedures, and prudent lending and administration standards. These violations included: (1) continued funding of loans and credit facilities despite receipt of reports showing dilution and aging of accounts receivable, violations of borrower covenants and loan agreements, ineligible collateral, and other severe collateral impairment; (2) unilateral and unauthorized waiver of key borrower financial covenants relating to working capital, net adjusted equity value, and cash flow ratios; (3) manipulation of the Bank's loan monitoring systems so as not to reflect the continuing deterioration of collateral and ineligible collateral; (4) funding of loans and credit facilities despite borrower defaults on key loan approval terms and the Bank's policy requirements; and (5) extensions and continued funding of expired loans and credit facilities, delaying losses and defaults, despite the borrower's failure to cure defaults.

213. Defendant Oliveros benefited from periodic overdrafts from 2017 to 2018 in his deposit account, estimated balances in the six (6) to seven (7) figures, without the previous authorization of the OCFI in contravention of Act 52. In 2017, the account was overdrawn in its most prolonged period from March to September. In 2018, the longest period was from April to June and November to December.

214. Defendants Oliveros and Valencia did not abstain from the discussion, meeting, and decision-making process of those matters that represented a conflict of interest.

215. In early 2018, Defendant Oliveros presented a transaction for the approval of the Bank's Board of Directors. The transaction comprised the purchase of an aircraft for $2.6 Million by the Bank. The transaction was approved by the Bank's Board of Directors. The seller in the transaction was Defendant Don Goyo Aviation, a company organized in the State of Delaware, which Defendant Oliveros Mora, Defendant Olivero's father, wholly owned.

216. On April 9, 2018, a wire transfer was generated from the account for $298,559.42. Since there were insufficient funds to cover the transaction, the account went into overdraft for $122,482.04. The transaction was made possible because it was done through a "batch," which is the only manner of performing such a transaction without sufficient funds in an account, but which function affects the assets of the Bank.

217. On June 28, 2018, Defendant Gorlio Enterprises transferred $125,000.00 to Defendant Don Goyo Aviation's account at the Bank, thus correcting the overdraft in that account.

218. As previously mentioned, on information and belief, Defendant Gorlio Enterprises is wholly owned by Defendants María Eugenia and Alexandra, although it is

controlled by Defendant Oliveros. Defendants María Eugenia and Alexandra are, respectively, the mother and sister of Defendant Oliveros.

219.    Following the aforementioned overdraft, Defendant Don Goyo Aviation's account at the Bank went into overdraft on multiple instances between July 12 and December 17, 2018. Transfers were made to the accounts of relatives and related entities of Defendant Oliveros.

220.    By October 2, 2018, the account went into overdraft for $1,860,377.04 through continuous approvals from Management on wire transfers to related and third parties. The overdraft was converted into a loan extended to Defendant Don Goyo Aviation. This transaction was executed by non-party conspirator González, the Operations Manager of the Bank, per orders of Defendant Valencia, President of the Bank.

221.    On the same day, October 2, 2019, after discussions with the former Credit Manager of the Bank, who raised a red flag on this loan approval, Defendant Valencia ordered to reverse the transaction and leave the account with an overdraft of $1,860,377.04.

222.    The transactions in the account of Defendant Don Goyo Aviation continued until December 17, 2018. By December 30, 2018, the overdraft in the account amounted to $1,439,494.67.

223.    On December 30, 2018, a transaction was registered in which Defendant Oliveros transferred $1,457,494.67 to Defendant Don Goyo Aviation's account in the Bank.

224.    The provenance of the funds utilized by Defendant Oliveros to settle the overdraft in the Defendant Don Goyo Aviation account in the Bank originated from a loan obtained by Customer E in Canal Bank for $2.3 Million. Customer E then transferred the funds to another account under his name at Activo Dominicana. There, a transfer was made to Defendant Oliveros' account at the Bank.

225.    Non-party conspirator González registered the transfer in Defendant Don Goyo Aviation's account in the Bank before transferring the funds from the Canal Bank account of Customer E to his account at Activo Dominicana.

226.    This is an example of how Defendant Oliveros utilized accounts of entities related to and/or controlled by him to transfer funds around by going into overdraft and converting the overdraft into loans. Then those loans were converted into zero balance, erasing the debts. As stated, Defendant Don Goyo Aviation's account was *de facto* controlled by Defendant Oliveros.

227.    It was not evident in the meeting minutes of the Bank's Board of Directors that Defendant Oliveros disclosed the existent relationship between Don Goyo Aviation and himself. Nor did he abstain from the discussion and approval of the purchase transaction. Especially, considering that the purchase of an aircraft by the Bank cannot be considered a banking activity or a regular activity for a financial entity. Neither is an authorized activity under the Bank's license, nor was there a request for approval of the OCIF for the acquisition.

228.    Moreover, Defendant Oliveros was extended credits in the Bank without the previous authorization of the OCFI in contravention of Act 52.

229.    Defendants Oliveros and Valencia authorized using the Bank's assets as collateral to guarantee related third-party loans in third-party financial institutions that were never intended to be repaid.

230.    Defendants Oliveros and Valencia authorized the extension of credit card agreements to directors, officers, and employees of Banco Universal. They also approved the extension of credit cards to their relatives and associates. All of this while knowing that any amount charged would never be repaid. The losses suffered by the Bank due to those credit card agreements amount to more than $388,000.00.

231.    Defendants Oliveros and Valencia made negligent investments in foreign banks that caused losses to the Bank of more than $7.9 Million. From 2018 to 2020, the Bank invested more than $7.9 Million in the purchase and ownership of Activo Dominicana. Activo Dominicana was acquired by the Bank and other investors, which included Defendant Oliveros and Valencia. Activo Dominicana's financial statements continuously showed losses and caused a financial strain and deficit on the Bank due to the capital infusions required to cover the losses.

232.    While Defendants Oliveros and Valencia's performance as members of management and the Board of Directors of the Bank was critically deficient, their compensation fees were increased even though the Bank's operation trend was negative and resulted in net losses. These increases totaled $180,000 in 2016, $392,000 in 2017, and $456,000 in 2018, although the Bank reported increasing losses. In 2019, they solicited an advance of the equivalent of a year in compensation fees.

233.    Defendants Oliveros and Valencia's actions and inactions constituted gross negligence, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions that were without the bounds of reason. These actions and inactions were the direct and proximate cause of the damages the Bank now seeks to recover.

## CLAIMS FOR RELIEF

### Count 1 - Violation of RICO, 18 U.S.C. § 1962(c) (Against All Defendants)

234.    The allegations of all the foregoing and the following paragraphs are incorporated by reference as if fully set forth in this paragraph.

235.    The Enterprise is an enterprise engaged in and whose activities affect interstate commerce.  The defendants are employed by or associated with the Enterprise.

236.    The defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of wire fraud and money laundering done for unlawful purposes, including intentionally defrauding the Bank.

237.    Pursuant to and in furtherance of their scheme, each of the defendants committed numerous and related acts of wire fraud, including the use of the interstate wires in connection with the receipt of millions of dollars from the Bank, and the corresponding use of the wires to share proceeds improperly received from the Bank.

238.    Pursuant to and in furtherance of the illegal scheme, the defendants used the interstate wires to transfer funds disbursed by the Bank product of the illegally obtained loans, credit facilities, and overdrafts, as detailed above.

239.    Pursuant to and in furtherance of the illegal scheme, the defendants made use of the interstate wires to send requests to the Bank, improperly charging prepayment for services that were overcharged and not aligned to the service rendered. Still, those prepayments were illegal because of the intertwined relationships among the various conspirators and defendants, as detailed in this Complaint.  The defendants knew those prepayments were illegal when they transmitted payment demands by interstate wires.

240.    The defendants have used an interstate private or commercial carrier in furtherance of the scheme.

241.    The acts engaged in by the defendants include the acts in all three modalities of their racketeering conduct, as described in this Complaint.  The damages suffered by the Bank, now TBB, include those sustained in all three modalities of their racketeering conduct, as described in this Complaint.

242.    Each of the defendants has used the interstate wires in furtherance of the scheme.

243.    Each defendant (along with the non-party co-conspirators) has engaged in predicate acts of racketeering.

244.    The acts set forth above relating to using the interstate wires violate 18 U.S.C. § 1343 and are part of a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

245.    The acts set forth above relating to using an interstate private or commercial carrier violate 18 U.S.C. § 1341 and are part of a racketeering activity pursuant to 18 U.S.C. § 1961(5).

246.    The acts set forth above relating to money laundering violate 18 U.S.C. § 1956 and are part of a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

247.    The acts set forth above involve close-ended continuity as the term is used in the context of 18 U.S.C. § 1962.  The defendants' scheme has been in place for multiple years. It has been directed against the Bank specifically since at least November 2015, including at least ten transactions in a period of five (5) years.

248.    The defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

249.    As a direct and proximate result of the defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Bank has been injured in its business and property, and in other ways described throughout this Complaint.

250.    TBB requests that this Court declare that the defendants violated 18 U.S.C. § 1962(c) and enter judgment against the defendants, including for treble damages, attorney's fees, as well as any other relief that may be available to remedy the defendants' actions.

### Count 2- Conspiracy to Violate RICO in Violation of 18 U.S.C. § 1962(d)
### (Against All Defendants)

251.    The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph

252.    As set forth above, the defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

253.    The defendants have intentionally conspired and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

254.    The defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

255.    Each defendant has committed multiple predicate acts of racketeering in the form of wire fraud described above.  Other co-conspirators have likewise committed predicate acts as described in this Complaint.

256.    Each such predicate act described in the preceding paragraph is also an overt act in furtherance of the conspiracy.

257.    Each defendant has committed an overt act in furtherance of the conspiracy that has injured the Bank, now TBB, which constitutes a predicate act under the RICO statute.

258.    The defendants have also engaged in theft by deception in furtherance of the conspiracy.

259.    Each defendant agreed to the loans, credit facilities, overdrafts from the Bank, proceeds from a prepayment contract, and loans from third-party financial institutions using the Bank's assets as collateral based on false representations, a significant component of the

defendants' scheme.  Each defendant further agreed to the scheme as reflected in their numerous conjoined activities, their overlapping and interconnected leadership, their agreement to transfer funds originated from loans, credit facilities, and overdrafts extended by the Bank, and their agreement to transfer those funds to persons and entities related to and/or controlled by a Defendant, individually and/or in conjunction with Defendant Oliveros.

260.    Defendants Inversiones Saitam and Consultora Baru (along with Defendant Corredor) have sent payments over interstate wires to the Bank that overcharged the Bank on a prepaid basis for services and proceeds redirected to related third parties, payments of loans for related third parties, dividends for directors of a related Bank, and bonuses of related Bank employees that was not aligned with the services contracted.

261.    The Bank, now TBB, has been injured by the overt acts, including by the billings presented to it by Inversiones Saitam and Consultora Baru (along with Defendant Corredor) that falsely represent those services were to be rendered to the Bank and the prepayments were made in consideration for those services. In reality, the commercial arrangement was a sham to divert funds from the Bank to benefit Defendant Oliveros and close associates ultimately.

262.    The defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

263.    As a direct and proximate result of the defendants' conspiracy and racketeering activities and violations of 18 U.S.C. § 1962(d), the Bank, now TBB, has been injured in its business and property in the overcharges that it has been billed for and has paid under the Prepaid Services, and in other ways described throughout this Complaint.

264. TBB requests that this Court declare that the defendants violated 18 U.S.C. § 1962(d) and enter judgment against the defendants, including for treble damages, attorney's fees, as well as any other relief that may be available to remedy the defendants' actions.

**Count 3- Fraud and Fraud in the Inducement (Against All Defendants)**

265. The allegations of all the foregoing and the following paragraphs are incorporated by reference as if fully set forth in this paragraph.

266. Pursuant to Article 1802 of the Puerto Rico Civil Code, 31 PR Laws Ann. § 5141, whoever by action or omission causes damage to another, through fault or negligence, is obliged to repair the damage caused.

267. Further, in accordance with Article of the Puerto Rico Civil Code, 31 PR Laws Ann. §3408, there is deceit when, by words or insidious machinations on the part of one of the contracting parties, the other is induced to execute a contract which without them he would not have made. In case of fraud, the debtor shall be liable for all those which clearly may originate from the nonfulfillment of the obligation. 31 PR Laws Ann. §3024.

268. Defendants concealed the architecture involved in requesting loans, credit facilities, overdrafts extended by the Bank, payments from prepaid services, and loans from third-party financial institutions using the Bank's assets as collateral, and misrepresented the real purposes for which those loans, credit facilities, and overdrafts were requested.

269. Defendants have concealed that the defendants' entities were merely sham entities in reality controlled by Defendants Oliveros and/or Valencia and have concealed their knowledge that it was illegal for Defendant Oliveros to benefit from the proceeds under the loans, credit facilities, overdrafts extended by the Bank, payments from prepaid services, and

loans from third-party financial institutions using the Bank's assets as collateral, obtained employing false pretenses.

270.    These misrepresentations were made in oral and written representations described above, and led to the extension of loans, credit facilities overdrafts by the Bank, and loans from third-party financial institutions using the Bank's assets as collateral.  These misrepresentations were also made by failing to disclose the information in documents submitted to the Bank containing false information.

271.    The defendants knew and intended that the Bank would enter into the Prepaid Services arrangements lacking knowledge that Defendants Inversiones Saitam and Consultora Baru would not be providing services as represented.

272.    The defendants knew and intended that the Bank would be deceived into believing that Defendants Inversiones Saitam and Consultora Baru legitimately provided the services included in the prepayments that the Bank was prepaid.

273.    The defendants knew and intended that the Bank would disburse prepayments under the Prepaid Services arrangements knowing the funds were going to be diverted to the defendants' account, to related third parties, payments of loans for related third parties, dividends for directors of a related Bank, and bonuses of related Bank employees that was not aligned with the services contracted.

274.    In disbursing funds pursuant to the loans, credit facilities, overdrafts, and guaranteeing related third-party loans from third-party financial institutions using the Bank's assets as collateral, the Bank reasonably and justifiably relied on the defendants' false representations and concealments of fact.

275.     In paying the requested amount submitted under the Prepaid Services arrangements, the Bank reasonably and justifiably relied on the defendants' false representations and concealments of fact.

276.     The Bank, now TBB, has been damaged in an amount to be proved at trial, which is at least equal to the losses suffered due to the loans and credit facilities extended, as well as the guarantees extended using the Bank's assets as collateral, which debts were not paid, and to the prepayments, it made under the Prepaid Services arrangements for services that were never rendered.

277.     TBB requests that the Court enter judgment against the defendants and award TBB damages in an amount to be proved at trial and that continues to accrue, along with punitive damages as well as any other relief that may be available to remedy the defendants' actions.

### Count 4- Unjust Enrichment (Against All Defendants)

278.     The allegations of all the foregoing and the following paragraphs are incorporated herein by reference as if fully set forth in this paragraph, excluding allegations governed by the parties' loan and credit facilities contracts.

279.     In the alternative, the defendants obtained from the Bank at least from 2015 to 2020 more than $29 million through loans, credit facilities, collateral, and guarantees extended using the Bank's assets as collateral under false representations and pretenses. The defendants were mere conduits to transfer those prepayments through the defendants' accounts that were related to and/or controlled by Defendant Oliveros.   Accordingly, those disbursements were illegal.

280.    Substantial portions of the money disbursed by the Bank to the defendants were, in turn, transferred by those entities to other defendants, with the purpose of ultimately benefiting Defendant Oliveros.

281.    The defendants, especially Defendant Oliveros, were therefore enriched by their unlawful conduct. However, all defendants benefitted, including Defendant Montenegro.

282.    This unjust enrichment occurred outside of and is not included within any of the loans and credit facilities agreements, and guaranteeing related third-party loans from third-party financial institutions using the Bank's assets as collateral that could have legitimately been requested from the Bank.  This Count is exclusive of and does not overlap with any remedies sought under any of the defendants' loan and credit facilities contracts.

283.    The defendants directed the conduct in requesting disbursement from the Bank of those illegal amounts under a loan and credit facility fraud scheme.

284.    The defendants caused the Bank to disburse those illegal amounts under a loan and credit facility fraud scheme.

285.    The defendants knew that it was illegal to request the Bank to disburse those illegal amounts under a loan and credit facility scheme.

286.    These disbursements were part of the first and second modalities of the scheme alleged in this Complaint.

287.    Also, in the alternative, Inversiones Saitam and Consultora Baru charged the Bank in excess of $4.4 Million from January 2016 through February 2020 for alleged services that would be provided under the Prepaid Services arrangements.  Inversiones Saitam and Consultora Baru were mere conduits to transfer those prepayments through the defendants'

accounts related to and/or controlled by Defendant Oliveros. Accordingly, those charges were illegal.

288.    Substantial portions of the money paid by the Bank to Inversiones Saitam and Consultora Baru was, in turn, transferred by those entities to other defendants, to ultimately benefit Defendant Oliveros and close associates.

289.    The defendants were therefore enriched by their unlawful conduct.

290.    This unjust enrichment occurred outside of and is not included within any of the services that could have legitimately been provided to the Bank under the Prepaid Services.

291.    The defendants directed the conduct of Inversiones Saitam and Consultora Baru in charging the Bank those illegal amounts under a Prepaid Services scheme.

292.    The defendants caused Inversiones Saitam and Consultora Baru to charge the Bank those illegal amounts under a Prepaid Services scheme.

293.    The defendants knew it was illegal for Inversiones Saitam and Consultora Baru to charge the Bank those illegal amounts under a Prepaid Services scheme.

294.    These charges were part of the third modality of the scheme alleged in this Complaint.

295.    The defendants have acquired and retained money belonging to the Bank, now TBB, as a result of their wrongful conduct.

296.    Under the principles of equity, the defendants should not be allowed to keep the money belonging to the Bank, now TBB, because they unjustly received it due to unlawful actions.

297.    TBB seeks all available damages to recover these amounts from the defendants as unjust enrichment.

298.    Defendants unjustly retained a benefit to TBB's detriment, and the defendants' retention of that benefit violates the fundamental principles of justice, equity, and good conscience.

299.    TBB requests that the Court enter judgment against the defendants and award TBB money, damages, and all relief available to TBB as a result of the defendants becoming unjustly enriched at the Bank's, now TBB's expense, as well as any other relief that may be available to remedy the defendants' actions.

### Count 5- Breach of Fiduciary Duties (Against Defendants Oliveros and Valencia)

300.    The allegations of all the foregoing and the following paragraphs are incorporated by reference as if fully set forth in this paragraph.

301.    By their actions and inactions, as explicitly described and generally herein, Defendants Oliveros and Valencia were grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of TBB and its depositors, or actions which were without the bounds of reason. These acts of gross negligence included:

a.      pursuing an aggressive and reckless growth and lending conduct ahead of the safety and soundness of the depositor funds entrusted to Defendants Oliveros and Valencia;

b.      permitting the Bank's commercial loan portfolio to deteriorate due to continued approvals, increases, extensions, and renewals of poorly underwritten, high-risk commercial loans, credit facilities, and credit card agreements in violation of the Bank's policies, procedures, federal and state regulations, and prudent banking practices, thereby jeopardizing the Bank's financial health and causing it to fail;

c.      failing to inform themselves of material information or alternatives reasonably or to engage in due analysis or deliberation as to the extreme risks of such strategies, actions, and failures to act;

d.      failing to analyze supporting information to ensure that loans, credit facilities, and credit cards agreements complied with the Bank's policies and procedures and prudent banking practices, and failing to inform themselves of material information or alternatives otherwise reasonably, or to engage in due analysis or deliberation as to the extreme risks inherent in those loans, credit facilities or credit card agreements;

e.      approving the loans, credit facilities, and credit cards agreements in violation of the Bank's policies and procedures, federal and state safety and soundness regulations, and prudent banking practices;

f.      approving multiple increases, extensions, and/or renewals of delinquent and defaulted loans, credit facilities, and credit cards agreements in order to fund interest reserves at the expense of the safety and soundness of depositor funds, delaying losses and defaults and increasing the losses on the loans, credit facilities, and credit cards agreements;

g.      as senior executive officers, failing to ensure that lending and administration within each officer's respective area of responsibility complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices;

h.      administering and funding loans, credit facilities, and credit cards agreements despite receipt of reports showing borrower defaults on key loan approval terms and severe collateral impairment; unilateral and unauthorized waiver of key borrower financial covenants designed to protect the Bank; manipulation of Bank loan monitoring systems so as not to reflect

the continuing deterioration of collateral, ineligible collateral, and violations of covenants and loan agreements; and advancing sums above-authorized credit limits;

i.      allowing the Bank's assets to be utilized as collateral or guarantee for related third-party loans at third-party financial institutions;

j.      other acts and omissions to be discovered through pretrial discovery and at trial.

302.    Defendants Oliveros and Valencia are liable, solidarily, for all damages proximately caused by their grossly negligent acts and omissions.

### Count 6- Collection of Monies (Against Defendant Oliveros)

303.    The allegations of all the foregoing and the following paragraphs are incorporated by reference as if fully set forth in this paragraph.

304.    The Bank extended a personal credit card to Defendant Oliveros as a customer. As such, Defendant Oliveros agreed to make payments on the credit balance on a monthly basis.

305.    Defendant Oliveros materially breached his obligations under the credit card agreement when he failed to pay the balance owed on the credit card.

306.    All obligations by Defendant Oliveros to the Bank, now TBB, are owed, due, and payable.

307.    TBB requests that the Court enter judgment against Defendant Oliveros and award TBB the amount due under the credit card agreement, plus all interests that have accrued and continue to accrue, since the same became due and payable, which at present amounts to $82,311.22.

**WHEREFORE**, Plaintiff TBB International Bank Corp. respectfully requests that this Honorable Court grant the following relief:

a)      Declare that the Defendants violated 18 U.S.C. § 1962(c) and enter judgment against the Defendants;

b)      Declare that the Defendants violated 18 U.S.C. § 1962(d) and enter judgment against the Defendants;

c)      Declare that the Defendants committed fraud and fraud in the inducement and enter judgment against the Defendants;

d)      Declare that the Defendants became unjustly enriched at TBB's expense and enter judgment against the Defendants;

e)      Declare that Defendants Oliveros and Valencia breached their fiduciary duties and enter judgment against Defendants Oliveros and Valencia;

f)      Declare that Defendant Oliveros is responsible for the amount due under the credit card agreement, plus all interests that have accrued and continue to accrue, and enter judgment against Defendant Oliveros;

g)      Enter judgment against Defendants, in the amounts of the losses suffered by TBB;

h)      Awards damages to TBB in an amount to be determined at trial, including trebling as appropriate, along with punitive damages;

i)      Awards restitution to TBB in an amount to be determined at trial;

j)      Awards reasonable attorneys' fees and expenses;

k)      Awards pre-and post-judgment interest, to the extent allowable;

l)      Awards such other and further relief as equity and justice require, including all forms of relief provided for under the RICO Act and the Puerto Rico Civil Code.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 12th day of June 2023.

67



**DLA Piper (Puerto Rico) LLC**
500 Calle de la Tanca, Suite 401
San Juan, PR 00901-1969
Tel. 787-945-9132
Fax 939-697-6102

*/s/ José Sosa Lloréns*
José Sosa Lloréns
USDC-PR No. 208602
jose.sosa@us.dlapiper.com

*/s/ Yahaira De la Rosa Algarín*
Yahaira De la Rosa Algarín
USDC-PR No. 306601
yahaira.delarosa@us.dlapiper.com