# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| TBB International Bank Corp., | |
| Plaintiff, | Civil Case No. 23-CV-01310 (ADC) |
| v. | |
| José Antonio Oliveros Febres Cordero; Alejandro J. Valencia Hurtado; Holding Activo Ltd.; Alexandra Oliveros Febres Cordero; María Eugenia Febres Cordero Zamora; José Antonio Oliveros Mora; Gorlio Enterprises Ltd.; El Retiro Group Ltd.; AIB Properties Limited Ltd.; Don Goyo Corporation Aviation; Inversiones Saitam, S.A.; Consultora Baru 2018, C.A.; Gustavo José Gerardo Corredor Salcedo; Alejandro Enrique Montenegro Díaz; Inversiones Elektrogorsk, C.A.; Intelinvest Casa de Valores, S.A., | |
| Defendants. | |

## OPPOSITION TO *MOTION TO DISMISS AS TO CODEFENDANTS' CORREDOR AND VALENCIA*

TO THE HONORABLE COURT:

COMES NOW, Plaintiff TBB International Bank Corp. ("TBB") through the undersigned counsel, and respectfully states and prays as follows in Opposition to Defendants Gustavo José Gerardo Corredor Salcedo and Alejandro J. Valencia Hurtado's *Motion to Dismiss as to Codefendants' Corredor and Valencia*:

### I.    Introduction

On September 25, 2023, Defendants Gustavo José Gerardo Corredor Salcedo and Alejandro J. Valencia Hurtado (hereinafter, "Corredor and Valencia") filed a *Motion to Dismiss as to Codefendants' Corredor and Valencia* ("Motion to Dsimiss") pursuant to Fed. R. Civ. P.

12(b)(6), for allegedly failing to state a claim upon which relief can be granted. *See* Docket No. 24. In their Motion to Dismiss, Corredor and Valencia cherry-pick allegations from TBB's Complaint (*See* Docket No. 1) while ignoring other essential allegations to argue that TBB's allegations are insufficient. They also improperly contest TBB's factual allegations, which is not allowed in a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Corredor and Valencia are deeply entrenched in the alleged racket and breaches of duty alleged in the Complaint. The pleadings, as to Corredor and Valencia, easily satisfy the requirements under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and Fed. R. Civ. P. 8(a), 9(b), and 12(b)(6).

The Complaint provides exceptionally specific detail (including as to Corredor and Valencia) in stating the factual allegations that establish each element of the asserted causes of action. Corredor, Valencia, and the other defendants and co-conspirators are intricately intertwined. They have the same leaders, connect through ownership and management of entities, share operations, and relentlessly pursue the same unlawful purposes. Together, they have engaged in a multi-faceted scheme violating the Racketeer Influenced and Corrupt Organizations Act ("RICO") and committing other statutory and common law wrongs against TBB. As will be shown in this response, TBB sufficiently alleged its Complaint. Accordingly, Corredor and Valencia's Motion to Dismiss should be denied.

## II.    Standard of Review

TBB asserts claims against Corredor and Valencia for violation of RICO (Count I), conspiracy to violate RICO (Count II), fraud and fraudulent inducement (Count III), unjust enrichment (Count IV), breach of fiduciary duty, (Count V), among others. To assert these claims, the Federal Rules of Civil Procedure establish that a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus,

when a motion to dismiss for failure to state a claim is filed under Fed. R. Civ. P. 12(b)(6), the Court must "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff[ ]." *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48-49 (1st Cir. 2009). Pursuant to *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007), in order to 'show' an entitlement to relief, a complaint must contain enough factual material to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact). *Id*. Accordingly, a claimant is required to present allegations that "nudge [his] claims across the line from conceivable to plausible" in order to comply with the requirements of Rule 8(a). *Twombly*, 550 U.S. at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Under the standard established by *Twombly* and *Iqbal*, the Court's inquiry, when analyzing a motion to dismiss, is a two-step process. First, the Court must "accept as true all of the allegations contained in a complaint." *Iqbal*, 556 U.S. at 678; *Mead v. Independence Ass'n*, 684 F.3d 226, 231 (1st Cir. 2012). Second, the Court must determine whether the complaint "states a plausible claim for relief." *Iqbal*, 556 U.S. at 679. This step is "context-specific" and requires that the Court draw from its own "judicial experience and common sense" to decide whether a plaintiff has stated a claim upon which relief may be granted, or, conversely, whether dismissal under Rule 12(b)(6) is appropriate. *Id*.; *see also*, *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009). To meet the requirements of this context-based analysis, the claimant must allege sufficient facts to comply with the basic elements of the cause of action—if that requirement is met, a motion to dismiss cannot be granted, regardless of how unlikely recovery may ultimately be. *See Iqbal*, 556 U.S. at 671-672; *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'")

The First Circuit has cautioned against equating plausibility with an analysis of the likely success on the merits, affirming that the plausibility standard assumes "pleaded facts to be true and read in a plaintiff's favor" "even if seemingly incredible." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 30 (1st Cir. 2010) (citing *Twombly*, 550 U.S. at 556). Thus, the First Circuit has emphasized that "[t]he make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, [rather than] not a merely conceivable, case for relief." *Id.* at 29. Indeed, the "court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Ocasio-Hernandez*, 640 F.3d at 12 (citing *Twombly*, 550 U.S. at 556). "Specific information, even if not in the form of admissible evidence, would likely be enough at [the motion to dismiss] stage; pure speculation is not." *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 596 (1st Cir. 2011).

As will be discussed in detail below, the factual allegations set forth in the Complaint clearly and adequately plead plausible claims for relief as to each cause of action, and, therefore, the Motion to Dismiss should be denied.

## II.    Factual Allegations

These are the relevant allegations that are deemed true for this Motion.

### A.    The Type of Schemes at Issue

The Complaint details a scheme to deceive Activo International Bank, Inc. (hereinafter, "Activo PR" or the "Bank"), at present known as TBB, of millions of dollars in the form of depleting assets of the Bank through several transactions which were approved in violation of federal and state bank regulations. *See* Docket No. 1 ¶ 1. The scheme had three different modalities totaling in excess of $29 Million. *Id.*, ¶ 3.

The first modality begins with the defendants' requesting and granting loans and credit facilities from the Bank—not independent arrangements because the entities are connected in the many ways described here. The customers who were extended these loans, credit facilities, and/or overdrafts were mere conduits ultimately controlled by José Antonio Oliveros Febres-Cordero ("Oliveros") and Valencia. Valencia was the Director and Executive President of the Bank, and was the executive involved in the day-to-day functions of the Bank. *See* Docket No. 1 ¶¶ 19 and 91. Unbeknownst to TBB, these loans and credit facility extensions to its different customers were shams as they were no legitimate and true end-user customers. The framework was put in place to circumvent state regulations that prohibited the officers and directors from being granted loans without the previous authorization of the OCFI. The loans and credit facilities in the defendants' scheme are illegal. *Id.,* ¶ 46; *see*, *also*, P.R. LAWS ANN. tit. 7 §232j(b)(6). The defendants' scheme defrauded the Bank of more than $5.6 Million due to their adverse nature and performance, which required a charge-off of the outstanding balance. *Id*., ¶ 4

In the second modality, the Bank was approached by Inversiones Saitam, S.A. ("Inversiones Saitam") and Consultora Baru 2018, C.A. ("Consultora Baru"), purportedly separate companies that are actually operated and managed by Corredor, the brother-in-law of Valencia, through a power of authority extended by Valencia. They shared the same business address, employees, supplier, and, at some point, the manager. Oliveros, Valencia, and the other defendants made representations (as described in the Complaint) about the legitimacy of the prepaid services that can be imposed on the Bank but offered to enter into a commercial arrangement on the false basis that the commercial arrangement would provide some (lawful) element. The defendants used the Bank to enter those contracts on the supposed notion that the charges of prepaid services were legitimate. The actual motivation for the approach to use commercial contracts is that the

defendants knew throughout their scheme that the illegality eventually would come to light. They believed using a commercial contract would enable them to escape oversight. The contracts, thus, were an evasive tactic to extend their scheme as long as possible before the regulatory regime caught up to them resulting in funneling the Bank's funds to illegitimate activity. *See* Docket No. 1 ¶ 46. TBB is still estimating the damages suffered by the Bank in this modality, but it paid entities in excess of $4.4 million during this period. *Id*., ¶ 5.

In its third modality, the scheme comprised the most extensive and blatant misuse of position and authority in diverting the Bank assets to collateralize loans for the defendants' benefit through third-party financial institutions and standby letters of credit against the Bank's assets. These funds were used to feed the fraud cycle of the different schemes, repayment of loans, and lifestyle with funds that belonged to the Bank and its depositors. Under this modality, the defendants defrauded the Bank in excess of $15.8 Million. *See* Docket No. 1 ¶ 6.

### B.    The RICO Enterprise

Corredor, Valencia, the other defendants, and the non-party co-conspirators are intricately intertwined. They are associated-in-fact and form an enterprise whose activities affect interstate and foreign commerce. *See* Docket No. 1 ¶ 190. The enterprise existed to enable the defendants to obtain from the Bank (i) loans, credit facilities, and overdrafts that were extended to the accounts of related persons and/or entities, creating a façade of somewhat standard everyday transactions, concealing an in-place scheme to divert the Bank's depositors' funds to ultimately beneficiate the defendants; (ii) payments for the Prepaid Services scheme in order to divert the Bank's funds, through which the defendants used Inversiones Saitam and/or Consultora Baru as vehicles to circumvent the regulated context and into the private commercial context; and (iii) loans from third-party financial institutions guaranteed with the Bank's assets, that were never intended to be

repaid, and which ultimately benefited the defendants. The enterprise profits from the disbursement of funds by the Bank through loans, credit facilities, overdrafts, and prepayments for services that are not actually provided. *Id*., ¶ 191.

The defendants and their co-conspirators have had overlapping ownership, management, and financial interests, which enables them to act in concert with each other and with multiple non-party co-conspirators to perpetrate the underlying scheme. *See* Docket No. 1 ¶ 2. Valencia is associated with the enterprise as a primary orchestrator of the scheme. He utilized his position as an officer and director of the Bank to authorize and conceal transactions and activities in furtherance of the schemes. Valencia likewise shares sums of money received from the Bank. *Id.,* ¶ 193.  In turn, Corredor is associated with the enterprise as it has various connections to other parties associated with it and is the acting manager of the entities purportedly providing overpriced services while receiving prepayments that ultimately benefit the defendants and related parties. *Id*., ¶ 203.  Corredor was also involved in some operational duties within the Bank, which posed a conflict of interest, and would act as the Operations Manager of the Bank on occasion. *Id*., ¶ 30.

### III.    Legal Argument

#### A.    TBB Sufficiently Alleged a RICO Claim Under 18 U.S.C. § 1962(c).

A RICO complaint under § 1962(c) need only identify "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 42 (1st Cir.2001); *Lerner v. Colman*, 26 F.4th 71, 77 (1st Cir. 2022).  The RICO claim is thoroughly pleaded.

At the outset, it bears mentioning that Corredor and Valencia only challenge the sufficiency of the predicate act allegations.  Their RICO challenge is narrow.  It does not dispute that (i) the Complaint properly pleads an association-in-fact enterprise,  (ii) the complained-of activity was

done in furtherance of the enterprise, (iii) the activity is closed-ended, or (iv) TBB was damaged. Nor could it argue otherwise. The Complaint painstakingly alleges the associations among the defendants and conspirators, the components of the enterprise, the continuance of the scheme, the actions in furtherance of the enterprise, and the impact on TBB.

### 1. TBB has Adequately, Plausibly, and Specifically Pleaded a Racketeering Act.

Corredor and Valencia instead make a minimally supported argument that the Complaint does not allege with particularity under Rule 9(b) that Corredor and Valencia themselves (as opposed to other defendants) committed predicate acts. (*See* Motion to Dismiss at pp. 10-11.) Corredor and Valencia misconstrue both the law and the allegations.

The law is well established on pleading wire fraud as RICO predicate acts. The plaintiff does not need to prove that the defendant has had any personal involvement in initiating the wire transfers; instead, the use of the wires need only have been a reasonably foreseeable part of the scheme in which he participated. *United States v. Vázquez–Botet*, 532 F.3d 37, 63–64 (1st Cir.2008). In this case, it could reasonably be foreseen by Corredor and Valencia that they and/or the other defendants would use wire transfers to move around the funds to perpetrate the fraudulent schemes. The Complaint details how, in the Credit Facility and Loan Scheme, funds were transferred through the bank accounts of different defendants to ultimately benefit Oliveros, its related entities, and close associates. *See* Docket No. 1 ¶¶ 98-104. Oliveros and/or Valencia approved the loans or letters of credit that provided the funds in their official capacity as directors and officers of the Bank. *Id.,* ¶ 103. Further, in the Prepaid Services Scheme, Oliveros and Valencia executed service contracts with Inversiones Saitam and Consultora Baru to provide services to the Bank by means of a prepaid services arrangement. However, the prepaid services were not rendered as agreed. Instead, the funds of the prepayments made by the Bank to Inversiones Saitam

and Consultora Baru were transferred to accounts related to and/or under the control of Oliveros, Valencia, and related associates. *Id.,* ¶¶ 107-130. Meanwhile, Corredor was the acting manager of Inversiones Saitam and Consultora Baru through a power of authority extended by Valencia. *Id.,* ¶ 108. Finally, in the Bank Assets as Collateral Scheme Oliveros and Valencia misused their position and authority to collateralize loans at third-party financial institutions with the Bank's assets. They transferred the borrowed funds from third-party financial institutions guaranteed with the Bank's assets through electronic payment. The defendants deposited the borrowed funds from third-party financial institutions guaranteed with the Bank's assets into bank accounts located in Puerto Rico. *Id.,* ¶¶ 133-167. All of these uses of the wire transfers were in furtherance of the defendants' fraudulent schemes.

The "key question" in assessing pleadings is whether each defendant is given sufficient notice of their respective roles in order that they may answer the complaint. *Westernbank Puerto Rico v. Kachkar*, No. CV 07-1606 (ADC), 2009 WL 10681037, at *4 (D.P.R. Aug. 20, 2009); *Corporación de Seguros v. Reyes–Muñoz*, 826 F.Supp. 599, 609 (D.P.R.1993) (sustaining complaint under Rule 9(b) where the plaintiff "pled other important details which should serve to put defendants on notice of the claims being asserted against them"). As for the degree of particularity required, allegations must contain the facts describing the time, place, and contents of the false representations. *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir.1987). However, where an alleged scheme of fraud involves numerous transactions that occur over a long period, relaxing the Rule 9(b) standard may be appropriate because pleading the precise specifics regarding every instance of fraudulent conduct may be impractical. *Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, No. CIV. 15-1167 JAG/SCC, 2015 WL 5719801, at *13 (D.P.R. Sept. 29, 2015), report and recommendation adopted, No. CV 15-1167 (JAG), 2016 WL

9459821 (D.P.R. Mar. 31, 2016). A plaintiff pleading wire fraud must allege (1) a scheme to defraud, (2) the defendant's knowing participation in that scheme, and (3) the use of the wires. *United States v. Hebshie*, 549 F.3d 30, 35 (1st Cir.2008).

The specific allegations of wire fraud against Corredor and Valencia fully satisfy these requirements. The Complaint alleges in excess of two predicate acts by Corredor and Valencia, which can be grouped into different categories, as shown non-exhaustively below.[1]

(1)    The Complaint identifies two funds transfers transmitted by wire from the Bank to Inversiones Saitam. (*See* Docket No. 1 ¶¶ 114 and 118). Corredor was the acting manager of Inversiones Saitam and Consultora Baru through a power of authority extended by Valencia. (*Id.,* ¶ 108). Those funds were then subsequently transferred by wire from Inversiones Saitam to other defendants. (*Id.*, ¶¶ 115, 119, and 125). The allegations state who sent them (Inversiones Saitam), when they were sent (December 28, 20217, and September 21, 2018), how they were sent (interstate wires), and how they were in furtherance of the scheme (they were a consequence of the false representations and as result of the effort to charge improperly). Those are predicate acts by Corredor and Valencia under 18 U.S.C. §1343.

(2)    The Complaint identifies one transfer of funds transmitted by wire from Intelinvest Casa de Valores, S.A. ("Intelinvest") to Holding Activo Ltd.'s ("Holding Activo") account as a result of a loan collateralized with the Bank's investment portfolio. (*See* Docket No. 1 ¶ 146). The loans were never registered in the Bank's books per the orders of Defendant Valencia, in his capacity as President of the Bank, and fulfilled by non-party conspirator Lawrenz González ("González"), as Operations Manager of the Bank. (*Id.,* ¶ 166). Non-party conspirator Francisco Vizcarrondo ("Vizcarrondo") was a transaction facilitator in many instances, using batch

---

[1] The below narrative desccribes examples of predicate acts alleged in the Complaint, but is not exhaustive of all the predicate acts comitted by the defendants.

processing to circumvent proper monitoring of illegal transactions in the Bank. (*Id.,* ¶ 70). Those funds were then subsequently transferred by wire to Oliveros, Gorlio Enterprises Ltd. ("Gorlio Enterprises"), Inversiones Saitam, and Valencia. (*Id.*, ¶¶ 147-149).  The allegations state who sent them (Intelinvest and Holding Activo), when they were sent (on or around August 2017), how they were sent (interstate wires), and how they were in furtherance of the scheme (they were a consequence of the false representations and as result of the effort to collateralize loans at third-party financial institutions with the Bank's assets).  This is a predicate act by Corredor and Valencia under 18 U.S.C. §1343.

(3)    The Complaint identifies one transfer of funds transmitted by wire from a third-party financial institution to Holding Activo's account in the Bank as a result of a loan collateralized with a Bank's certificate of deposit.  (*See* Docket No. 1 ¶¶ 158, 160). The loans were never registered in the Bank's books per the orders of Valencia, in his capacity as President of the Bank, and fulfilled by non-party conspirator González, as Operations Manager of the Bank. (*Id.,* ¶ 166). Non-party conspirator Vizcarrondo was a transaction facilitator in many instances, using batch processing to circumvent proper monitoring of illegal transactions in the Bank. (*Id.,* ¶ 70). Those funds were then subsequently transferred by wire to Gorlio Enterprises. (*Id.*, ¶ 160).  The allegations state who sent them (Holding Activo), when they were sent (on or around June 2018), how they were sent (interstate wires), and how they were in furtherance of the scheme (they were a consequence of the false representations and as result of the effort to collateralize loans at third-party financial institutions with the Bank's assets).  This is a predicate act by Valencia under 18 U.S.C. §1343.

(4)    The Complaint alleges that the defendants (including Corredor and Valencia) were transferring and/or depositing the proceeds of their schemes in financial institutions, which

constitutes money laundering in violation of 18 U.S.C. § 1956. (*Id.*, ¶¶ 187-189) Each transfer and/or deposit is another Corredor and Valencia's predicate act.

(5)  The entirety of this case concerns the use of the wires to perpetuate different schemes to defraud. (*Id.*, ¶¶ 172-175) The defendants, as well as their non-party co-conspirators, repeatedly and knowingly used the interstate wires to effectuate their schemes. Wire fraud occurs when the interstate wires are used in furtherance of a scheme. Wire fraud is indelibly part of this case. Predicate acts are endemic.

As for the requirement that the alleged enterprise be "engaged in, or the activities of which affect, interstate or foreign commerce," 18 U.S.C. § 1962(a), the interstate commerce requirement is satisfied if the activity of either the enterprise or the predicate acts of racketeering affects interstate commerce. *United States v. Robertson*, 514 U.S. 669, 671 (1995). The "affecting commerce" test was developed to define the extent of Congress' power over purely intrastate commercial activities that nonetheless have substantial interstate effects. *Id.* The required interstate commerce nexus is *de minimis*. *United States v. Marino*, 277 F.3d 11, 35 (1st Cir.2002).

The Complaint avers how the defendants transferred funds transmitted by wire from Intelinvest to Holding Activos's account in the Bank. *See* Docket No. 1 ¶ 146. Intelinvest is an entity organized, existing, and doing business under and by virtue of the laws of the Republic of Panama. Intelinvest's office and principal place of business are located in Panamá. *Id.*, ¶ 68. There is no doubt that the predicate act affects foreign commerce. Moreover, the Complaint identifies one transfer of funds transmitted by wire from a third-party financial institution to Holding Activo's bank account. *Id.*, ¶¶ 158, 160. It has been held that transferring funds from one bank to another involved one or more financial institutions engaged in interstate commerce. *United States*

*v. Morales-Rodriguez*, 467 F.3d 1, 13 (1st Cir. 2006). Thus, the predicate act affects interstate commerce.

In addition, the Complaint describes two funds transfers transmitted by wire from the Bank to Inversiones Saitam. *See* Docket No. 1 ¶¶ 114 and 118. Inversiones Saitam is an entity organized, existing, and doing business under and by virtue of the laws of the Bolivarian Republic of Venezuela. Inversiones Saitam's office and principal place of business are located in Caracas, Venezuela. *Id*., ¶ 63. Considering that Inversiones Saitam is a participant in the enterprise, its activities affect foreign commerce.

Notwithstanding, the First Circuit has held that because it will often be difficult for a plaintiff to plead with specificity when the facts that would support its claim are solely in possession of a defendant, a court faced with an insufficiently specific claim may permit limited discovery in order to give a plaintiff an opportunity to develop the claim and amend the complaint. *New England Data Services, Inc. v. Becher*, 829 F.2d 286 (1st Cir.1987). Here, defendants are in exclusive control of crucial information that furthers their illegal acts and racketeering activity. After all, it was precisely Valencia who was, with Oliveros, in control of the Bank and was a primary orchestrator of the scheme. He utilized his position as an officer and director of the Bank to authorize and conceal transactions and activities in furtherance of the schemes. *See* Docket No. 1 ¶ 193. Meanwhile, Corredor was the acting manager of the entities purportedly providing overpriced services while receiving prepayments that ultimately benefited other defendants and related parties. *Id.,* ¶ 203. In the alternative, TBB contends that an opportunity to conduct discovery is warranted.

**2.  TBB has Sufficiently Pleaded the Existence of a Pattern of Racketeering Activity.**

The RICO Act specifically enumerates what kinds of illegal acts count as "racketeering." *See* 18 U.S.C. § 1961(1). To establish a "pattern," the statute requires a plaintiff to show that at least two acts of racketeering occurred within ten years of each other. 18 U.S.C. § 1961(5). The Supreme Court has additionally required that the racketeering predicates be related and that they amount to or pose a threat of continued criminal activity. *Giuliano v. Fulton*, 399 F.3d 381, 386–87 (1st Cir.2005) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989)).

To prove a "pattern of racketeering activity," one must show separate predicate acts that 1) are "related," and 2) "amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. A plaintiff establishes that predicate acts are related by demonstrating that they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.,* at p. 240.

Predicate acts amount to continued criminal activity when they form a "closed period of repeated conduct," which the Court defined in *H.J.* by proving a series of related predicates extending over a substantial period of time. *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 446 (1st Cir. 1990) (alleged criminal conduct spans years, not "a few weeks or months," thus sufficient to establish continuity). Both the Supreme Court and the First Circuit have declined to spell out specifically how many predicate acts, or how long the racketeering has to endure, for a plaintiff to allege the pattern requirement satisfactorily. *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 529 (1st Cir. 2015). The Court just takes a natural and commonsense approach to RICO's pattern element, to determine whether the specific fact pattern of the case before us suggests the kind of broad or ongoing criminal behavior at which the RICO statute was aimed. *Id.*

Corredor and Valencia allege that TBB failed to establish a pattern of racketeering to comply with a RICO claim. They claim the number of predicate acts is not high, nor is the duration of the conduct so long as to necessitate a finding of continuity. Also, the predicate acts jointly targeted only TBB, and the alleged conduct constitutes a single effort to benefit Oliveros and/or entities related to or controlled by him. (*See* Motion to Dismiss at pp. 13-14).

Corredor and Valencia do not contend that the separate predicate acts stated in the Complaint are related. Undoubtedly, the facts alleged in the Complaint demonstrate that the predicate acts have the same or similar purposes, results, participants, victims, or methods of commission.  Thus, the first prong of the requisite to prove a "pattern of racketeering activity" has been complied with.

In addition, the predicate acts alleged in the Complaint amount to continued criminal activity because they formed a closed period of repeated conduct extending over a substantial period of time. The alleged criminal conduct of Corredor and Valencia spanned a total of five years, not a few weeks or months.  *See* Docket No. 1 ¶¶ 87-169. Their conduct was not sporadic activity. In the case of Valencia, the conduct identified at the time the Complaint was filed spanned at least five years and various illegal acts. *Id*. Considering that Valencia, while acting as director, shareholder, and officer of the Bank, directed and provided all necessary instructions and approvals to further the schemes, it is at present unknown the extent of his participation that can represent more illegal acts, including wire fraud, illegal use of interstate delivery service, transport or receipt of stolen money, and money laundering for a longer period of time.

As for Corredor, the conduct identified at the time the Complaint was filed spanned at least three years and various illegal acts. *See* Docket No. 1 ¶¶ 107-132. However, per information and belief, it is understood that Corredor was involved in more than two interstate wire transactions

during that time, provided that the Prepaid Services scheme involving Defendant Inversiones Saitam caused losses of no less than $3.55 million. Meanwhile, the Prepaid Services scheme involving Defendant Consultora Baru caused losses of approximately $850,000. *Id.,* ¶ 19. Moreover, it should be taken into account that Corredor was also involved in some operational duties within the Bank, which posed a conflict of interest and would act as the Operations Manager of the Bank on occasion. *Id.*, ¶ 30. Thus, it is at present unknown the extent of Corredor's participation in any of the other schemes perpetrated by the defendants that can represent more illegal acts, including wire fraud, illegal use of interstate delivery service, transport or receipt of stolen money, and money laundering.

Considering that there is no rule on how many predicate acts, or how long the racketeering has to endure, for a plaintiff to allege the pattern requirement satisfactorily, the Complaint suggests the kind of ongoing criminal behavior at which the RICO statute was aimed based on a natural and commonsense approach. Contrary to what Corredor and Valencia allege, the predicate acts jointly targeted the Bank (now TBB) and its depositors and employees, as the defendants' actions and wrongdoing left the Bank in a negative capital position with no funds to repay them. *See* Docket No. 1 ¶ 2. Due to the mismanagement and the fraudulent schemes object stated in the Complaint, on February 10, 2020, the Puerto Rico Office of the Commissioner of Financial Institutions ("OCFI") issued an Emergency Consent Order ordering Activo PR to adopt and implement a Restructuring Plan to reestablish normal operations, thus meeting its obligations to its depositors and other creditors. *Id.*, ¶ 10. Among the requirements of the OCFI in the Restructuring Plan was removing Oliveros and Valencia from the management of the Bank and ownership of the Bank. *Id.*, ¶ 15. The predicate acts targeted and affected more than one victim, but ultimately, the Bank's

(now TBB) depositors, creditors, and employees as well. The series of predicate acts committed by the defendants extended to other persons or entities.

Further, the alleged conduct did not constitute a single effort to benefit Oliveros and/or entities related to or controlled by him. In the Complaint, it is alleged that it benefited other individuals as well, such as Valencia (*See* Docket No. 1 ¶¶ 83, 87, 170, and 193), Alejandro Montenegro (*Id.*, ¶ 31, 47, 156, 170, 204, and 281), and the rest of the defendants (*Id.*, ¶ 281). Moreover, the alleged conduct did not constitute a single effort, given that it encompassed three different schemes that involved different individuals and entities outside Puerto Rico and the United States, which affected numerous victims, as discussed before, and that benefitted all the defendants. As such, TBB sufficiently pleaded the existence of a pattern of racketeering activity.

### 3. TBB Has Sufficiently Pleaded that Corredor and Valencia Participated in the Operation and/or Management of the Enterprise.

Section 1962(c) makes it unlawful for a person to "conduct, or participate in the conduct of the affairs of the enterprise" through a pattern of racketeering activity. 18 U.S.C. § 1962(c). In order to have taken part in or associated with the conduct of an enterprise, an "associate" must have had some part in directing those affairs of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 177-178 (1993). An enterprise is operated not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management. *Id.*, at p. 184.

The First Circuit in *United States v. Cianci*, 378 F.3d 71 (1st Cir. 2004) stated:

> [The] requirement of association with the enterprise is not strict. The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise. The RICO statute seeks to encompass people who are merely associated with the enterprise. The defendant need only be aware of at least the general existence of the enterprise named in the indictment, and know about it related activities.

*Id.*, at p. 95.

Corredor and Valencia pose that TBB has not alleged that they participated willingly and knowingly in the operation and/or management of the enterprise, nor has TBB alleged that they acted on behalf of the enterprise. (*See* Motion to Dismiss at p. 14). Those arguments are unfounded.

The Complaint discusses extensively Corredor and Valencia's involvement in the operation and/or management of the enterprise and how they acted on behalf of the enterprise. The defendants and their co-conspirators have had overlapping ownership, management, and financial interests, which enables them to act in concert with each other and with multiple non-party co-conspirators to perpetrate the underlying scheme. *See* Docket No. 1 ¶ 2. As for Valencia, he is associated with the enterprise as a primary orchestrator of the scheme. He utilized his position as an officer and director of the Bank to authorize and conceal transactions and activities in furtherance of the schemes. *Id.,* ¶ 193.  For example, Valencia willingly and knowingly misused his position of power in the Bank to authorize illegal transactions. *Id.,* ¶ 19. He supplied the authorization to perpetrate the collateralized loans scheme and bypass the Bank's monitoring systems on at least three occasions by ordering not to register the loans in the Bank's books.  *Id.,* ¶¶ 166-167.

As for Corredor, he is associated with the enterprise as it has various connections to other parties associated with it and is the acting manager of the entities purportedly providing overpriced services while receiving prepayments that ultimately benefit the defendants and related parties. *See* Docket No. 1 ¶ 203.  Corredor was also involved in some operational duties within the Bank, which posed a conflict of interest, and would act as the Operations Manager of the Bank on occasion. *Id.,* ¶ 30. Corredor willingly and knowingly, as manager of Inversiones Saitam and/or Consultora Baru, sent or made to send multiple invoices over the interstate wires to further the Prepaid Services scheme. The entities were paid under the scheme in at least two instances, as

described in the Complaint. *Id.,* ¶¶ 114, 118, and 130. Thus, Corredor and Valencia played a part in directing the affairs of the enterprise. They were aware of at least the general existence of the enterprise, knew about its related activities, and clearly acted on behalf of the enterprise.

### B.    TBB Sufficiently Pleaded Corredor and Valencia conspired to violate RICO under 18 U.S.C. § 1962(d).

In order "[t]o prove a RICO conspiracy ..., the [plaintiff] must show that 'the defendant knowingly joined the conspiracy, agreeing with one or more co-conspirators to further [the] endeavor, which, if completed, would satisfy all the elements of a substantive [RICO] offense." *Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023). However, it suffices that the conspirator "adopt the goal of furthering or facilitating the criminal endeavor, and [...] need not agree to undertake all of the acts necessary for the crime's completion." *Salinas v. United States*, 522 U.S. 52, 53 (1997).

Even if Corredor and Valencia could somehow evade § 1962(c) on the ground that the predicate act allegations against them are insufficiently pleaded—and they more than suffice— they are separately liable for a § 1962(d) RICO conspiracy. Corredor and Valencia make no additional arguments against their § 1962(d) liability. They do not challenge the enterprise allegations or question that TBB was harmed. Their sole contention remains that the Complaint does not specifically aver Coredor and Valencia agreed to assist or to act on behalf of "the enterprise" and/or the existence of a commitment or agreement to commit two predicate acts. (*See* Motion to Dismiss at p. 16) .

Corredor and Valencia again misconstrue the law and facts. A plaintiff may recover for a RICO violation against "co-conspirators who might not themselves have violated one of the substantive provisions of § 1962," so long as the plaintiff is injured by an overt act that is also a predicate act of racketeering. *Beck, II v. Prupis*, 529 U.S. 494, 506-07 (2000). The predicate acts

do not have to have been committed by a defendant.  To plead a claim for *conspiracy* to violate RICO, the Complaint needs to allege that the defendant agreed to facilitate conduct constituting the RICO violation and that *someone*—not necessarily a defendant—would commit at least two predicate acts. *FAC, Inc. v. Cooperativa de Seguros de Vida*, 106 F. Supp. 2d 244, 260. (D.P.R. 2000). A defendant who does not know the "entire conspiratorial sweep" is nevertheless jointly and severally liable, in the civil context, for all acts in furtherance of the conspiracy. *Aetna Cas. & Sur. Co. v. P & B Autobody*, 43 F.3d 1456 (1st Cir.), *supplemented sub nom. Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546 (1st Cir. 1994). As the District of Puerto Rico has ruled:

> A "RICO conspiracy does not require proof that a defendant 'himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under § 1962(c).' " *United States v. Cianci*, 378 F.3d 71, 90 (1st Cir.2004) (quoting *Salinas v. United States*, 522 U.S. 52, 61, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)). Instead, § 1962(d) only requires that the defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, [i.e.] that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

*Davila Uviles v. RYS Int'l Corp*., 443 F. Supp. 2d 233, 240 (D.P.R. 2006).

Leaving Corredor and Valencia aside, the Complaint is replete with allegations that *other* defendants and co-conspirators committed predicate acts (and they are all part of the conspiracy).

- The Complaint identifies at least one transaction over the interstate wires to transfer the funds obtained from the loan and credit facilities scheme involving Gorlio Enterprises and Oliveros. (*See* Docket No. 1 ¶¶ 98-106);

- The Complaint identifies at least two transactions over the interstate wires to transfer the funds obtained from the prepaid services scheme involving Inversiones Saitam, Consultora Baru, Gorlio Enterprises, and AIB Properties Limited.(*See* Docket No. 1 ¶¶ 114-132);

- The Complaint identifies at least three transactions over the interstate wires to transfer the funds obtained using bank assets as a collateral scheme involving Gorlio Enterprises, Oliveros, Inversiones Elektrogorsk, C.A., Inversiones Saitam, Holding Activo, and Alejandro Montenegro (*See* Docket No. 1 ¶¶ 136-169); and

> ▪ All the other defendants are alleged to have engaged in the use of interstate delivery service and/or money laundering—and pervasive use of the interstate wires as an endemic part of their scheme.

Corredor and Valencia thus agreed to the commission of predicate acts by the co-conspirators. They participated in misrepresentations to convince TBB to continue with the arrangements. For example, Valencia misused his position and authority to collateralize loans with the Bank's assets at third-party financial institutions. *See* Docket No. 1 ¶ 133. He supplied the authorization to perpetrate the scheme and bypass the Bank's monitoring systems on at least three occasions by ordering the Bank not to register the loans in its books. *Id.*, ¶¶ 166-167. Under Corredor's direction as manager, Inversiones Saitam and/or Consultora Baru sent multiple invoices over the interstate wires to further the Prepaid Services scheme. The entities were paid under the scheme in at least two instances, as described in the Complaint. *Id.,* ¶¶ 114, 118, and 130. In addition, Corredor was involved in some operational duties within the Bank, which posed a conflict of interest and would act as the Operations Manager of the Bank on occasion. *Id.*, ¶ 30. As shown extensively throughout the Complaint, Corredor and Valencia are thus not distant actors with feeble connections to the misconduct. They are prime movers.

### C. TBB Sufficiently Pleaded its State Law Claims Against Corredor and Valencia.

TBB demonstrated that its RICO causes of action have been sufficiently pleaded, conforming to the standards set forth by law and case law. Notwithstanding, the state law causes of action included in the Complaint are justified on their own merits to grant this Honorable Court subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332.

### 1. TBB Sufficiently Alleged Fraud and Fraudulent Inducement.

Article 1868 of the Puerto Rico Civil Code establishes a one-year statute of limitations for tort actions commencing "from the time the aggrieved person had knowledge" of the injury. P.R.

LAWS ANN. tit. 31, § 5298. For determining when the statute of limitations begins to run, Puerto Rico adopts the "cognitive theory of harm," which is when the claimant knew or should have known, that they suffered any injury, who caused it, and the elements necessary to be able to pursue their cause of action effectively. *Barretto Peat, Inc. v. Luis Ayala Colon Sucrs., Inc*., 896 F.2d 656, 658 (1st Cir. 1990). The First Circuit has previously stated that the specific knowledge of the tort in question consists of knowledge of the injury and the person who caused it. *Hodge v. Parke Davis & Co*., 833 F.2d 6, 7 (1st Cir.1987).

Corredor and Valencia essentially claim that TBB's fraud in the inducement claim is time-barred since the statute of limitation is one (1) year for damages claims pursuant to Article 1802 of the Puerto Rico Civil Code —and their arguments largely fail. Among other allegations, TBB has claimed that the defendants concealed the architecture involved in requesting loans, credit facilities, overdrafts extended by the Bank, payments from prepaid services, and loans from third-party financial institutions using the Bank's assets as collateral, and misrepresented the real purposes for which those loans, credit facilities, and overdrafts were requested. *See* Docket No. 1 ¶ 268. Moreover, the defendants have concealed that the defendants' entities were merely sham entities in reality controlled by Oliveros and/or Valencia and have concealed their knowledge that it was illegal for Oliveros to benefit from the proceeds under the loans, credit facilities, overdrafts extended by the Bank, payments from prepaid services, and loans from third-party financial institutions using the Bank's assets as collateral, obtained employing false pretenses. *Id*., ¶ 269.

As stated in the Complaint, the defendants have taken careful and deliberate steps to conceal their misconduct by layering activity. *See* Docket No. 1 ¶ 43. The information that shed light on the defendants' scheme was and is currently in the defendants' control. In its current form, the Complaint reflects what has been discovered by exhaustive means at the date of filing. It was

not until TBB's new management (which had no connection with the previous management of the Bank by Oliveros and Valencia) took the reins of the Bank that it could begin to assemble an initial explanation of the dire financial situation of the Bank and the reasons behind it. Further, TBB anticipates that discovery may show that other individuals and/or entities are involved, that the scheme has additional components, and that the damages are more widespread. *Id.*, ¶ 50. TBB has adequately established that its lack of knowledge was not due to its own carelessness but because of the extent of the defendants' concealment and the complexity of the illegal schemes.

The Complaint thus sets forth an independently powerful fraud claim against Corredor and Valencia.  As demonstrated, Corredor and Valencia made numerous false statements to the Bank (now TBB).  (The circumstances also established a duty to speak and not to conceal material information.)  Corredor and Valencia's statements were material; they went directly to the terms on which the Bank was induced to enter into transactions and extend money.  Corredor and Valencia made the statements to induce the Bank to act on them.  The Bank acted to its detriment on Corerdor and Valencia's statements.  The Bank, now TBB, was damaged.

## 2.    TBB Sufficiently Pleaded its Unjust Enrichment Cause of Action.

TBB states a claim for unjust enrichment.  A claim for unjust enrichment under Puerto Rico law requires allegations of: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause. *Puerto Rico Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir.2011); *Montalvo v. LT's Benjamin Records, Inc.*, 56 F. Supp. 3d 121, 136 (D.P.R. 2014). For all the reasons set forth above, those requirements are well met.  The defendants have retained millions of dollars as a result of their conduct.  (*See, e.g.*, Docket No. 1 ¶¶ 278-299.)

Corredor and Valencia make no independent arguments against the cause of action for unjust enrichment. (*See* Motion to Dismiss at p. 18)  They essentially claim that the Complaint does not include any factual event to demonstrate that TBB suffered as a result of unjust enrichment by Corredor or Valencia. Also, Corredor and Valencia allege that TBB does not aver how the defendants were enriched or the exact amount of money received due to the alleged fraudulent acts. Additionally, they argue that TBB only states that the benefited party was Oliveros. Finally, Corredor and Valencia claim the cause of action is not viable due to the acts being related to contractual agreements, precluding the claim. Those arguments fail, as shown below.

First, TBB has stated extensively in the Complaint that the actions and wrongdoing of the defendants left the Bank in a negative capital position with no funds to repay all depositors or employees. *See* Docket No. 1 ¶ 2.  The vast losses were attributed to the defendants utilizing Activo PR's (now TBB) assets for personal use and funding third-party investments and loans to promote fraud schemes further. These losses were attributed to investments in other foreign banks that had losses, loan losses that were issued to related individuals or entities that did not pay back the loan and acted as straw persons for loan fraud, credit card losses, using Activo PR's funds, investments, and overpriced prepaid "outsourced" service contracts to capitalize and subsidize personal use and funnel funds for the continuation of the scheme. *Id*., ¶¶ 12-13. Hence, this is why the OCFI ordered the restructuring process on the Bank. *Id*., ¶¶ 10-11, 14-17. Thus, undoubtedly, TBB has included sufficient factual events to demonstrate that it suffered as a result of unjust enrichment by Corredor and/or Valencia.

Second, TBB has explained throughout the Complaint how the defendants were unjustly enriched. As an example, it is stated that Inversiones Saitam and Consultora Baru charged the Bank in excess of $4.4 million from January 2016 through February 2020 for alleged services that

would be provided under the Prepaid Services arrangements. Inversiones Saitam and Consultora Baru were mere conduits to transfer those prepayments through the defendants' accounts. Accordingly, those charges were illegal. Substantial portions of the money paid by the Bank to Inversiones Saitam and Consultora Baru was, in turn, transferred by those entities to other defendants, to ultimately benefit them. *See* Docket No. 1 ¶¶ 287-294. The Complaint explains that Corredor assisted in furthering the Prepaid Services scheme by managing the sham companies that Oliveros and Valencia utilized to move money from the Bank to other related accounts to pay for loans, credit facilities, overdrafts, and make capital contributions to the affiliate banks. *Id.*, ¶ 30. In addition, Corredor was involved in some operational duties within the Bank, which posed a conflict of interest, and would act as the Operations Manager of the Bank on occasion. *Id.*

Also, the Complaint further indicates how Valencia utilized the Bank, its related companies, and the bank accounts of related persons and/or entities as instruments to carry out the fraudulent schemes and how he benefitted from the illegal activity. *Id.*, ¶¶ 19, 28-29, 37. In regards to the Prepaid Services scheme, TBB thoroughly explains how Corredor managed Inversiones Saitam and Consultora Baru through a power of authority extended by Valencia. *Id.*, ¶¶ 28-29.

Third, contrary to what Corredor and Valencia allege, TBB has averred that all the defendants, especially Oliveros, were therefore enriched by their unlawful conduct. All defendants benefitted, including Alejandro Montenegro. *See* Docket No. 1 ¶ 281. Finally, precisely because the defendants benefitted from illegal activities and fraudulent charges, there is an unjust enrichment without cause or validly binding economic activity. *See, e.g.*, *Alcoa S. S. Co. v. Velez*, 285 F. Supp. 123, 126 (D.P.R. 1968) ("[i]t is crystal clear that defendant would be unjustly enriched if it was permitted to retain the fruits of its illegal demands"). Therefore, the cause of

action for unjust enrichment is a separate claim to be judged on its own merits. TBB has sufficiently stated a claim under it.

### 3.   TBB Sufficiently Alleged a Breach of Fiduciary Claim.

TBB includes a breach of fiduciary claim against Valencia based on his acts and/or omissions while serving as Director and Executive President of the Bank. *See* Docket No. 1 ¶¶ 300-302. However, Corredor and Valencia allege that TBB does not allege enough facts to establish a claim under Puerto Rico corporate law nor under the Civil Code or Puerto Rico. (*See* Motion to Dismiss at p. 18) .

Throught the Complaint, TBB narrates how Valencia, as the Director and Executive President of the Bank, utilized the Bank, its related entities, and the bank accounts of related persons and/or entities as instruments to carry out the fraudulent schemes described in detail in the Complaint. Also, Valencia misused his position of power in the Bank to authorize illegal transactions, failing his fiduciary responsibilities and benefiting from the wrongful activity. *See* Docket No. 1 ¶¶ 19, 34, 37-38, 40-41, 47, 71, 83, 87, 89, 90-91, 103, 107-108, 113, 121-122, 127, 129, 133, 145, 165-166, 170, 210-233. Specifically, TBB described the acts of gross negligence in the Complaint, which encompass pursuing an aggressive and reckless growth and lending conduct ahead of the safety and soundness of the depositor funds entrusted; approving the loans, credit facilities, and credit card agreements in violation of the Bank's policies and procedures, federal and state safety and soundness regulations, and prudent banking practices; as senior executive officers, failing to ensure that lending and administration within each officer's respective area of responsibility complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices; allowing the Bank's assets to be utilized as collateral or guarantee for related third-party loans at third-party financial institutions; among

others. *Id*., ¶ 301.  Acts and omissions that resulted in Valencia being removed from the management of the Bank and ownership of the Bank as required by the OCFI. *Id*., ¶ 15. Hence, TBB has sufficiently stated enough facts to sustain its breach of fiduciary claim against Valencia.

Contrary to Corredor and Valencia's argument, TBB's Complaint is specific and contains sufficient information to support its claims, to provide Corredor and Valencia with sufficient notice of TBB's claims against it, and to survive a motion to dismiss. Accordingly, the Honorable Court should deny Corredor and Valencia's Motion to Dismiss.

WHEREFORE, TBB respectfully requests the Honorable Court deny the *Motion to Dismiss as to Codefendants' Corredor and Valencia*.

RESPECTFULLY SUBMITTED.

IT IS HEREBY CERTIFIED that, on this same date, a copy of this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record.

In San Juan, Puerto Rico, this 27th day of November 2023.



**DLA Piper (Puerto Rico) LLC**
500 Calle de la Tanca, Suite 401
San Juan, PR 00901-1969
Tel. 787-945-9132
Fax 939-697-6102

*/s/ José Sosa Lloréns*
José Sosa Lloréns
USDC-PR No. 208602
jose.sosa@us.dlapiper.com

*/s/ Yahaira De la Rosa Algarín*
Yahaira De la Rosa Algarín
USDC-PR No. 306601
yahaira.delarosa@us.dlapiper.com