## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**TBB INTERNATIONAL BANK CORP.**
Plaintiff

v.

**JOSE ANTONIO OLIVEROS-FEBRES-CORDERO, et al.**
Defendants

**Case No. 23-cv-1310-ADC**

## MOTION TO DISMISS

**COME NOW** the defendants El Retiro Group Ltd. (hereinafter "ERG"), AIB Properties Limited Ltd. (hereinafter "AIB"), María Eugenia Febres Cordero Zamora (hereinafter "Ms. Febres"), and José Antonio Oliveros Mora (hereinafter "Mr. Oliveros Mora," collectively "Moving Defendants"), by and through the undersigned counsel, and hereby respectfully state, aver, and request that the Honorable Court dismiss all federal RICO claims and all Puerto Rico law fraud claims against Moving Defendants under Federal Rule of Civil Procedure 12(b)(6).

### I.    STANDARD OF REVIEW

A motion under Rule 12(b)(6) is used to dismiss complaints that do not "state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). A 12(b)(6) motion to dismiss will succeed when a complaint does not "plausible" claim for relief, as opposed to merely stating a possible claim for relief. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— that 'the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In order to "nudge [a claim] across the line from conceivable to plausible," the complaint must contain enough facts to support a claim for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "This plausibility standard has become the 'new normal' in federal civil practice."

*Garcia-Catalan v. United States*, 734 F.3d 100, 101 (1st Cir. 2013) (citing *A.G. v. Elsevier, Inc.*, 732 F.3d 77, 78–79 (1st Cir. 2013)).

The First Circuit has mapped out the proper methodology to adequately analyze the plausibility of the claims present in a complaint: "Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Committee*, 669 F.3d 50, 55 (1st Cir. 2012) (citing *Ocasio-Hernandez*, 640 F.3d at 12; *Iqbal*, 556 U.S. 662; and *Twombly*, 550 U.S. at 555.)). This is an exception to the general rule that, when evaluating the sufficiency of a complaint, "a court must accept as true all of the allegations contained in a complaint." *Iqbal*, 556 U.S. at 678.

"A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." *Ocasio-Hernandez*, 640 F.3d at 12, (citing *Iqbal*, 556 U.S. at 680). "A complaint 'must contain more than a rote recital of the elements of a cause of action,' but need not include 'detailed factual allegations.'" *Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto*, 743 F.3d 278 (2014) (citing *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (reiterated by *Garcia-Catalan*, 734 F.3d at 103)). Notwithstanding, a second exception was carved out from *Twombly* by the First Circuit: "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Peñalbert–Rosa v. Fortuño–Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (citing *Twombly*, 550 U.S. at 557 n.5 ("The border in [*DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)] was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.")). The First Circuit, in a separate case, expounded upon these two exceptions:

> A conclusory allegation . . . is one which simply asserts a legal conclusion, such as "I was retaliated against," not a specific factual allegation, such as "my supervisor threw a book at me," that merely lacks some surrounding context. *See Ocasio-Hernández*, 640 F.3d at 13-14.  We have held that some factual allegations may be so "threadbare" that they are in essence conclusory even if they include more than an assertion that an element of a cause of action was satisfied. *See Peñalbert-Rosa*, 631 F.3d at 595–96 (1st Cir. 2011). But this is only the case where the bareness of the factual allegations makes clear that the plaintiff is merely speculating about the fact alleged and therefore has not shown that it is plausible that the allegation is true. <u>Id.</u>

*Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto*, 743 F.3d 278, 286 (1st Cir. 2014).

After duly describing step one in detail, the First Circuit continued their meticulous methodology of identifying a complaint's plausibility:

> Step two: take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.  *Ocasio-Hernandez*, 640 F.3d at 12 (again, discussing *Iqbal* and *Twombly*, among others); *see also S.E.C. v. Tambone*, 597 F.3d 436, 441–42 (1st Cir. 2010) (en banc). Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a "context-specific" job that compels us "to draw on" our "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. And in performing our review, we realize too that we can consider (a) "implications from documents" attached to or fairly "incorporated into the complaint," (b) "facts" susceptible to "judicial notice," and (c) "concessions" in plaintiff's "response to the motion to dismiss." *Arturet–Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n. 2 (1st Cir. 2005); *see also Haley v. City of Boston*, 657 F.3d 39, 44, 46 (1st Cir. 2011). (emphasis provided).

*Schatz*, 669 F.3d at 55-56 (footnote omitted).  "Specific information, even if not in the form of admissible evidence, would likely be enough at [the motion to dismiss] stage; pure speculation is not."  *Penalbert-Rosa*, 631 F.3d at 596.  Nevertheless, "[n]othing about the plausibility standard requires a court to blind itself to what is obvious."  *Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40, 48 (1st Cir. 2012).  When considering a motion to dismiss, the Court's inquiry occurs in a two-step process under the current context-based "plausibility" standard established by *Twombly* and *Iqbal*.

It should also be noted that *Iqbal* recognized that the first sentence of Rule 9(b)—which governs how fraud or mistake is to be pleaded—creates a higher pleading standard than what is otherwise required.  *Iqbal,* 556 U.S. at 686.  Consequently, a complaint that alleges fraud or mistake must, in addition to containing a plausible claim for relief, also state "with particularity

the circumstances constituting fraud or mistake." *See* Fed. R. Civ. P. 9(b); 5A C. Wright & A. Miller, Federal Practice and Procedure §§ 1296 *et seq.*, p. 30 et seq. (3d ed. 2004).

Finally, when Courts are called upon to assess a Rule 12(b)(6) motion to dismiss, they may not consider any matters outside of the pleadings unless the motion is treated as a motion for summary judgment. Fed. R. Civ. P. 12(d).

## II.    FACTUAL OVERVIEW

At the outset, we note that this section is not meant to admit to any of the facts contained in the complaint. We provide this overview in the spirit of the familiar Rule 12(b)(6) analysis requirement that all well-pleaded factual allegations should be taken as true, and all reasonable inferences drawn in favor of the plaintiff, the non-moving party. *See, e.g., Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023). Further, we will attempt to primarily focus on the Moving Defendants: ERG, AIB, Ms. Febres, and Mr. Oliveros Mora.

The plaintiff TBB International Bank Corp. (hereinafter "Bank Plaintiff") filed the instant complaint against sixteen defendants. Bank Plaintiff asserts this Court's jurisdiction on either federal question or diversity jurisdiction grounds. The claims for relief levied against Moving Defendants are: (1) RICO under 18 U.S.C. § 1962(c), (2) RICO conspiracy under 18 U.S.C. § 1962(d), (3) fraud and fraud in the inducement under Puerto Rico's general tort statute, and (4) unjust enrichment under Puerto Rico law.

The complaint describes several ways different defendants supposedly took advantage of and defrauded Bank Plaintiff. Perhaps it is easiest to understand the complaint and its deficiencies by first placing the defendants into distinct groups. The first group are the four defendants who actually worked for or had some sort of ownership interest in Bank Plaintiff: (1) Holding Activo Ltd., which is believed to have been owned in some proportion by the other three

defendants in this group and alleged to have been Bank Plaintiff's majority shareholder; (2) José Antonio Oliveros-Febres-Cordero ("José Oliveros"), who was a director and chairman of the Bank Plaintiff's board of directors from 2009 to 2020; (3) Alejandro J. Valencia Hurtado, who was a director and executive president of Bank Plaintiff from 2012 to 2020; and (4) Alejandro Enrique Montenegro Díaz.  The complaint goes so far to say that José Oliveros and Alejandro J. Valencia Hurtado "totally controlled" Bank Plaintiff.  Docket No. 1 at p. 24, ¶ 83.

The second group of seven defendants are José Oliveros' (a group one defendant) relatives and entities owned by those relatives: (1) Mr. Oliveros Mora (one of the Moving Defendants), who is José Oliveros' father and a former Bank Plaintiff customer; (2) Ms. Febres (one of the Moving Defendants), who is José Oliveros' mother and a former Bank Plaintiff customer; (3) Alexandra Oliveros, who is José Oliveros' sister and a former Bank Plaintiff customer; (4) Don Goyo Corporation Aviation, which is believed to be wholly owned by José Antonio Oliveros Mora and alleged to be a former Bank Plaintiff customer; (5) Gorlio Enterprises Ltd. and (6) ERG (one of the Moving Defendants), which are both believed to be owned by Ms. Febres (one of the Moving Defendants) and Alexandra Oliveros and are both alleged to be a former Bank Plaintiff customers; and (7) AIB (one of the Moving Defendants), which is believed to be partially owned by ERG (one of the Moving Defendants). and Alejandro Enrique Montenegro Díaz (a group one defendant) and is alleged to have been a former Bank Plaintiff customer.  All four Moving Defendants come from this second group.

The third group of three defendants are Alejandro J. Valencia Hurtado's (a group one defendant) relatives and entities managed by those relatives: (1) Gustavo José Gerardo Corredor Salcedo, who is Mr. Valencia Hurtado's brother-in-law; (2) Inversiones Saitam, S.A. and (3)

Consultora Baru 2018, C.A., which were both managed by Gustavo José Gerardo Corredor Salcedo.

The fourth and final group is simply a miscellaneous category of the two leftover defendants who do not fit so neatly into the previous groups: (1) Inversiones Elektrogorsk, C.A., which is believed to have some relation to Alejandro Enrique Montenegro Díaz (a group one defendant) and alleged to have been a former Bank Plaintiff customer and (2) Intelinvest Casa de Valores, S.A., which does not appear to have any alleged relationship to any other defendant.

Another useful organizational task is to generally describe the three different schemes described in the complaint: (1) the credit facility and loan scheme, (2) the prepaid services scheme, and (3) the bank assets as collateral scheme. The credit facility and loan scheme was essentially an endeavor whereby the defendants and non-party co-conspirators concealed necessary information from Bank Plaintiff that would allow it to monitor and stop unfavorable loans from being made to Bank Plaintiff's customers. Supposedly, the money received by the Bank Plaintiff's customers was being used for purposes not specified in the loan application. Next, the prepaid services scheme was essentially an endeavor to pay third parties for services where it was known that these services would never be done. Supposedly, the defendants and non-party co-conspirators concealed necessary information from Bank Plaintiff that would allow it to monitor and stop these unfavorable arrangements from happening. Finally, the bank assets as collateral scheme was essentially an endeavor whereby Bank Plaintiff would pay off different Bank Plaintiff customers' debts owed to third parties in the event of their default. These alleged schemes were supposedly aimed at defrauding Bank Plaintiff. However, despite a careful reading of the complaint, it is not always so clear how each defendant is supposed to fit into

these schemes or what exactly each of them did to aid in the commission of these supposed schemes.

Before we eventually go into more specificity with respect to Moving Defendants, it must be noted how the complaint lumps all sixteen defendants into the term "Defendants" in inconsistent and confusing circumstances. There is nothing inherently wrong with this practice of combining all defendants into one shorthand term like "Defendants," but it is a problem when the drafter's use of the term causes inconsistencies with the remaining allegations. Any confusion this creates could have been remedied by the inclusion of clarifications and more detail.

For instance, the complaint does not (and cannot) explain how Moving Defendants can be lumped into "[t]he defendants have committed repeated predicate acts of wire fraud, mail fraud, and money laundering in furtherance of their fraudulent scheme." Docket No. 1 at p. 2, ¶ 2. What acts (if any) did ERG, AIB, Ms. Febres, and Mr. Oliveros Mora do or participate in? Surely, more specificity is required and available to Bank Plaintiff. Also, there is an additional "particularity requirement" under Federal Rule of Civil Procedure 9(b) when pleading fraud. Despite this heightened pleading demand, there is a persistent lack of specificity when the Bank Plaintiff uses this term.

Moving Defendants can cite numerous examples of these empty and unsupported allegations where Bank Plaintiff uses "Defendants" in such an all-encompassing way. We ask the Court to read the complaint with caution when conducting an individualized analysis for each defendant. The complaint is quite lengthy but surprisingly generic at crucial junctures, especially when it relates to Moving Defendants. It simply does not make sense how, for instance, the exact same discrete racketeering act can be alleged to have been done at the same

time by every single defendant when there are three different alleged schemes and several distinct groups of dissimilarly situated defendants. Perhaps an inventive mind can reconcile some of these issues, but that would be improper considering the heightened pleading requirement for fraud allegations. The Court should hold the Bank Plaintiff to its pleading demands.[1]

---

[1] The Court should be cautious about lumping Moving Defendants into these allegations due to the persistent lack of specificity. Some additional examples of Bank Plaintiff's ineffective use of the term "Defendants" is included here in the margin:

"In furtherance of these schemes, the defendants and their cohorts do everything they can to maintain a stream of funds available by allowing existing credit facilities of related persons and/or entities to increase the credit facilities, which would be transferred to the Defendants." Docket No. 1 at p. 3, ¶ 7.

"Defendants or their co-conspirators assert the right to generate transactions that further prolong their ability to move around monies illegally to the ultimate benefit of Defendants." Docket No. 1 at p. 3, ¶ 7.

"The deficiencies noted in the Credit, Compliance, and Accounting programs were structured by management and the Board of Directors to aid the fraud schemes through a lack of internal controls, independence, and lack of policies and procedures with checks and balances. In addition, the activities were strictly controlled by the Defendants and their co-conspirators." Docket No. 1 at p. 5, ¶ 17.

"Moreover, the defendants utilized the Bank's assets as collateral and/or guarantee for loans extended to related third parties by third-party financial institutions." Docket No. 1 at p. 10, ¶ 36.

"All defendants have been conjoined and associated in many direct and indirect ways. Sometimes in whole and sometimes in part, they have common employees, ownership, investors, executives, and physical locations." Docket No. 1 at p. 11, ¶ 39.

"At least from March 2017, the defendants have made at least one transaction over the interstate wires to transfer the funds obtained from the loan and credit facilities scheme." Docket No. 1 at p. 28, ¶ 104.

"Defendants utilized the prepaid services funds obtained by Inversiones Saitam to fund the account of Defendant Gorlio Enterprises at the Bank. As stated, Defendant Gorlio Enterprises was controlled by Defendant Oliveros." Docket No. 1 at p. 30, ¶ 117.

"Defendants utilized the prepaid services funds obtained by Defendant Inversiones Saitam to cover the debt of the commercial promissory note held by Defendant AIB Properties. As stated, Defendant AIB Properties was controlled by an entity in which Defendant Oliveros' relatives had a complete interest." Docket No. 1 at p. 32, ¶ 126.

"At least from 2017, the defendants have made at least two transactions over the interstate wires to transfer the funds obtained from the prepaid services scheme." Docket No. 1 at p. 34, ¶ 133.

"As discussed in detail below, the defendants and non-party conspirators sought loans from third-party financial institutions, authorized the guarantees, and failed to repay the loans, knowing its consequences to the Bank. All while concealing and controlling the information for the Bank to be able to monitor the fraudulent transactions." Docket No. 1 at p. 33, ¶ 140.

To avoid repetition, we reserve a more particularized discussion of the facts relating to the Moving Defendants for the upcoming analysis section.

### III.    LEGAL ANALYSIS

**A. Dismissal of RICO Claims**

**i.    RICO Overview**

The Racketeer Influenced and Corrupt Organizations Act ("RICO") is an important statutory scheme created "as a tool in the federal government's 'war against organized crime.'" *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 527–29 (1st Cir. 2015) (citing *United States v. Turkette*, 452 U.S. 576, 587, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). In addition to defining conduct subject to criminal penalties, RICO also creates a private right of action to be used in civil court. Also meriting attention is the fact that RICO has both a substantive and conspiratorial dimension, each of which requires a slightly different focus.

The elements of a substantive civil RICO claim are: "(1) conduct, (2) of an enterprise, (3) through [either] a pattern . . . of racketeering activity . . . or a single collection of an unlawful debt." *Id.* (internal quotations and citations omitted). On the other hand, "[i]n order [t]o prove a RICO conspiracy . . . , the [plaintiff] must show that 'the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators to further [the] endeavor, which, if completed, would satisfy all the elements of a substantive [RICO] offense." *Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023) (internal quotations and citations omitted). In addition, to state a

---

"Specifically, Holding Activo transferred more than $3.1 million to Defendant Oliveros, more than $2 million to Defendant Gorlio Enterprises, and $500,000.00 to Defendant Inversiones Saitam. The funds were transferred to the defendants' accounts in the Bank." Docket No. 1 at p. 36, ¶ 148.

"At least from 2016, the defendants have made at least three transactions over the interstate wires to transfer the funds obtained using bank assets as a collateral scheme." Docket No. 1 at p. 39, ¶ 167.

"As detailed above, the defendants, as well as their non-party co-conspirators, repeatedly and knowingly used the interstate wires to effectuate their schemes." Docket No. 1 at p. 41, ¶ 172.

RICO claim, a plaintiff must show injury proximately caused by racketeering activity. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266–68 & n. 12, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Moreover, a civil RICO plaintiff is required "to allege and prove a domestic injury to business or property" and is not authorized to "recover for foreign injuries." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 354, 136 S. Ct. 2090, 2111, 195 L. Ed. 2d 476 (2016). Prior to moving on, some of these elements require additional analysis.

For instance, "enterprise" is defined broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Specifically, the Supreme Court defined "an association-in-fact enterprise" to have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946, 129 S. Ct. 2237, 2244, 173 L. Ed. 2d 1265 (2009). The *Boyle* court also noted the consistency of this finding with what it previously stated 28 years earlier: "an association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Id.* (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Moreover, to fall within RICO's § 1962(c) prohibition, the enterprise must be "engaged in, or the activities of which affect, interstate or foreign commerce." *See United States v. Robertson*, 514 U.S. 669, 671, 115 S. Ct. 1732, 1733, 131 L. Ed. 2d 714 (1995).

Additionally, "conduct" has been thoroughly analyzed by the Supreme Court: "We conclude, therefore, that as both a noun and a verb in [18 U.S.C. § 1962(c)] 'conduct' requires an element of direction." *Reves v. Ernst & Young*, 507 U.S. 170, 178, 113 S. Ct. 1163, 1169, 122 L. Ed. 2d 525 (1993). "In sum, we hold that 'to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Id.* at 185. The Supreme Court called this the "operation or management test." *Id.*

The definition of "racketeering activity" is quite carefully and extensively laid out in 18 U.S.C. § 1961(1). For our purposes here today, it is enough to state that wire and mail fraud and money laundering (what the plaintiff identifies the defendants' alleged racketeering activity to be), if proven, would fall within this definition. Moreover, "pattern of racketeering activity" is defined by statute to simply require "two acts of racketeering activity . . . within ten years" of each other "excluding any period of imprisonment." 18 U.S.C. § 1961(5). However, after carefully analyzing RICO's purpose and legislative history, the Supreme Court read two additional requirements into this pattern element: (1) the relatedness requirement and (2) the continuity requirement. The First Circuit provided a concise summary of these requirements: "[t]he Supreme Court has additionally required that the racketeering predicates be related, and that they amount to or pose a threat of continued criminal activity." *Home Orthopedics,* 781 F.3d at 528 (citing *Giuliano v. Fulton*, 399 F.3d 381, 386–87 (1st Cir.2005) and *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)) (internal quotations, alterations, and citations omitted).

The Supreme Court identified what is required in order to satisfy the relatedness requirement: "[c]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240.

The Supreme Court was purposefully less precise but more detailed when addressing how to satisfy the continuity requirement:

> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. **Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.** Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated. *See* S.Rep. No. 91–617, at 158.
>
> Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. Without making any claim to cover the field of possibilities—preferring to deal with this issue in the context of concrete factual situations presented for decision—we offer some examples of how this element might be satisfied. A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime." The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

*Id.* at 242-43 (emphasis added).

After the Supreme Court's aforementioned pronouncement, the First Circuit has had opportunity to delve into the continuity requirement in much more detail, which is perhaps best summarized in the following passage:

> The Supreme Court in *H.J. Inc.* noted Congress's "natural and commonsense approach to RICO's pattern element," see 492 U.S. at 237, 109 S.Ct. 2893, suggesting that its discussion of temporal factors did not mean that other considerations were to be entirely ignored. Indeed, in rejecting the notion that a pattern of racketeering activity requires proof of multiple schemes, the Court noted that "proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity." *Id.* at 240, 109 S.Ct. 2893. Likewise, where the racketeering activity exceeds in duration the "few weeks or months" that the Supreme Court in *H.J. Inc.* deemed inadequate, but is neither so extensive in reach nor so far beyond the minimum time period that common sense compels a conclusion of continuity, the fact that a defendant has been involved in only one scheme with a singular objective and a closed group of targeted victims also strikes us as "highly relevant." *Cf. Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 780 (7th Cir.1994) (various factors considered in assessing continuity, including the number of victims, the presence of separate schemes, and the

occurrence of distinct injuries); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir.1993) (considering, in addition to duration, "extensiveness" of the RICO scheme, including number of victims, variety of racketeering acts, whether the injuries caused were distinct, and the complexity and size of the scheme); *Pelullo*, 964 F.2d at 208 ("We have eschewed the notion that continuity is solely a temporal concept, though duration remains the most significant factor."); *U.S. Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1269 (7th Cir.1990) ("'[I]t is not irrelevant, in analyzing the continuity requirement, that there is only one scheme.' ") (quoting *Sutherland v. O'Malley*, 882 F.2d 1196, 1204 (7th Cir.1989)).

*Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 18 (1st Cir. 2000) (footnote omitted) (affirming a dismissal on a Rule 12(b)(6) motion because "[a]lthough the twenty-one month time frame for these communications [seventeen alleged acts of wire and mail fraud] meets the Supreme Court's requirement for closed continuity of more than 'a few weeks or months,' . . . , it is not so long a period nor are there so many predicate acts that other indicators of continuity—or the lack of them—are without significance.").

### ii.     Lack of Requisite "Continuity"

Recapping, for Bank Plaintiff to satisfy its pleading requirements, it must plead a plausible pattern of racketeering activity.  To do so, plausible "continuity" should be alleged in the complaint.  Such a conclusion is consistent with the Supreme Court's finding that "Congress was concerned in RICO with long-term criminal conduct."  *H.J. Inc.*, 492 U.S. at 242.

Although RICO is quite broad in its coverage of illegal conduct, it does not encompass every series of acts committed by an individual or even a group of individuals.  Dismissal of RICO claims are commonplace, even where there are clear illegalities that have taken place.  *See, e.g., Efron*, 223 F.3d at 18 (affirming a dismissal on a Rule 12(b)(6) motion because "[a]lthough the twenty-one month time frame for these communications [seventeen alleged acts of wire and mail fraud] meets the Supreme Court's requirement for closed continuity of more than 'a few weeks or months,' . . . , it is not so long a period nor are there so many predicate acts that other indicators of continuity—or the lack of them—are without significance."); *Johnson v. Heath*, 56 F.4th 851, 856 (10th Cir. 2022) (Finding no continuity where purchaser defendant

operated gas station for about 11 years, scammed at least 24 customers, fraudulently overcharged at least 25 customers for gasoline, tires, or repairs, and fraudulently sold station to plaintiff at inflated price.); *Batal-Sholler v. Batal*, 621 F. Supp. 3d 122, 128 (D. Me. 2022) (Finding no continuity where defendants, in attempt to defraud plaintiff of profits from her work at agency, stole her client list and misclassified her as independent contractor rather than employee, where all of the alleged acts were geared towards one thing, namely defrauding plaintiff of her clients, profits, wages, retirement, inheritance, property, and control over agency.).

The Court should not allow Bank Plaintiff to overstretch the RICO and federal jurisdiction statutes to its own benefit. Instead, Bank Plaintiff should be made to properly adhere to the requirements of other non-RICO claims for relief that it may have for these alleged illegalities. If the illegalities alleged by Bank Plaintiff are true, a dismissal on RICO grounds does not leave it without remedy; on the contrary, it may pursue claims on traditional non-RICO grounds. The factors to consider in making this finding include the following: (1) temporal factors, (2) the number of acts committed, (3) the number of schemes where the defendant was involved, and (4) the number of victims. *See, e.g., Efron*, 223 F.3d at 18. After considering these factors and the circumstances surrounding the complaint's allegations, it becomes clear that RICO is not the appropriate avenue to seek relief for these claims.

It is undisputed that there is only one alleged victim in this case: Bank Plaintiff. This factor counsels against a "continuity" finding. However, an evaluation of the remaining factors would benefit from an individualized discussion as to each Moving Defendant. Notwithstanding, we note the difficulty this involves because precise answers to these inquiries are not always so clear and can change depending on which defendant and which scheme the complaint is referring

to. The complaint is simply too devoid of specificity or clarity, leaving us with too many implausible allegations to support Bank Plaintiff's grandiose assertions.

Starting with ERG, it is alleged that it was "one of the entities utilized to carry out the previous fraudulent schemes" and that it "allowed itself to be used as a conduit of fraud and wrongdoing, as a front for [José Olivares] to control the illegal activities." Docket No. 1 at p. 7, ¶ 25. Further, supposedly ERG was "designed to present a false air of credibility and as a means to circumvent federal and state regulations concerning the extension of loans, credit facilities, and overdrafts" and "was also used as a means to purchase real estate." *Id.* at p. 15, ¶ 47f. In addition, the complaint claims that "is associated with the Enterprise as it . . . has the aforementioned connections to other parties associated with the Enterprise" and "thus is intimately involved with and participates in all aspects of the fraudulent scheme" and "likewise shares sums of money received from the [Bank Plaintiff]. *Id.* at p. 47, ¶ 199.

The only other allegation against ERG worth mentioning that is not simply a repetition of what has already been noted is that it wholly owns AIB. Notwithstanding, the complaint does not adequately connect any AIB misconduct to ERG. If AIB did in fact act improperly, that does not fall on ERG's shoulders without anything more.

Applying the continuity factors to Bank Plaintiff's RICO case against ERG counsels for dismissal. An overly-generous reading of the complaint yields, at best, about three acts committed by ERG: (1) generally allowing itself to be used for fraud and wrongdoing, (2) sharing money received from Bank Plaintiff, and (3) owning AIB. Indeed, when viewing the case from ERG's perspective, things look quite implausible, and RICO is quite a stretch. What money was shared? How did ERG affect AIB's actions? Which of the alleged schemes were these actions part of? Furthermore, the complaint conveniently does not even attempt to identify

a temporal overview of ERG's supposed involvement.  When did these acts happen?  Of course, we cannot perhaps expect Bank Plaintiff to know everything at this juncture, but plausibility is still required before being allowed to drag defendants through an expensive discovery process. The case against ERG is akin to a fishing expedition.  Nevertheless, three actions against one victim in what would appear to be a short amount of time with no threat of continued harm must fail any continuity analysis.  The Court should remove Bank Plaintiff from the RICO avenue and redirect them towards traditional means for relief.

The analysis is not much different for AIB.  AIB is also claimed to "be used as a conduit of fraud and wrongdoing, as a front for [José Oliveros] to control the illegal activities."  *Id.* at pp. 7-8, ¶ 26.  AIB was also supposedly "designed to present a false air of credibility and as a means to circumvent federal and state regulations concerning the extension of loans, credit facilities, and overdrafts" and "was also used as a means to purchase real estate."  *Id.* at p. 15, ¶ 47g.  AIB is claimed to have "received from Inversiones Saitam funds that were payments for [the prepaid services scheme]."  *Id.* at p. 20, ¶ 61.  Specifically, "Inversiones Saitam received a payment of $100,000.00 for the prepaid services it provided to the [Bank Plaintiff]" and "transferred $28,000.00" of this money to AIB on September 21, 2018, for an invoice payment without providing "supporting documentation."  *Id.* at p. 31, ¶¶ 118-19.  Moreover, on an unspecified date, Bank Plaintiff allegedly loaned AIB $1,000,000 "for a capital investment contribution in Spain" using real estate in Venezuela as collateral but Bank Plaintiff never "perfected" the collateral due to inadequate procedure.  *Id.* at p. 31-32, ¶¶ 123-24.  The complaint also asserts that on September 28, 2018, AIB made a $21,116.10 payment on this loan, but obtaining this amount from the $28,000 received from Inversiones Saitam.  *Id.* at p. 32, ¶ 125.  Additionally, AIB is allegedly "associated with the Enterprise as it . . . has the aforementioned connections to

other parties associated with the Enterprise" and "likewise shares sums of money received from the [Bank Plaintiff]." *Id.* at p. 47, ¶ 200.

It is difficult to try to make a case for their being continuity with respect to AIB. Dismissal is necessary after considering the now familiar continuity factors. Once more, trying to read the complaint as generously as possible yields at most about five acts committed by AIB: (1) generally allowing itself to be used for fraud and wrongdoing, (2) receiving $28,000 on September 21, 2018, from Inversiones Saitam as payment for work that was supposedly not done, (3) receiving $1,000,000 loan from Bank Plaintiff by improper means, (4) paying Bank Plaintiff $21,116.10 (from the $28,000 received from Inversiones Saitam) on September 28, 2018, for the $1,000,000 loan, and (5) sharing sums of money received from Bank Plaintiff. Even if these acts were plausible and actually occurred, there is simply no continuity. Five acts against one victim in a short amount of time with no threat of additional harm simply fails the continuity test. RICO is simply an improper vehicle in this case.

Coming now to Ms. Febres, it is alleged that she is José Oliveros' mother, a Bank Plaintiff customer, and "owner, shareholder, and/or executive of various entities utilized to carry out the previously described fraudulent schemes." *Id.* at pp. 6-7, ¶ 22. Further, the complaint claims that Ms. Febres "allowed herself to be used as a conduit of fraud and wrongdoing, as a front for [José Oliveros] to control the illegal activities." *Id.* Specifically, it is claimed that Ms. Febres partially owns ERG, AIB, and Gorlio Enterprises Ltd. However, the complaint unequivocally pleads that it was in fact her son José Oliveros who controlled each of these entities. *Id.* at p. 15, ¶ 47e ("Defendant Gorlio Enterprises, wholly owned by Defendants Alexandra and [Ms. Febres] but ultimately controlled by Defendant [José Oliveros.]"); p. 15, ¶ 47f (same allegation regarding ERG); p. 15, ¶ 47g (same allegation for AIB). Additionally, the

17

complaint avers that Ms. Febres "willingly provided their identities to open accounts and register entities under their name to transfer the funds utilized in the schemes." *Id.* at p. 14, ¶ 47c. Ms. Febres also supposedly "shares sums of money received from the Bank." *Id.* at pp. 46-47, ¶ 196.

Bank Plaintiff fares no better on the continuity tightrope with respect to Ms. Febres. Once more, the overly-generous reading of the complaint yields at most about three acts committed by Ms. Febres: (1) generally allowing herself to be used as a conduit for her son's supposed illegal acts, (2) willingly providing her identity to open accounts and register entities, and (3) share in sums of money from Bank Plaintiff. The irony of this analysis is that, at the expense of repetition, the complaint itself identifies José Oliveros as the person controlling the entities owned by Ms. Febres. Three acts of misconduct in what must be a short amount of time against one victim with no risk of future harm must fail RICO's continuity requirement. The RICO case against Ms. Febres is quite underwhelming and implausible. If Ms. Febres did wrong Bank Plaintiff, it was certainly not in violation of RICO. The wrong remedy is being sought by Bank Plaintiff and this Honorable Court, after conducting this continuity analysis, should put a stop to this.

From one parent to another, we now conduct the continuity tamisage with respect to Mr. Oliveros Mora. To that effect, he is alleged to be José Oliveros' father, a Bank Plaintiff customer, and "owner, shareholder, and/or executive of various entities utilized to carry out the previously described fraudulent schemes." *Id.* at p. 7, ¶ 23. However, despite the complaints use of the phrase "various entities," the complaint only mentions one entity that is claimed to be owned in any way by Mr. Oliveros Mora: Don Goyo Aviation Corporation. *Id.* at p. 8, ¶ 27. Further, the complaint claims that Mr. Oliveros Mora "allowed himself to be used as a conduit of fraud and wrongdoing, as a front for [José Oliveros] to control the illegal activities." *Id.*

Notably, the complaint unequivocally pleads that it was in fact his son José Oliveros who controlled Don Goyo Aviation Corporation.  *Id.* at p. 20, ¶ 62 ("On information and belief, it is wholly owned by Defendant Oliveros Mora, although Defendant Oliveros controls it.").  Moreover, the complaint proclaims that the Venezuelan real estate property that was supposed to be used as collateral for the previously mentioned $1,000,000 loan to AIB belonged to Mr. Oliveros Mora's current spouse (not Ms. Febres).  *Id.* at p. 32, ¶ 124.  Also, the complaint states that Mr. Oliveros Mora "shares sums of money received from the Bank."  *Id.* at p. 47, ¶ 197.

Continuing the trend, continuity here is also lacking.  Using the pleader-friendly search for supposed misconduct we can, at best, find about two acts supposedly committed by Mr. Oliveros Mora: (1) generally allowing himself to be used as a conduit for illegal activity and (2) he somehow knew that the real estate property belonging his current spouse was being used in some improper manner to obtain the $1,000,000 loan from Bank Plaintiff.  Trying to make the continuity case here is almost humorous.  Two acts in what would appear to be a short amount of time against one victim with no threat of future harm definitely cannot be enough to withstand a continuity challenge.  Plausibility demands more than wishful thinking.  If Mr. Oliveros Mora did in fact wrong Bank Plaintiff, then Bank Plaintiff has more appropriate claims for relief at its disposal.  RICO is not meant to encompass all wrongs.

Before closing, we suspect that Bank Plaintiff will attempt to remedy these deficiencies by pointing out different generic allegations contained in the complaint, but they will have to be deemed too speculative, conclusory, and implausible to be considered.  Dismissal of these RICO claims against Moving Defendants on continuity grounds appears to be unavoidable.

**iii.    Lack of Requisite "Conduct"**

Although dismissal of the RICO claims against Moving Defendants on continuity grounds is appropriate, we offer an alternative ground for dismissal of the RICO claims. As detailed above, the Bank Plaintiff is required at this stage of the case to plead that it is plausible that a defendant engaged in the alleged RICO "conduct." To evaluate whether Bank Plaintiff has satisfied this requirement, reviewing courts are required to use the "operation or management test." *Reves*, 507 U.S. at 185. Slightly restated, this Court should consider whether Bank Plaintiff's complaint pleads that a defendant plausibly "participate[d] in the operation or management of the enterprise itself." *Id.* After careful study of the complaint, there is, at best, a mere possibility that any of the Moving Defendants participated in the "operation or management of the enterprise," which would require a dismissal of the RICO counts. Let us review the relevant allegations for each Moving Defendant.

As the arguments for Ms. Febres and Mr. Oliveros Mora are so similar, we address them both in tandem. Both Ms. Febres and Mr. Oliveros Mora are alleged to be José Oliveros' parents and a Bank Plaintiff customer. In addition, it is alleged that they own ERG, AIB, Gorlio Enterprises Ltd., and Don Goyo Aviation Corporation. However, the complaint repeatedly states that it is in fact José Oliveros (their son) who controls all four of these entities while there is no such mention of control regarding Ms. Febres or Mr. Oliveros Mora. Taking this fact as true makes it difficult for Bank Plaintiff to cross the plausibility threshold with respect to their conduct. This assertion is difficult to reconcile with a finding that either parent satisfies the "operation or management test." When combining these asseverations with the surprising scarcity of acts that Ms. Febres and Mr. Oliveros Mora supposedly committed, a dismissal is unavoidable.

With the hope of saving this Honorable Court time and effort, we simply refer to the facts listed as to Ms. Febres and Mr. Oliveros Mora in the prior continuity section.  Even the most favorable reading of those allegations cannot lead to a plausible finding that either Ms. Febres or Mr. Oliveros Mora operated or managed the alleged RICO enterprise in any way.  The complaint is simply too speculative, conclusory, and devoid of detail as to their involvement to cross the threshold from the possible to the plausible.  If anything, it describes how their son (José Oliveros) may have operated or managed the supposed RICO enterprise.

More than mere desire is needed to subject Ms. Febres and Mr. Oliveros Mora to an expensive discovery process in this case.  The complaint may have plausibly pleaded this "conduct" element against other codefendants, but not against them.  For all the foregoing, the RICO claims should be dismissed against Ms. Febres and Mr. Oliveros Mora.

We now conduct the same exercise in tandem for ERG and AIB, which are similarly situated, and the resulting dismissal arguments are virtually identical.  We also wish to save to avoid bloating this motion any further and respectfully refer it to the detailed factual allegations against ERG and AIB listed in the previous continuity section.  Even the most favorable reading of those allegations cannot lead to a plausible finding that either ERG or AIB operated or managed the alleged RICO enterprise in any way.  The complaint is simply too deficient and general as to their involvement to make a reasonable plausibility case that ERG or AIB exercise any management or control over the enterprise.  If anything, it describes how José Oliveros may have used them as conduits to operate or manage the supposed RICO enterprise.

### B.  Puerto Rico Law Fraud Claims are Time Barred

In addition to the ambitious RICO claims described above, Bank Plaintiff claims that Moving Defendants are liable for fraud and fraud in the inducement under Puerto Rico's general

tort statute.  However, these fraud claims should be dismissed on statute-of-limitations grounds.  It is worth noting that Puerto Rico's long-standing Civil Code was relatively recently amended.  However, the substance of the general tort statute and its statute of limitations survived this amendment.  *Comp.* Articles 1802, 1868, and 1873 of Puerto Rico Civil Code (1930) (repealed) *and* Articles 1197, 1204, and 1536 of Puerto Rico Civil Code (2020).  Thus, there is no need to explore which of the Civil Codes apply, since dismissal on statute-of-limitations is required under either for the very same reasons.

Accordingly, absent any tolling of the one-year clock, any fraud in question had to have occurred or have been diligently discovered by Bank Plaintiff no earlier than June 12, 2022, which is exactly one year before the complaint was filed.  There is no indication anywhere in the complaint that there is any applicable tolling mechanism at play in this case.  Further, there is no date remotely close to June 12, 2022, that could apply to any fraud committed by either of the three Moving Defendants.  Finally, Bank Plaintiff appears to have been alerted to all possible frauds in 2020 at the latest.  *See* Docket No. 1 at p. 25, ¶¶ 85 and 86.  Therefore, dismissal of these fraud claims is compelled.

**WHEREFORE**, El Retiro Group Ltd., AIB Properties Limited Ltd., María Eugenia Febres Cordero Zamora, and José Antonio Oliveros Mora respectfully request that the Honorable Court grant this motion and dismiss all federal RICO and Puerto Rico law fraud claims against them.  The RICO statute has been extended beyond recognition and these claims should be dismissed on lack-of-continuity grounds.  In the alternative, the RICO claims should be dismissed as they do not pass the "operation or management test."  Further, all fraud claims under Puerto Rico law must fail as they were filed long after the expiration of the one-year statute of limitations.

 **I HEREBY CERTIFY** that, in accordance with Federal Rule of Civil Procedure 5, a true and correct copy of the foregoing has been furnished via CM/ECF to all appearing parties or their attorneys by way of their designated email addresses on this 15th day of March, 2024.

 **RESPECTFULLY SUBMITTED** on this 15th day of March, 2024.

**Manuel Alejandro Law Firm, LLC**
8350 NW 52nd Ter, Suite 301
Doral, FL 33166
Tel: (786) 554-3145

_s/ Manuel Alejandro Franco-Domínguez_
Manuel Alejandro Franco-Domínguez
USDC-PR No. 302406
Manuel@AlejandroLaw.net
