THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **TBB INTERNATIONAL BANK CORP.,**<br><br>　　**Plaintiff,**<br><br>　　**v.**<br><br>**JOSÉ ANTONIO OLIVEROS-FEBRES-CORDERO, et al.,**<br><br>　　**Defendants.** | **Civil No. 23-1310 (ADC)** |

## OPINION AND ORDER

> "Oh, what a tangled web we weave,
> When first we practice to deceive!"
>
> Sir Walter Scott, *Marmion: A Tale of Flodden Field* (1808).

## I.　　Introduction and Background

On June 12, 2023, plaintiff TBB International Bank Corp. ("TBB" or "plaintiff") filed a complaint against sixteen defendants, both corporate and natural persons, alleging a multimodal scheme of deception, fraud, and corporate abuse aimed at misusing and depleting its funds for the personal use, enjoyment, and gain of its officers and shareholders, as well as their family members and close associates. Many of plaintiff's claims were initially dismissed in a previous round of dispositive motions, *see TBB Int'l Bank Corp. v. Oliveros-Febres Cordero*, No. CV 23-1310 (ADC), 2024 WL 3924670 (D.P.R. Aug. 23, 2024), although some were later revived, *see* **ECF No. 130**. Importantly, the Court allowed TBB to conduct limited jurisdictional discovery

**Civil No. 23-1310 (ADC)**                                                      **Page 2**

on its claim under the Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Therefore, from August 2024 to June 2025, the parties engaged in discovery, with the end result being that TBB decided to amend its complaint to drop the racketeering claim and replead its other state law claims. *See* **ECF No. 154**.

The Amended Complaint, filed on June 11, 2025, asserts five separate counts or causes of action against the same defendants as before, alleging fraud and fraud in the inducement ("Count I"), unjust enrichment ("Count II"), breach of fiduciary duties ("Count III"), corporate veil piercing ("Count IV"), and collection of monies ("Count V").[1] Briefly, TBB alleges that defendants José Antonio Oliveros-Febres-Cordero ("Oliveros") and Alejandro J. Valencia-Hurtado ("Valencia"), as former directors and officers of TBB, then known as Activo International Bank, Inc. ("Bank"), used their position to illegally circumvent Puerto Rico banking regulations and fraudulently lend, transfer, and collateralize millions of dollars of the Bank's funds in favor of outside entities controlled by them, their family members, and their close associates.[2] They allegedly did so by means of several separate schemes detailed in the Amended Complaint.

---

[1] The Amended Complaint is in substance very similar to the original complaint, with minor factual supplementation.

[2] To clarify, TBB is the same entity as the Bank but under new ownership and management. Accordingly, the Court will refer to the entity as the "Bank" to describe relevant actions taken prior to this change in ownership and management.

Before the Court are two separate motions to dismiss, one filed jointly by Oliveros and the Bank's sole shareholder, Holding Activo, Ltd. ("Holding Activo"), and another by seven other defendants, hereinafter referred as the "Related Defendants" because they are relatives of Oliveros or companies allegedly wholly owned or controlled by them or by Oliveros.[3] *See* **ECF Nos. 158, 161**, respectively.  Both motions seek dismissal of Counts I, II, and IV pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).[4] In addition, Oliveros and Activo's motion also seeks dismissal of Count III. In sum, the moving defendants argue (i) that the Amended Complaint lacks the required factual particularity to maintain TBB's fraud-based, unjust enrichment, and breach of fiduciary duties claims, (ii) that the allegations supporting these claims likewise fail a to sufficiently state a claim upon which relief may be granted, and (iii) that the corporate veil piercing claim is not a substantive cause of action, and should be dismissed as such.[5]

The Court has expended much effort in describing the facts below and analyzing how they fit into the stated causes of action, due in no small part to the repetitive and circuitous

---

[3] The Related Defendants are: José Antonio Oliveros-Mora ("Oliveros-Mora"), María Eugenia Febres-Cordero-Zamora ("María Febres-Cordero"), Alexandra Oliveros-Febres-Cordero ("Alexandra Oliveros"), Gorlio Enterprises Ltd. ("Gorlio Enterprises"), El Retiro Group Ltd. ("El Retiro Group"), AIB Properties Limited Ltd. ("AIB Properties"), and Don Goyo Corporation Aviation ("Don Goyo Aviation.").

[4] More specifically, the Related Defendants' motion to dismiss contains (i) Gorlio Enterprises' request to dismiss Count IV; (ii) Oliveros-Mora, Don Goyo Aviation, María Febres-Cordero, Alexandra Oliveros, El Retiro Group, and AIB Properties' request to dismiss Counts I and II for failure to plead fraud with particularity under Rule 9(b); and (iii) Oliveros-Mora, Don Goyo Aviation, María Febres-Cordero, Alexandra Oliveros, El Retiro Group's request to dismiss Counts I and II on sufficiency grounds under Rule 12(b)(6).

[5] Count V is not being challenged by any defendant.

framing that plaintiff presents. But ultimately, the Court has found sufficient well-pleaded factual allegations to maintain the challenged causes of actions, but only as to some defendants. After careful consideration, the Court **GRANTS IN PART, DENIES IN PART** the motions to dismiss.

## II.     Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint "must contain more than a rote recital of the elements of a cause of action . . . [and they] must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citation modified). To perform this plausibility inquiry, the Court must "separate factual allegations from conclusory ones and then evaluate whether the factual allegations support a 'reasonable inference that the defendant is liable for the misconduct alleged.'" *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528 (1st Cir. 2023) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "If the factual allegations in a complaint, stripped of conclusory legal allegations, raise no 'more than a sheer possibility that a defendant has acted unlawfully,' the complaint should be dismissed." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 270 (1st Cir. 2022) (quoting *Rodríguez-Reyes*, 711 F.3d at 53, and *Iqbal*, 556 U.S. at 678). Thus, "an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). "The relevant inquiry focuses on the reasonableness of the

inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Id., at 13.*

Relatedly, Fed. R. Civ. P. 9(b) applies a heightened pleading standard to allegations of fraud or mistake. Its "core purposes" are "to place the defendants on notice and enable them to prepare meaningful responses, to preclude the use of a groundless fraud claim as pretext for discovering a wrong, and to safeguard defendants from frivolous charges that might damage their reputation." *Dumont v. Reily Foods Co.*, 934 F.3d 35, 39 (1st Cir. 2019) (citing *New England Data Servs., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987)) (citation modified). The Rule requires that the party making the allegation "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). That has been held to require "the pleader . . . to specify the who, what, where, and when of the allegedly false or fraudulent representation" or act. *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004); *see also Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 50 (1st Cir. 2020); *Dumont*, 934 F.3d at 38. And, notwithstanding the Rule's allowance for generality in pleading other aspects of a fraud claim, a general averment of, for example, knowledge of the falsity of a statement will not suffice if the complaint does not "also set forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009).

## III.   Discussion

### A.  The well-pleaded allegations.[6]

#### 1.  The Bank and its Main Protagonists/Antagonists

According to the Amended Complaint, TBB is the successor of the Bank, a corporation organized under Puerto Rico law, and licensed as an international banking entity under the Puerto Rico International Banking Center Regulatory Act, Act No. 52 of August 11, 1989, P.R. Laws Ann. t. 7, §§ 232-232x ("Act 52"). **ECF No. 154**, at ¶ 50. The Bank was authorized, since at least September 30, 2008, to accept and demand fixed-term deposits, as well as interbank deposits, from non-Puerto Rico residents. *Id.*, at ¶ 74. It was also authorized to borrow from other international banking entities, foreign persons, the Puerto Rico Government Development Bank, and the Puerto Rico Economic Development Bank. *Id.* On March 30, 2009, the Office of the Commissioner of Financial Institutions ("OCFI")—Puerto Rico's banking regulator—issued the Bank its license number, EIB-059. *Id.* Defendant Oliveros served as the Bank's Director and Board Chairman from March 2009 through April 2020. *Id.*, at ¶ 51. Defendant Valencia served as Director and the Bank's Executive President from January 2012 through April 2020. *Id.*, at ¶ 52. The Bank was wholly owned by Holding Activo, which was in turn owned by Oliveros,

---

[6] Much of the facts are found spread out (and often repeated) across separate sections of the Amended Complaint: in the fourteen-page-long introduction, the description of the parties, the factual recitation, and the listing of the claims for relief. The Court has endeavored to piece together the well-pleaded factual allegations from the pleading as a whole so as to fairly evaluate the Amended Complaint.

**Civil No. 23-1310 (ADC)**                                                              **Page 7**

Valencia, and codefendant Alejandro Enrique Montenegro-Díaz ("Montenegro")[7], as well as other non-parties. *Id.*, at ¶¶ 75, 115.

Oliveros and Valencia controlled the Bank. *Id.*, at ¶ 76. Valencia was involved in its day-to-day functions and, upon information and belief, made all business decisions and directed the daily activities. *Id.*, at ¶ 84. During Oliveros and Valencia's tenure, the Bank suffered significant losses and became insolvent. *Id.*, at ¶ 76. These losses were attributable to, among other things, bad investments in other foreign banks, bad loans issued to related individuals or entities acting as straw borrowers that defaulted, credit card losses, and overpriced prepaid service contracts. *Id.*, at ¶ 13.

Oliveros and Valencia approved, administered, and/or funded loans, credit facilities, and credit card agreements in violation of several specific terms, policies, procedures, standards, and regulations. *Id.*, at ¶¶ 165-66. These included: (1) violations of the Bank's loan-to-value ratio limits; (2) lack of required borrower equity; (3) inadequate or non-existent real estate appraisals; (4) insufficient analyses of collateral or inadequate collateral; (5) insufficient borrower repayment information and repayment sources; (6) questionable character of the borrower or guarantor; (7) continued funding of loans and credit facilities despite receipt of reports showing dilution and aging of accounts receivable, violations of borrower covenants and loan

---

[7] Montenegro is among a group of defendants that have not yet appeared in this case, which include: Inversiones Saitam, S.A.; Consultora Baru 2018, C.A.; Gustavo José Gerardo Corredor Salcedo; Inversiones Elektrogorsk, C.A.; and Intelinvest Casa de Valores, S.A.

agreements, ineligible collateral, and other severe collateral impairment; (8) unilateral and unauthorized waiver of key borrower financial covenants relating to working capital, net adjusted equity value, and cash flow ratios; (9) manipulation of the Bank's loan monitoring systems so as not to reflect the continuing deterioration of collateral and ineligible collateral; (10) funding of loans and credit facilities despite borrower defaults on key loan approval terms and the Bank's policy requirements; and (11) extensions and continued funding of expired loans and credit facilities, delaying losses and defaults, despite the borrower's failure to cure defaults. *Id.* Additionally, Oliveros and Valencia repeatedly increased, extended, and/or renewed expired and deteriorating loans, credit facilities, and credit card agreements to enable continued funding of interest reserves, delaying losses and defaults, and increasing the losses on said loans, credit facilities, and credit card agreements. *Id.*, at ¶ 165.

The Bank's critical financial condition was reflected in adjustments to its 2019 financial statements. *Id.*, at ¶ 11. On February 10, 2020, OCFI issued an Emergency Consent Order to protect depositors, requiring the restructuring of the Bank. *Id.*, at ¶¶ 10, 77. On March 5, 2020, the Bank adopted a restructuring plan as per the requirements of the Emergency Consent Order. *Id.*, at ¶ 14. On March 6, 2020, OCFI accepted the restructuring plan, resulting in removing Oliveros and Valencia from the Bank's ownership and management structure and in the Bank's name-change to TBB on May 4, 2020. *Id.*, at ¶¶ 15, 78. Under new management, TBB reorganized business operations, attended to its clients' financial needs, and overhauled its internal credit

management, compliance, and accounting program to correct certain deficiencies previously pointed out by OCFI in 2018, among other things. *Id.*, at ¶ 16. As to these internal deficiencies, they were structured by the previous management to aid fraud schemes through a lack of internal controls, independence, policies, procedures, and checks and balances. *Id.*, at ¶ 17. As a result of the corrective actions taken by TBB's new management, the schemes through which the Bank was defrauded were uncovered. *Id.* at ¶¶ 17, 79.

### 2. The "Credit Facility and Loan Scheme"

The first scheme detailed in the Amended Complaint took place between 2015 and 2020. *Id.*, at ¶¶ 4, 87. This scheme consisted of defendants requesting loans and credit facilities from the Bank, usually unsecured and uncollateralized, based on false representations of their purpose, which were then approved by Oliveros and/or Valencia. *Id.*, at ¶¶ 88-89, 96. The loan proceeds were transferred to Oliveros' personal account at the Bank or to accounts belonging to an entity related to or controlled by him. *Id.*, at ¶ 96. Defendants and non-parties controlled and concealed information that would have otherwise caused the Bank to avoid extending the loans and credits facilities. *Id.* These transactions contravened Act 52. *Id.*, at ¶ 95.

One such transaction involved an entity referred to as "Customer A" which, on February 9, 2017, obtained a $1.2 million loan from the Bank. *Id.*, at ¶ 91. Little more than a month later, on March 22, 2017, Customer A transferred $1 million to co-defendant Gorlio Enterprises, which is alleged to be wholly owned by Oliveros. *Id.*, at ¶ 92. Gorlio Enterprises is alleged to be in the

business of purchasing and selling real estate according to account opening documentation. *Id.*, at ¶ 24. Gorlio Enterprises used the funds received from Customer A to pay a previous loan debt owed to the Bank. *Id.* Customer A defaulted on the loan and the $1.2 million debt to the Bank remains outstanding, representing a loss. *Id.*, at ¶¶ 93-94. Customer A claimed that Oliveros promised to repay at least $900,000 and acknowledged responsibility for that amount via sworn statement. *Id.*

The Amended Complaint states that this transaction only reflects a small portion of the overall scheme. *Id.*, at ¶ 99.

### 3. The "Prepaid Services Scheme"

The second scheme alleged in the Amended Complaint describes how Oliveros and Valencia caused the Bank to contract with codefendants Inversiones Saitam, S.A. ("Inversiones Saitam") and Consultora Baru 2018, C.A. ("Consultora Baru") on March 1, 2014, and March 1, 2019, respectively. *Id.*, at ¶¶ 100, 104. Inversiones Saitam and Consultora Baru were run by Valencia's brother-in-law, codefendant Gustavo José Gerardo Corredor-Salcedo ("Corredor"), as their acting manager through power of attorney, and the companies shared the same business address in Caracas, Venezuela, the same employees, and the same supplier. *Id.*, at ¶¶ 28-29, 61-63, 101. They are alleged to be "sham companies." *Id.*, at ¶ 120. Notably, Corredor is alleged to have also had a role in the Bank's management, acting at times as its Operations Manager, exercising operational duties involving customer service, requesting account opening

documentation, placing client transaction requests and collecting transactional information. *Id.* at ¶ 30.

Pursuant to the contracts, Inversiones Saitam and Consultora Baru agreed to provide the Bank with marketing services aimed at customer acquisition, as well as limited compliance assistance and call center services. *Id.*, at ¶ 104. The Bank "prepaid" for Inversiones Saitam and Consultora Baru's services, sending periodic payments to both companies to cover set periods. *Id.*, at ¶¶ 105-06. Inversiones Saitam, in addition, would receive quarterly payments. *Id.*, at ¶ 106. However, the services provided do not match the charges imposed or the representations made to the Bank to enter into the agreements. *Id.*, at ¶ 37. It is alleged that there was patent overcharging and that the funds paid to Inversiones Saitam and Consultora Baru were rerouted to other persons and entities associated with Oliveros, Valencia, and Montenegro. *Id.* These transactions contravened Act 52. *Id.*, at ¶ 95.

The Amended Complaint contains two specific examples of this scheme at play. First, on December 28, 2017, Inversiones Saitam received a $345,000 payment from the Bank under its prepaid services agreement. *Id.*, at ¶ 107. That same date, Inversiones Saitam transferred the same amount to an account in the Bank belonging to Gorlio Enterprises, which is wholly owned by Oliveros. *Id.*, at ¶ 108. Thus, the Bank paid Inversiones Saitam for future services to be rendered only to have Inversiones Saitam immediately forward the funds to Gorlio Enterprises, allegedly for the benefit of its owner Oliveros. *Id.*, at ¶ 110.

Second, on September 12, 2018, Inversiones Saitam received a $100,000 payment from the Bank under its prepaid services agreement. *Id.*, at ¶ 111. A few days later, on September 21, 2018, Inversiones Saitam transferred $28,000 to an account in the Bank belonging to codefendant AIB Properties, a Barabados entity whose majority shareholder is codefendant El Retiro Group, which is in turn a British Virgin Islands entity whose shareholders are Oliveros' mother and sister, codefendants María Febres-Cordero and Alexandra Oliveros. *Id.*, at ¶¶ 112-13. Other AIB Properties shareholders include codefendants Valencia and Montenegro. *Id.*, at ¶114. The stated purpose of this transfer was ostensibly to pay an invoice, but no supporting documentation was provided. *Id.*, at ¶ 112. The Bank had previously extended AIB Properties a $1 million loan secured by a promissory note that was supposed to be collateralized by a property located in Caracas, Venezuela. *Id.*, at ¶ 117. The property belonged to Inversiones Curruchanga, C.A., an entity represented by the spouse of codefendant Oliveros-Mora (Olivero's father). *Id.* However, the collateral was never perfected because the Bank failed to perform the adequate procedure. *Id.* Under the terms of the promissory note, AIB Properties owed the Bank a quarterly payment of $21,116.10. *Id.*, at ¶ 116. AIB Properties made one such payment on September 28, 2018, with the funds the Bank paid to Inversiones Saitam that were later transferred to its account. *Id.*, at ¶ 118.

Overall, the Bank suffered losses in the amount of $3.55 million from payments to Inversiones Saitam and $850,000 from payments to Consultora Baru. *Id.*, at ¶ 121. Plaintiff alleges

that Oliveros and Valencia approved these transactions as directors and officers of the Bank and that these transactions contravened Act 52. *Id.*, at ¶¶ 95, 122. The Amended Complaint states that these two groups of transactions only reflect a small portion of the overall scheme. *Id.*, at ¶ 125.

### 4.  The "Bank Assets as Collateral Scheme"

The third scheme detailed in the Amended Complaint recounts how Oliveros and Valencia caused the Bank to extend guarantees to third-party creditors of codefendants Gorlio Enterprises, Inversiones Elektrogorsk, C.A. ("Elektrogorsk"), and Holding Activo on loans that they ultimately defaulted on, forcing the Bank to satisfy their debts with the pledged collateral. *Id.*, at ¶¶ 126, 159. Each party's transaction under this scheme is detailed separately in the Amended Complaint.

As to Gorlio Enterprises, on September 30, 2016, the Bank extended a standby letter of credit to Gorlio Enterprises to guarantee payment of a $4 million loan secured by a promissory note held by a third-party financial institution. *Id.*, at ¶ 129. The loaned funds were used to pay Gorlio Enterprises' loans and overdrafts with the Bank and to make payments to Oliveros, his relatives, and to other companies controlled by them. *Id.*, at ¶ 132. By December 30, 2019, the amount of the standby letter of credit had increased to $5.2 million, and Gorlio defaulted on the underlying loan, causing the Bank to have to fulfill its obligation under the standby letter of

credit. *Id.*, at ¶ 132-33. The Bank lost $5.2 million as a result. *Id.*, at ¶ 133. This transaction was not approved by the Bank's Board of Directors. *Id.*, at ¶ 129.

As to Elektrogorsk, the Amended Complaint describes how the Bank extended a standby letter of credit to secure payment of a $1.5 million loan Elektrogorsk owed to a third-party financial institution. *Id.*, at ¶ 146. Elektrogorsk represented that this was the purpose of the requested guarantee. *Id.* Elektrogrosk failed to make the underlying loan payment, requiring the Bank to step in and cover the $1.2 million default and suffer the loss. *Id.*, at ¶ 148. Elektrogorsk is alleged to be an entity related to defendant Montenegro, a shareholder of the Bank's majority shareholder Holding Activo and of Banco Activo Banco Universal ("Banco Universal"), a Venezuelan bank. *Id.*, at ¶¶18, 147. It is also alleged that the loan funds were used for the benefit of Montenegro. *Id.*, at ¶ 149.

As to Holding Activo (the Bank's majority shareholder alleged to be controlled by Oliveros), the Amended Complaint states that, on or around June 2018, the Bank acquiesced to allowing it to utilize a certificate of deposit as collateral for a $4.5 million loan owed to a third-party financial institution. *Id.*, at ¶ 151-52. Around that same time, Holding Activo transferred $2.9 million of the loaned funds to Gorlio Enterprises' account in the Bank. *Id.*, at ¶ 153. Gorlio Enterpresis is alleged to be wholly owned by Oliveros. *Id.*, at ¶ 154. When Holding Activo defaulted on the loan, the Bank was called to answer for it but was unable to satisfy its obligation as guarantor. *Id.*, at ¶ 156.

In addition, on or around August 2017, the Bank pledged its investment portfolio held with codefendant Intelinvest Casa de Valores, S.A ("Intelinvest"), as collateral for a $8 million loan issued to Holding Activo. *Id.*, at ¶ 138-39. Intelinvest is a Panama-registered broker-dealer with which the Bank had a commercial relationship since 2016. *Id.*, at ¶¶ 134-35. Intelinvest held several accounts with the Bank and the Bank in turn maintained its investment portfolio with it. *Id.*, at ¶ 135. The Bank sought to earn income through this portfolio. *Id.*, at ¶ 136. Intelinvest, however, created a particular trust structure and operation that facilitated the diversion of the Bank's funds, even generating false account statements. *Id.*, at ¶ 137. The pledge in favor of Holding Activo was facilitated by this trust structure. *Id.* The loaned funds were deposited in Holding Activo's account in the Bank, and on or around August 2017, $3.1 million were transferred to an account belonging to Oliveros, $2 million to one belonging to Gorlio Enterprises, and $500,000 to another belonging to Inversiones Saitam. *Id.*, at ¶ 140-41. Oliveros then transferred $188,017 and $1.4 million to Valencia's and Gorlio Enterprises' respective accounts in the Bank. *Id.*, at ¶¶ 141-42. Gorlio Enterprises then transferred $1.58 million to an account in the Bank belonging to a certain "Customer B" which were then used to pay a debt said customer owed to the Bank. *Id.*, at ¶ 143. Then Holding Activo defaulted on its $8 million loan, which caused the Bank to incur losses exceeding $4.9 million. *Id.*, at ¶ 145.

Overall, the Bank is alleged to have lost $15.8 million because of this scheme. *Id.*, at ¶ 157. It is alleged that Oliveros and/or Valencia approved the loan guarantees in their capacity as

directors and officers of the Bank, that the loans were never registered in the Bank's books under the orders of Valencia, and that the transactions contravened Act 52. *Id.*, at ¶¶ 158-60. These four groups of transactions are alleged to reflect a small portion of the overall scheme. *Id.*, at ¶ 162.

### 5.  Other fraudulent conduct.

#### a.  Purchase of aircraft from Don Goyo Aviation.

In early 2018, in a transaction presented by Oliveros to the Bank's Board of Directors, the Bank purchased an aircraft from codefendant Don Goyo Aviation for $2.6 million. *Id.*, at ¶ 169. Don Goyo Aviation is wholly owned by Olivero's father, codefendant Oliveros-Mora. *Id.* This transaction was not approved by OCFI and is alleged to not be proper under the Bank's license. *Id.*, at ¶ 181. The Board of Director's meeting minutes do not show that Oliveros disclosed any relationship between Don Goyo Aviation and himself, or that he abstained from the discussion and approval of the transaction.

On April 9, 2018, Don Goyo Aviation transferred $298,559.42 via wire out of its account, incurring an overdraft in the amount of $122,482.04. *Id.*, at ¶ 170. This transaction was made possible because it was done in "batch," avoiding internal controls and monitoring. *Id.*, at ¶¶ 163(i), 170. On June 28, 2018, defendant Gorlio Enterprises (wholly owned and controlled by Oliveros) transferred $125,000.00 to Don Goyo Aviation account, correcting the overdraft. *Id.*, at ¶ 171. In the following months, Don Goyo Aviation's account went into overdraft several times, with transfers from it going to unnamed relatives and related entities of Oliveros. *Id.*, at ¶ 173.

By October 2, 2018, the account had an overdraft balance of $1,860,377.04. *Id.*, at ¶ 174. The transfers that led to this overdraft were approved by the Bank's management. *Id.* This amount was converted into a loan, as per the orders of Valencia. *Id.* However, that same day, Valencia backtracked after a discussion with the Bank's former credit manager, who had raised a red flag on the loan approval. *Id.*, at ¶ 175.

The overdrafts in Don Goyo Aviation's account continued up to December 30, 2018, and the overdraft balance ascended to $1,439,494.67. *Id.*, at ¶ 176. On that date, Oliveros transferred $1,457,494.67 to Don Goyo Aviation's account, wiping its overdraft balance. *Id.*, at ¶ 177. Oliveros received these funds from the account of a certain "Customer E" held in Banco Multiple Activo Dominicana, S.A., a bank based in the Dominican Republic and in which Olivero possessed an interest. *Id.*, at ¶¶ 18, 51, 178. Customer E, in turn, had obtained a $2.3 million loan from a certain Canal Bank, and it is alleged that the funds used by Oliveros to settle Don Goyo Aviation's overdraft at the Bank came from Customer E's loan. *Id.*

### b. Extension of credit card agreements to relatives and associates.

It is also alleged, albeit briefly, that Oliveros and Valencia authorized the extension of credit card agreements to directors, officers, and employees of Banco Universal, as well as to associates and relatives. *Id.*, at ¶ 184.[8] Oliveros is alleged to also have an interest in Banco Universal. *Id.*, at ¶ 18. Oliveros and Valencia are alleged to have authorized these credit card

---

[8] Plaintiff alleges that Oliveros also holds an interest in Banco Universal. **ECF No. 154** at ¶ 18.

agreements knowing that any amount charged on the cards would not be repaid, and as a result, the Bank lost $388,000. *Id.*

### B. Plaintiff's fraud in the inducement claim (Count I).

The Court finds it important at the outset to clarify what plaintiff's fraud-based cause of action is and what it is not. First, plaintiff's fraud claims are directed at all defendants. Some, like Oliveros and Valencia, have direct involvement in the allegedly fraudulent transactions. Others are alleged to be liable due to their connections to Oliveros and Valencia and as beneficiaries of the allegedly fraudulent transactions. While the tentacles of the fraudulent schemes are alleged to reach these other defendants, their core centers on Oliveros and Valencia.

Second, Count I is grounded in contract law, not tort law. This was established prior to the filing of the Amended Complaint, when plaintiff moved for relief from the Court's prior Opinion and Order dismissing these and other claims as time barred. **ECF Nos. 74, 79**. Plaintiff argued that the Puerto Rico fifteen-year statute of limitations for contractual claims was applicable instead of the one-year period for tort claims. **ECF No. 79** at 6-9. Based on that premise, the Court reinstated the original complaint's fraud and fraud in the inducement claims, which are essentially the same as those included in Count I of the Amended Complaint. **ECF No. 130**.

Third, plaintiff's fraud claims appear to refer largely to fraud in the inducement, not fraud in the performance. *See Punta Lima, LLC v. Punta Lima Dev. Co., LLC*, 425 F. Supp. 3d 87,

105 (D.P.R. 2019) (explaining both modalities). In the Amended Complaint, plaintiff invoked Article 1221 of the 1930 Civil Code of Puerto Rico, in force at the time the allegations took place, which establishes the presence of contractual deceit "when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." P.R. Laws Ann. t. 31, § 3408 (repealed). That provision refers to fraud or deceit, otherwise known as "dolo," in the process of contract formation, which is "essentially fraud in the inducement." *Portugués-Santana v. Rekomdiv Int'l*, 657 F.3d 56, 62 (1st Cir. 2011). In particular, it concerns the validity of a party's consent to a contract, and any such deceit, if serious (*dolo causante*), may carry the penalty of voiding the contract or, if incidental (*dolo incidental*), the indemnification of losses and damages only. *See* Articles 1217 and 1222 of the 1930 Civil Code of Puerto Rico, P.R. Laws Ann. t. 31, §§ 3404, 3409 (repealed); *see also Huongsten Prod. Imp. & Exp. Co. v. Sanco Metals LLC*, 810 F. Supp. 2d 418 (D.P.R. 2011) (citing *Dialysis Access Center, LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 378 (1st Cir. 2011)).[9]

Beyond the above citations to the Civil Code, no party provided much in the way of actual *law* in their briefing. Plaintiff did not invoke any substantive law on what fraud or fraud in the inducement is and how it applies to its allegations. Instead, it concentrated on how the

---

[9] In its motion in compliance with the Court's Order to Show Cause of December 19, 2025, plaintiff at times refers to its claims as including fraud in the performance of the contracts at issue. *See*, *e.g.*, **ECF No. 173** at 9, 11, 12. There is no mention of plaintiff's claim encompassing fraud in the performance in any of its other filings related to the motions to dismiss. In any case, fraud in the performance is not what is pled in Count I of the Amended Complaint— at least not with any discernible clarity.

allegations meet the pleading standard applicable to fraud claims under Fed. R. Civ. P. 9(b). On the other end of the field, no defendant fared much better, with the Related Defendants including only a perfunctory enumeration of the elements of the cause of action for contractual fraud that need to be pled. **ECF No. 161** at 20. The rest is just a back and forth on whether there are sufficiently detailed allegations to meet Rule 9(b)'s pleading standard. While it is true that "the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of" Fed. R. Civ. P. 9(b), "state law governs the burden of proving fraud at trial." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985). An analysis of a pleading's sufficiency under Rules 9(b) and 12(b)(6) must be looked at through the prism of the applicable state law cause of action. All of which makes the lack of briefing on the Puerto Rico law cause of action profoundly unhelpful.

The allegations describe a convoluted scheme and require elaboration on *how* they make out a claim of *contractual* fraud in the inducement under substantive law, not just on how much detail the pleading standard requires. Furthermore, the fraud allegations here revolve around the allegedly self-dealing actions of Oliveros and Valencia as the Bank's officers and directors. They allegedly acted on behalf of the Bank in these improper transactions but also on behalf of some of the other contracting parties. How the principles of corporate personhood and separateness interact with fraudulent inducement claims in the circumstances alleged here is not addressed in the parties' briefs. By simply sweeping all the factual allegations under a single

fraudulent inducement claim, plaintiff has unnecessarily complicated the analysis the Court must undertake.[10]

As the Related Defendants helpfully point out, the First Circuit has held that under Puerto Rico law, a plaintiff alleging fraud "must provide sufficiently specific factual allegations regarding four elements: (1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 54 F.4th 42, 53-54 (1st Cir. 2022) (citation modified). The Court will evaluate each of the "schemes" alleged in the Amended Complaint in respect to the parties alleged to be involved, supplemented by well-pleaded facts found in other sections of the complaint.

### 1. Fraudulent inducement in the "Credit Facility and Loan Scheme."

As detailed above, this scheme involved the participation of Oliveros and Valencia as officers and directors of the Bank, an unnamed "Customer A" entity, and Gorlio Enterprises, which is alleged to be wholly owned and controlled by Oliveros. In essence, the allegations are that Oliveros, as Director of the Bank, induced Customer A to take out a loan with the Bank under a promise of partial repayment, evidenced by a sworn statement subscribed by Oliveros, so that Gorlio Enterprises, owned by Oliveros, could pay off a debt it owed to the Bank. Valencia,

---

[10] To be fair, the Court appreciates the effort plaintiff took to provide details on its allegations. But that effort should accompany some attempt at demonstrating how the allegations make out the stated claim under the applicable law.

as the officer in charge of the day-to-day operation of the Bank, is implicated in the issuance of the loan. The result was that Customer A was left on the hook for Gorlio Enterprises' debt on the Bank's balance sheet, with only a promise of partial repayment by the Bank's own director. When Customer A defaulted on said loan, the Bank was left with a $1.2 million loss.

From the Bank's perspective, Oliveros used it to issue a loan (*i.e.*, create a new debt obligation) in favor of Customer A to pay off Gorlio Enterprises' existing debt obligation, leaving Customer A on the hook for Gorlio Enterprises' debt. The transaction improved Gorlio Enterprises' balance sheet to the detriment of Customer A, who defaulted on its loan from the Bank. Accordingly, the "who, what, where, and when" of the false or misleading representation are, respectively: Oliveros and Valencia (who), the real purpose of the loan (what), the loan application (where), and February 9, 2017 (when).

Key here for the substance of the fraud claim is the implication that Oliveros and/or Valencia employed deceit in getting the Bank to issue the loan. Plaintiff states that the loan circumvented the prohibitions of Act 52. In this regard, the Court takes note that Section 12 of Act 52, as amended, contains a detailed list of prohibited transactions, among which is a prohibition against "grant[ing] any kind of financing or credit to any of its directors, officers, employees or stockholders, except when previously authorized in writing by the

Commissioner." P.R. Laws Ann. t. 7, § 232j(b)(6).[11] By not disclosing or by misrepresenting that the purpose of the loan to Customer A was to pay Gorlio Enterprises' loan to the Bank, by misrepresenting or not disclosing the ownership-control nature of the relationship between Gorlio Enterprises and Oliveros, and by approving said loan on behalf of the Bank, Oliveros and Valencia are properly alleged to have fraudulently induced the Bank into issuing the loan.

As to Gorlio Enterprises' role in this scheme, it is not alleged that Gorlio Enterprises misrepresented anything to the Bank. Although Gorlio Enterprises was the beneficiary of the allegedly fraudulent transfer, it is not alleged that it acted to cause the transfer to occur. In fact, it is Oliveros who is alleged to have personally vouched for the partial repayment of Customer A's loan to the Bank, inducing both the Bank and Customer A to enter into the loan. Nonetheless, Gorlio Enterprises is alleged to be both wholly owned (**ECF No. 154** at ¶¶ 24, 57, 92, 109, 131, 154, 172) and controlled (*id.*, at ¶ 110) by Oliveros, to such extent that it is alleged to be a front and a conduit for him (*id.*, at ¶ 24). Under these circumstances, it is reasonable to infer from the allegations that Gorlio Enterprises and Oliveros shared intent, knowledge, and purpose, making Gorlio a party to the fraudulent inducement.

Accordingly, the Court finds that fraud in the inducement of Customer A's loan is sufficiently pled as against Oliveros, Valencia, and Gorlio Enterprises.

---

[11] Plaintiff further cites to two other sections of Act 52 establishing criminal liability for bank directors, officers, or employees who engage in conduct such as receiving loan deposits or contracts while the bank is insolvent and engaging in embezzlement. *See* **ECF No. 154** at ¶¶ 72-73 (citing P.R. Laws Ann. t. 7, §§ 232p(b), (c)).

### 2. Fraudulent inducement in the "Prepaid Services Scheme."

The Prepaid Services Scheme involved, on one hand, Oliveros and Valencia as officers and directors of the Bank, and on the other, Inversiones Saitam, Consultora Baru, as well as Corredor in his capacity as their acting manager through power of attorney. But beyond the bilateral contractual relationships between the Bank and these two companies, the allegations cover the involvement of Gorlio Enterprises (wholly owned and controlled by Oliveros) and AIB Properties (whose majority shareholder is El Retiro Group, which is in turn owned by Olivero's mother, María Febres-Cordero, and his sister, Alexandra Oliveros) as the beneficiaries of the Bank's payments.

As summarized above, this scheme consisted of the Bank paying periodically and in advance for certain services to be provided by Inversiones Saitam and Consultora Baru. However, plaintiff alleges that there was patent overcharging and that the payments were neither commensurate with the services rendered nor reflective of the representations given to the Bank. Also, plaintiff alleges payments to Inversiones Saitam and to Consultora Baru were diverted to benefit Gorlio Enterprises and AIB Properties. Accordingly, the allegation is that the Bank overpaid for services so that Inversiones Saitam and Consultora Baru could then transfer the payments or portions thereof to Oliveros' alter ego or his close relatives.

Plaintiff detailed two transactions where Inversiones Saitam received payment under its agreement with the Bank and quickly funneled said payments to other codefendants. The first

involved a $345,000 payment on December 28, 2017, that was immediately transferred to Gorlio Enterprises' account. The second involves a $100,000 payment made on September 12, 2018, $28,000 of which was quickly transferred to AIB Properties on September 21, ostensibly as an invoice payment. But AIB had a pre-existent payment obligation of $21,116.10 due to the Bank, which it fulfilled on September 28 with the money it received from Inversiones Saitam. The implication is that the Bank "paid" Inversiones Saitam so that it then could "pay" AIB Properties, who in turn "paid" the Bank back on the loan it had taken out—the result being that the Bank paid itself back with its own money.

As to the "who, what, where, and when" of the misrepresentations that make up the alleged fraudulent inducement, the Court considers them pled as follows. The "who" of this scheme are Inversiones Saitam, Consultora Baru and Corredor (as their manager) on one side of the transaction, and Oliveros and Valencia as directors and officers of the Bank on the other. The "what" is the purported purpose of the payments made under the prepaid service agreements, which plaintiff alleges was to "ultimately benefit Defendants and their related entities, not to cover *bona fide* services rendered to the Bank." *Id.*, at ¶ 119. The "where" of the misrepresentation is in the respective services agreements between them. Finally, the "when" is March 1, 2014, for Inversiones Saitam and March 1, 2019, for Consultora Baru.

Nevertheless, the two relevant transactions pled with detail in the Amended Complaint do not mention Consultora Baru, but rather center on payments made to Inversiones Saitam.

That affects the sufficiency of the misrepresentation allegation under Fed. R. Civ. P. 9(b) and 12(b)(6) as to Consultora Baru. While the transactions involving Inversiones Saitam serve to illustrate the fraudulent nature of the scheme, no such detail is provided for Consultora Baru. That leaves only general allegations of fraudulent inducement that fail to comply with Rule 9(b)'s particularity requirement and to show a plausible claim that the agreement was fraudulent.

There are additional problems with the allegations against defendants AIB Properties, El Retiro Group, María Febres-Cordero, and Alexandra Oliveros. While they are alleged to have benefited from the payments made to Inversiones Saitam, they are not alleged to have done anything in furtherance of the scheme. Indeed, the payment received by AIB Properties is alleged to have been said to be payment for an invoice owed by Inversiones Saitam. **ECF No. 154** at ¶ 112. It is not affirmatively alleged that the invoice was fraudulent, and neither is it alleged that AIB Properties made any misrepresentation to the Bank. Although Oliveros is alleged to "control" AIB Properties, it is only through several degrees of corporate separation which ultimately boils down to the existence of a family relationship at the bottom rung of the ladder. However, that María Febres-Cordero and Alexandra Oliveros are majority shareholders[12] of AIB Properties through their ownership of El Retiro Group does not, by itself,

---

[12] There is some contradiction in the Amended Complaint as to the ownership structure of AIB Properties. It is first alleged that "it is wholly owned by El Retiro Group LTD, which in turn is wholly owned by Defendants María Eugenia and Alexandra, although Defendant Oliveros controls it." **ECF No. 154** at ¶ 59. But later, plaintiff alleges

imply that they acted to induce the Bank to enter into the prepaid service agreements. There are no well-pleaded facts to support an inference that the mere ownership by family members constitutes control, and therefore the Court is not in a position to impute Oliveros' intent, knowledge, or purpose to AIB Properties, El Retiro Group, María Febres Cordero, or Alexandra Oliveros in this scheme. As such, the allegations against them under the "Prepaid Services Agreement Scheme" are insufficient to state a claim for fraudulent inducement under Fed. R. Civ. P. 9(b).

Accordingly, the Court finds that fraud in the inducement of the prepaid services agreements is sufficiently and plausibly pled under this scheme against Oliveros, Valencia, Corredor, Gorlio Enterprises, and Inversiones Saitam. However, it is insufficiently and implausibly pled as to Consultora Baru, AIB Properties, El Retiro Group, María Febres-Cordero, and Alexandra Oliveros.

### 3. Fraudulent inducement in the "Bank Assets as Collateral Scheme."

This scheme has Oliveros and Valencia, as officers and directors of the Bank, approving the use of Bank assets to be used as collateral for the financial obligations owed by Gorlio Enterprises, Elektrogosk, and Holding Activo to third parties. For Gorlio Enterprises and Elektrogosk, the Bank is alleged to have extended to them, respectively, a $5.2 million and a $1.5

---

that El Retiro Group is only a majority shareholder of AIB Properties and lists seven other shareholders. *Id.*, at ¶¶ 113-14. One of them is codefendant Valencia, but he is not alleged to have control over the entity.

million standby letter of credit to secure their loan obligations to other lenders. For Holding Activo, the Bank is alleged to have pledged its own proprietary investment portfolio, held at Intelinvest, as collateral for an $8 million loan extended to Holding Activo. Intelinvest, it is alleged, created a trust structure supported by false account statements that facilitated this pledge. In addition, in a separate transaction favoring Holding Activo, the Bank allowed it to use a certificate of deposit as collateral for a loan exceeding $4.5 million with a third-party financial institution. In all these cases, it is alleged that the borrowed funds were diverted to the benefit of defendants Oliveros, Gorlio Enterprises, Montenegro, Inversiones Saitam, Valencia, and a certain "Customer B." And because of Gorlio Enterprises, Elektrogosk, and Holding Activo's eventual defaults on their loans, the Bank was ultimately called to answer for their debts.

The false misrepresentation at the heart of this scheme lies largely with Oliveros and Valencia having approved the extension of the guarantees knowing that they were in furtherance of their scheme to use Bank assets in violation of Act 52. *See* **ECF No. 154** at ¶¶ 158-59. Valencia is, in addition, alleged to have purposefully kept these transactions out of the Bank's records, which in itself is plausibly understood as an act of deceit or concealment. *Id.* Moreover, Gorlio Enterprises, Elektrogosk, and Holding Activo, as counterparties to the Bank's decision to extend loan guarantees, can also be inferred to have misrepresented the purpose of their

requests for collateral.[13] And Intelinvest is squarely alleged to have deceived the Bank through false account statements related to the pledged investment portfolio.[14]

Accordingly, the Court finds that fraud in the inducement of the extension of collateral guarantees is sufficiently and plausibly pled under this scheme against Oliveros, Valencia, Elektrogosk, and Holding Activo.

### 4. Fraudulent inducement in Don Goyo Aviation's aircraft sale and overdrafts.

Although not an independent scheme, plaintiff maintains that Don Goyo Aviation and its sole owner, Oliveros-Mora (Oliveros' father), are liable to it under Count I. Accordingly, the Court examines the alleged airplane purchase transaction and the account overdrafts to determine if they plead fraud in the inducement.

For starters, the aircraft purchase transaction itself is not premised on a misrepresentation by Don Goyo Aviation, but on those made by Oliveros. It is alleged that he presented the Board of Directors with the transaction, but that the Bank's Board of directors meeting minutes do not

---

[13] In its opposition to Oliveros and Holding Activo's joint motion to dismiss, plaintiff appears to describe this transaction as Intelinvest transferring funds directly to Holding Activo. **ECF No. 165** at 7. The Court does not read the allegations as describing a direct transfer of funds between these two entities, but rather as the pledging of the investment portfolio as collateral for the loan obtained by Holding Activo. Thus, Holding Activo is alleged to have received funds from its third-party lender, not Intelinvest. A similar discrepancy is suggested by TBB's description of Gorlio Enterprises' collateralized loan in the same opposition. *See id.*

[14] It is not clear, however, how the trust structure itself would constitute fraud. Plaintiff does not allege that Intelinvest deceived the Bank by setting up that structure, only that it was used to facilitate the allegedly fraudulent pledge in favor of Holding Activo. If the falsified account statements are all that is specifically alleged to be deceitful, then plaintiff may well come up short in alleging the "what" and the "when" of these. But Intelinvest has not moved for dismissal because it has not appeared in this case, so the Court will not decide that today.

reflect that he disclosed his relationship to the seller. Oliveros is also alleged to have failed to abstain from the discussion or approval of the transaction. Oliveros-Mora, however, is not alleged to have said or done anything. His only participation is that he was the sole owner of Don Goyo Aviation and Oliveros' father. In fact, plaintiff alleges that Don Goyo Aviation's accounts at the Bank were controlled by Oliveros, not his father. Accordingly, assuming the corporate separateness of Don Goyo Aviation and Oliveros-Mora, the Court cannot find any specific allegations of fraud in the inducement as against Oliveros-Mora. And as to Don Goyo Aviation itself, there is nothing to indicate that the aircraft purchase was fraudulent. It may have been prohibited by Act 52, but the prohibition applies to the Bank, not Don Goyo Aviation. There are no allegations, beyond Oliveros' alleged control over the company, that any misrepresentations as to the legality of the transaction were made by Don Goyo Aviation.

In addition, the plaintiff alleges that Don Goyo Aviation's account was continuously overdrafted during 2018 because of transfers to the accounts of unnamed relatives and related entities of Oliveros. Some of these transactions were made possible due to them being processed in "batch" per the orders of Valencia, because otherwise they would have been impossible to perform due to the account's insufficient funds. Valencia also attempted to convert the overdraft balance into a loan on October 2, 2028, but had to backtrack due to internal pushback from the Bank's former credit manager. At the end of the year, when the overdraft balance reached

$1,439,494.67, Oliveros transferred $1,457,494.67 to Don Goyo Aviation's account with funds he received from "Customer E."

Again, this spells out no claim against Oliveros-Mora. And as to Don Goyo Aviation itself, the allegations are insufficient. The Court is not in a position to evaluate whether the overdrafts were in and of themselves unlawful or even improper. The overdrafts carried over for close to a year and only when Valencia attempted to convert the balance into a loan waws it flagged for review. And even then, there is no allegation of what action, if any the Bank took in response to the overdraft. To put it simply, apart from the allegation that some of these transactions could only be done in "batch" there is no indication that this conduct was deceitful or even that Bank considered it as much. There is no allegation that Don Goyo Aviation misrepresented the purposes of the overdrafts. All that is alleged is Oliveros and Valencia's misconduct.

Accordingly, the Court finds that fraud in the inducement of the extension of collateral guarantees is sufficiently and plausibly pled under this scheme against Oliveros and Valencia, but insufficiently pled as to Oliveros-Mora and Don Goyo Aviation.[15]

---

[15] The Court agrees with the Related Defendants (**ECF No. 161** at 12-13) that the mention of Oliveros-Mora in relation to the unperfected collateral related to AIB Properties' loan obligation (**ECF No. 154** at ¶ 117) is insufficient to tie him to the fraudulent in inducement claim.

### 5. Fraudulent inducement in the credit card agreements.

Finally, plaintiff alleges that Oliveros and Valencia approved the extension of credit card agreements to directors, officers, and employees of Banco Universal, as well as to associates and relatives, knowing that any amount charged on the cards would not be repaid. But no specifics are alleged. The "who" are Oliveros and Valencia on the one hand and unnamed Banco Universal employees on the other. The "what" is the expectation of repayment, which is alleged to have been knowingly false. However, the "when" and the "where" are evidently missing. The Court deems these allegations insufficient to plead fraud.

\*\*\*

After the above review of the well-pleaded facts, the Court **GRANTS IN PART, DENIES IN PART** the request to dismiss Count I. The claim is **DISMISSED WITH PREJUDICE** as to Consultora Baru, AIB Properties, El Retiro Group, María Febres-Cordero, Alexandra Oliveros, Oliveros-Mora and Don Goyo Aviation.

### C. Plaintiff's unjust enrichment claims as an alternative basis for relief against all defendants (Count II).

Both motions to dismiss seek dismissal of this claim because it was required to be plead in accordance with Rule 9(b)'s particularity requirement. *See* **ECF No. 158** at 10-11; **ECF No. 161** at 8-11. The Related Defendants, moreover, seek its dismissal on grounds that it fails to state a claim against Oliveros-Mora, Don Goyo Aviation, El Retiro Group, María Febres-Cordero, and

Alexandra Febres-Cordero. **ECF No. 161** at 11-17. AIB Properties joins the argument for dismissal under Rule 9(b), but does not seek dismissal under Rule 12(b)(6).

"Unjust enrichment occurs when the laws have not foreseen a situation where a patrimonial shift occurs, which shift cannot be rationally explained by the prevalent body of laws." *Punta Lima, LLC v. Punta Lima Dev. Co., LLC*, 440 F. Supp. 3d 130, 150 (D.P.R. 2020) (quoting *Ortíz Andújar v. Commonwealth of Puerto Rico*, 122 P.R. Dec. 817, 22 P.R. Offic. Trans. 774, 780 (1988)). To plead a cause of action for unjust enrichment under Puerto Rico law, a party must plead "(1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause." *Id.*, at 151 (quoting *Hatton v. Mun. de Ponce*, 134 P.R. Dec. 1001 (1994)) (citation modified). As to this last requirement, "the doctrine of unjust enrichment does not apply where ... there is a contract that governs the dispute at issue." *Puerto Rico Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011).

While the parties largely focus on whether the allegations are sufficiently specific to surpass Rule 9(b)'s bar or whether the allegations meet the first four requirements set out above, the Court will first address whether the last of the doctrine's five requirements is properly pled.

María Febres-Cordero, Alexandra Oliveros, Oliveros-Mora, El Retiro Group, AIB Properties, and Don Goyo Aviation, are all alleged to be "customers" of the Bank. **ECF No. 154** at ¶¶ 21-25, 54-60. Further, the Amended Complaint alleges that fraudulent loans and credit

facilities were obtained through loan applications. *Id.*, at ¶ 81.[16] AIB Properties and Don Goyo Aviation likely entered a contractual agreement in relation to the loans they received from the Bank. *Id.*, at ¶¶ 116, 174. Don Goyo Aviation, in addition, entered into a commercial transaction to sell an aircraft to the Bank. *Id.*, at ¶ 169. Moreover, of the above defendants, only AIB and Don Goyo Aviation are alleged to have had accounts at the Bank. *Id.*, at ¶¶ 112, 171-178.

Read in conjunction, and with a healthy degree of liberality, it appears that there must be a contractual agreement in place governing each of these defendants' relationship with the Bank, either as customers, loan recipients, or counterparties to transactions. However, the existence (and much less the details) of said agreements are not alleged, and it is not certain whether those agreements would govern the unjust enrichments alleged in the Amended Complaint. Because the case remains in the pleading stage, the Court will therefore reasonably infer that a contract does not govern the subject of the unjust enrichment claim.

As to the other factors, the Amended Complaint alleges that all of the defendants were pecuniarily enriched, either directly or indirectly, by Oliveros and Valencia's schemes, that this enrichment caused a correlative pecuniary loss in of the Bank's assets, and that the enrichment was without cause. Indeed, even in the "Bank assets as collateral" scheme, the borrowers benefitted from a "non-loss in the patrimony (*damnum cessans*) . . . . In other words, to the extent

---

[16] Plaintiff astutely excludes these allegations from its unjust enrichment claim. **ECF No. 154** at ¶ 200. The claim is also plead in the alternative to Count I, a valid pleading strategy in accordance with Fed. R. Civ. P. 8(d)(2) and (3).

that someone suffers a loss which normally should be suffered by somebody else, the former spares the latter an expense." *Ortíz Andújar v. E.L.A.*, 22 P.R. Offic. Trans at 783-84. That is because the Bank guaranteed their debts to third-party lenders and ended up footing the bill for them upon their default.

Regarding AIB Properties specifically, the "Prepaid Services Scheme" alleges that it benefited directly from the transfer of Bank funds to Inversiones Saitam, which then transferred funds to its account so that it could make its quarterly payment to the Bank. However, this does not implicate El Retiro Group or its owners María Febres-Cordero and Alexandra Oliveros. The recipient of the funds was AIB Properties, and they were used to make a payment to the Bank. Had it not been enriched, AIB Properties, and not its owners, would have been in default. The Court does not see how El Retiro Group, María Febres-Cordero, or Alexandra Oliveros were enriched by this transfer of patrimony.

As to Don Goyo Aviation and Oliveros-Mora, these are not alleged to have been enriched without cause. Don Goyo Aviation's sale of the aircraft is not without cause, and Don Goyo Aviation satisfied its overdraft balance at the Bank with funds received from Oliveros, alleged to have received them himself from a third party. Accordingly, there was no enrichment for Don Goyo Aviation or correlative loss for the Bank, as the facts are alleged.

Finally, Oliveros-Mora is nowhere alleged to have been enriched. To the extent his enrichment is alleged to be Don Goyo Aviation's, the Court finds that insufficient.

Accordingly, the Court concludes that Count II is properly pled as to AIB Properties. On the other hand, it is insufficiently pled as to Oliveros-Mora, Don Goyo Aviation, El Retiro Group, María Febres-Cordero, and Alexandra Oliveros. The request to dismiss Count II is **GRANTED IN PART, DENIED IN PART**. Count II is **DISMISSED WITH PREJUDICE** as to Oliveros-Mora, Don Goyo Aviation, El Retiro Group, María Febres-Cordero, and Alexandra Oliveros.

### D. Plaintiff's claims for breach of fiduciary duties as against Oliveros and Valencia (Count III).

In Count III, plaintiff alleges a myriad of fiduciary duty violations against Oliveros and Valencia. **ECF No. 154** at ¶¶ 222-24. Oliveros and Holding Activo seek to dismiss this claim on the grounds that it must comply with Rule 9(b)'s heightened pleading standard. **ECF No. 158** at 10-11. Because fraud is insufficiently pled in Count I, then Count III must also fail. Also, on reply, Holding Activo (not Oliveros) alleges that this claim was dismissed as time-barred by the Court's previous Opinion and Order of August 23, 2024. **ECF No. 169** at 5-7.

As to the main argument, the Court's analysis of the well-pleaded factual allegations leaves little space for debate: the Amended Complaint properly pleads allegations that Oliveros and Valencia abused their positions as directors and officers of the Bank in violation of their fiduciary duties to the Bank. And as to the prior dismissal argument, this was raised solely on reply, as Holding Activo candidly concedes. **ECF No. 169** at 6. The Court will not accept a new argument for dismissal raised solely on reply and not in response to anything raised by plaintiff's opposition.

Accordingly, Oliveros and Holding Activo's request to dismiss Count III is **DENIED**.

### E. Plaintiff's request to pierce Holding Activo and Gorlio Enterprises' corporate veils (Count IV).

In Count IV of the Amended Complaint, plaintiff alleges that "Gorlio Enterprises, wholly owned by Defendant Oliveros, was designed to present a false air of credulity and circumvent federal and state regulations concerning extending loans, credit facilities, and overdrafts. It was also used to purchase and sell real estate." **ECF No. 154** at ¶ 227. Plaintiff further alleges that Holding Activo, "the Bank's majority shareholder, controlled by Defendant Oliveros, was utilized as a conduit to further perpetrate the schemes." *Id.*, at ¶ 228. Both entities are alleged to be business conduits or alter egos of Oliveros and that they are actually one and the same. *Id.*, at ¶¶ 229-30. Plaintiff thus alleges that Oliveros "is jointly liable for the amounts and remedies herein claimed." *Id.*, at ¶ 231. Accordingly, plaintiff seeks a declaration that Gorlio Enterprises and Holding Activo are alter egos of Oliveros. *Id.*, at 50 ¶ (e). Oliveros and Holding Activo jointly moved to dismiss Count IV in their motion to dismiss (**ECF No. 158** at 11-12), whereas Gorlio Enterprises did as well in the Related Defendants' motion to dismiss (**ECF No. 161** at 6-7). Together, these defendants propose two arguments: that piercing the corporate veil is not a substantive cause of action but rather an extension of liability (**ECF No. 161** at 7), and that the Amended Complaint contains no factual allegations that would meet the "strong and robust" evidentiary standard applicable to the doctrine under Puerto Rico law (**ECF No. 158** at 12).

To "pierce" the corporate veil, in layman's terms, means to hold the owners liable for the obligations of a corporation, whereas to "reverse-pierce" the corporate veil means to hold the corporation liable for the obligations of its owners. *See Goya Foods, Inc., v. Unanue-Casal*, 982 F. Supp. 103, 108 (D.P.R. 1997). Under Puerto Rico law, "the corporate veil may be pierced . . . where recognizing the corporate form would (1) sanction a fraud; (2) promote an injustice; (3) evade statutory obligations; (4) violate public policy; (5) result in inequity; or (6) cover up fraudulent or criminal activity." *Villa Miramar, L.P. v. Triple-S Propiedad, Inc.*, No. CV 22-1213 (CVR), 2024 WL 5412279, at *3 (D.P.R. Sept. 10, 2024) (quoting *Nieto-Vincenty v. Valledor*, 22 F. Supp. 3d 153, 162 (D.P.R. 2014)). Other factors endemic to the common law are considered: "(1) undercapitalization; (2) nonpayment of dividends; (3) failure to observe corporate formalities; (4) absence of corporate records; (5) commingling of funds; and (6) use of corporate funds for non-corporate purposes." *Id.* (quoting *Nieto-Vincenty*, 22 F. Supp. 3d at 162). To pierce the corporate veil, the proponent must point to "strong and robust" evidence that the corporate form should be disregarded, *i.e.*, of the above-mentioned factors. *Villa Miramar, L.P.*, 2024 WL 5412279, at *4 (citing *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980); *De Castro v. Sanifill, Inc.*, 198 F.3d 282, 284 (1st Cir. 1999)).

The Court must address the Related Defendants' contention that it is not proper to maintain Count IV as a stand-alone cause of action. The Court first notes that there is out-of-circuit support, namely from the Third and Seventh Circuits, for the Related Defendants'

contention that piercing the corporate veil is proper only after liability of the owner has been established. *See* **ECF No. 161** at 7 (citing *QVC, Inc., v. OurHouseWorks, LLC*, 649 F. App'x 223, 225 (3rd Cir. 2016); *Golin v. Neptune Mgmt. Corp.*, 704 F. App'x 591, 594 (7th Cir. 2017); *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004); *Bd. of Trustees v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000)). A noted treatise on corporations also notes that, under common law, a judgment against the corporation whose veil is sought to be pierced is necessary in order to invoke the doctrine. *See* 1 Fletcher Cyc. Corp. § 41.28.70. And at least two courts in this district have recently held something similar. *See KetoneAid, Inc. v. Suspend Aging L.L.C.*, No. CV 25-1234 (GMM), 2025 WL 3171206, at *2 n.1 (D.P.R. Nov. 13, 2025); *Kalkey v. Euromodas, Inc.*, 706 F. Supp. 3d 305, 326 (D.P.R. 2023).[17]

On the other hand, corporate veil-piercing is not exclusively analyzed as an issue of liability. For example, in *Muñiz v. Walgreen Co.*, a court in this district considered the doctrine to determine whether a subsidiary's contacts in Puerto Rico could be attributed to its parent

---

[17] The conclusion in *KetoneAid, Inc.* is premised on a statement by the Supreme Court in *Peacock v. Thomas*, 516, U.S. 349, 354 (1996). That statement, however, was cabined to whether such a stand-alone claim could be maintained under ERISA to support federal question jurisdiction. And the district court's conclusion in *Kalkey* rests in part on the application of Article 12.04(b) of the General Corporations Act of Puerto Rico, P.R. Laws Ann. t. 14, § 3784, which provides, among other things, that a corporation's officers, directors or stockholders may be made liable "by the provisions of this subtitle" (*i.e.,* the General Corporations Act) to answer for the debts of the corporation. P.R. Laws Ann. t. 14, § 3784(a). But that provision refers to specific situations provided for by the statute, *see* e.g., *id.* at §§ 3567 (director or officer liability for publishing false statements or reports), 3588 (shareholder or subscriber liability for partially paid shares), 3602 (director's liability for illegal payment of dividends or purchase or redemption of shares), 3712 (stockholder's liability dissolved corporation)—not to situations governed by the doctrine of corporate veil-piercing.

**Civil No. 23-1310 (ADC)**                                                    **Page 40**

company for purposes of personal jurisdiction. *Muñiz v. Walgreen Co.*, 46 F. Supp. 3d 117, 124 (D.P.R. 2014). Also, in *Villa Miramar, L.P.*, another court in this district squarely refused to dismiss the claims against the parent company when faced with a similar argument. 2024 WL 5412279, at *5.[18]

In the balance, the Court considers Oliveros and Holding Activo to have the better argument in law. A stand-alone cause of action to extend Gorlio Enterprises and Holding Activo's potential liability to Oliveros is premature, and may well be unnecessary. There are allegations of misuse of the corporate form woven all across the Amended Complaint, not only as to Gorlio Enterprises and Holding Activo but as to other corporate defendants. But Gorlio Enterprises and Holding Activo are also alleged to have been active participants in the fraudulent schemes, and they are being called to answer directly for their possible liability in Counts I and II. Accordingly, under the circumstances, Count IV of the Amended Complaint should not stand as a stand-alone request for relief.

The request to dismiss Count IV of the Amended Complaint is **GRANTED**. Count IV is **DISMISSED WITHOUT PREJUDICE**.

---

[18] Plaintiff also cites to then Judge Gelpí's Opinion & Order in *Mercado-Salinas v. Bart Enterprises Intern., Ltd.*, 800 F. Supp. 2d 354, 361 (D.P.R. 2011). However, the Court's decision to maintain the veil-piercing claim there rested on the application of Florida law. The only applicable law referred to in the Amended Complaint and the motion to dismiss briefing is Puerto Rico law.

## IV.    Conclusion

At the beginning of this Opinion and Order, the Court included Sir Walter Scott's oft-quoted lines on the complex nature of deceit to allude to the tangle of loans and transactions allegedly used by the defendants to perpetrate their fraud upon TBB. However, the same sentiment may also be understood to apply, indirectly, to plaintiff's tortuous attempt at making out its claims in compliance with Rules 8(a) and 9(b).

The Court's decision to maintain the various fraud-based claims is based on the understanding that Rule 9(b) acts in harmony with Rule 8(a)'s basic notice requirement. "The major purpose of Rule 9 is to give adequate notice of the plaintiff's claim of fraud." *New England Data Servs., Inc. v. Becher*, 829 F.2d at 288. Having canvassed the allegations, the Court finds that beneath the tangle of characters and corporations, the tale woven in the Amended Complaint provides sufficient and specific indicia that fraud, unjust enrichment, and breaches of fiduciary duties have occurred, but only as to certain schemes and defendants.[19]

For the above-stated reasons, the Court **GRANTS IN PART, DENIES IN PART** the motions to dismiss at **ECF Nos. 158** and **161**. The following claims are **DISMISSED**:

---

[19] Limping through the finish line in a Rule 9(b) and 12(b)(6) challenge is no feather on anyone's cap, and plaintiff has substantial work ahead of it to prove its allegations.

- **Count I,** as to Consultora Baru, AIB Properties, El Retiro Group, María Febres-Cordero, Alexandra Oliveros, Oliveros-Mora and Don Goyo Aviation, **WITH PREJUDICE**.

- **Count II**, as to El Retiro Group, María Febres-Cordero, and Alexandra Oliveros, Oliveros-Mora, and Don Goyo Aviation, **WITH PREJUDICE**.

- **Count IV**, as to Gorlio Enterprises and Holding Activo, **WITHOUT PREJUDICE**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 31st day of March, 2026.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**